# EXHIBIT B



ĊENTRU DWAR L-ARBITRAĠĠ TA' MALTA

MALTA ARBITRATION CENTRE

## Registration of
## an International Arbitral Award

(Articles 61(3) and 72 of the Arbitration Act)

**This is to certify that the Arbitration Award delivered by the arbitral tribunal on the 29th October 2020 in the hereunder mentioned names has been registered in accordance with the provisions of the Arbitration Act [Chp 387 of the Laws of Malta]**

**Names of Parties :**

*SinSin Europe Solar Asset Limited Partnership et*

**and**

*SPI China (HK) Limited et*

**Centre's Reference No. :** **ARB I. 5532/2018**

**Date of registration of the award :** **2nd May 2022**

**Date of issue of the Certificate of registration :** **22nd June 2022**

**Signature of Registrar or other authorized officer on her behalf :** [signature]

In the Matter of an Arbitration Ref No I 5532/2018

Between

SinSin Europe Solar Asset Limited Partnership and SinSin Solar Capital Limited Partnership

(Claimants)

And

SPI China (HK) Limited and SPI Energy Co. Ltd

(Respondents)

# FINAL AWARD

Members of the Tribunal

Arthur Galea Salomone, Presiding Arbitrator

Louis Cassar Pullicino

Louis de Gabriele

29 October 2020.





The undersigned Arbitrators, having been appointed pursuant to Clause 16.2 of the Share Sale and Purchase Agreement dated 6th September 2014 ("SPA" or the Share Sale and Purchase Agreement")[1], having heard witness and expert testimony, having received documentary evidence and written submissions of Claimants and Respondents, having duly reviewed and considered all oral testimony and documentary evidence, as well as the Parties' submissions and arguments, do hereby FIND and AWARD as follows.

## *I THE PARTIES*

1. The claimants in these arbitration proceedings are:

SinSin Europe Solar Asset Limited Partnership of Suite 716, 10, Market Street, Grand Cayman KY1-9006, Cayman Islands (the "First Claimant") and SinSin Solar Capital Limited Partnership of Suite 716, 10, Market Street, Grand Cayman KY1-9006, Cayman Islands (the "Second Claimant") (both jointly referred to as the "Claimants").

The legal representatives of the Claimants formally notified to the Arbitral Tribunal are Dr. Michael Psaila, Dr. Frank Testa and Dr. Maria Lisa Buttigieg of MAMO TCV Advocates of Palazzo Pietro Stiges, 103, Strait, Street, Valletta, Malta.

The Respondents in these arbitration proceedings are:

SPI China (HK) Limited of RM1702, 17/F, Tung Hip Commercial Building, 248 Des Voeux Rd Central, Hong Kong (the "First Respondent") and and SPI Energy Co. Ltd of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "Second Respondent") (both jointly referred to as the "Respondents").

The legal representatives of the Respondents formally notified to the Arbitral Tribunal is Dr. Nicolai Falzon of Fenech & Fenech Advocates of 198, Old Bakery Street, Valletta, Malta. By means of letter dated 4th April 2019, the Malta Arbitration Centre (The "Centre") was notified that the following were added as co-counsel for the Respondents; Dr. Vangelis Politis of Politis and Partners of 14, Solonos St. GR 10673 Athens and Dr. Thomas Bugeja of Fenech & Fenech Advocates of 198, Old Bakery Street, Valletta, Malta.

## *II PROCEDURAL HISTORY*

2. Claimants filed the Notice of Arbitration and a Statement of Claim at the Malta Arbitration Centre on the 27th September 2018. The Notice of Arbitration and Statement of Claim were duly served on the Respondents.

[1] Document NVF 1

Pursuant to Clause 16.2 of the Share Sale and Purchase Agreement, the Claimants appointed Dr. Louis Cassar Pullicino as arbitrator, the Respondents appointed Dr. Louis de Gabriele as arbitrator and the said arbitrators appointed Dr. Arthur Galea Salomone as the presiding arbitrator.

A preliminary meeting was held between the three arbitrators, the legal counsel for Claimants and legal counsel for Respondents on the 22nd October 2018. The preliminary meeting was followed by the issuance of Procedural Order Number 1 dated 8th November 2018 laying down, inter alia, the procedural rules and the proposed arbitration schedule as discussed and agreed between the Parties' legal counsel at the preliminary meeting.

The Respondents filed the Statement of Defence at the Malta Arbitration Centre on the 23rd November 2018. The Statement of Defence was duly served on Claimants.

The Arbitral Tribunal issued further Procedural Orders as follows:

Procedural Order Number 2 dated 20th December 2018 in terms of which it was decided that following agreement between the parties testimony and/or evidence, documentary or otherwise, submitted in SPI China (HK) Limited and SPI Energy Co. Ltd versus SinSin Europe Solar Asset Limited Partnership and SinSin Solar Capital Limited Partnership (I 5320/2018) shall for all intents and purposes of law form part of the evidence of these arbitration proceedings;

Procedural Order Number 3 dated 25th January 2019 extending the deadline for filing of evidence by Affidavit by Claimants to the 18th February 2019;

Procedural Order Number 4 dated 4th March 2019 extending deadline for Respondents to file note specifying what, if any, additional evidence they require to produce to Friday 8th march 2019;

Procedural Order Number 5 dated 21st March 2019 dealing, inter alia, with the purpose of the sittings of the 11th and 12th April 2019 respectively and the postponement of the cross examination in respect of the Accuracy Report;

Procedural Order Number 6 dated 4th July 2019 rejecting, inter alia, the striking out or redaction of the Loumakis Report;

Procedural Order Number 7 dated 22nd July 2019 establishing the 30th November 2019 as the deadline for filing of written submissions by Claimants and the 29th February 2020 as the deadline for filing of written submissions by Respondents.

Procedural Order Number 8 dated 18th September 2019 Procedural Order Number 8, dated 18th September 2019 striking Doc XDP 44 from the record of the Proceedings and ordering its replacement by a corrected translation provided by Mr. Liu Ling of BARE Translation Co Ltd in which paragraph 128 of the said translation was amended to read;





"Before the execution of the Supplementary Agreement, SinSin had told me that they would need to apply to a bank to provide project financing and that SinSin did not have the means to secure the approval by such bank";

Procedural Order Number 9 dated 9th September 2020 requesting both Claimants and Respondents to submit a Schedule of Costs.

## *III THE GOVERNING LAW AND THE ARBITRATION CLAUSE.*

3. In terms of Clause 16.1 of the Share Sale and Purchase Agreement, the "Agreement shall be governed by and construed in accordance with Maltese law."

In terms of Clause 16.2 of the Share Sale and Purchase Agreement it is provided that "Any question or difference which may arise concerning the construction, meaning or effect of this Agreement or concerning the rights, duties, obligations and liabilities of parties hereunder, or any other matter arising out of or in connection with this Agreement, shall be referred to and settled by arbitration. The venue of such arbitration shall be Malta. the number of arbitrators shall be three (3). The appointing authority shall be the Malta Arbitration Centre save as provided below. Each party to the arbitration proceedings shall appoint one (1) arbitrator. If within fifteen (15) days after receipt of the claimant's notification of the appointment of an arbitrator the respondent has not notified the claimant of the name of the arbitrator he appoints, the second arbitrator shall be appointed by the Malta Arbitration Centre. The two (2) arbitrators this appointed shall choose the third arbitrator who will act as the presiding arbitrator of the tribunal. If within fifteen (15) days after the appointment of the second arbitrator, the two arbitrators have no agreed upon the choice of the presiding arbitrator, then, at the request of either Party to the arbitration proceedings, the presiding arbitrator shall be appointed by the Malta Arbitration Centre. The language of the arbitration shall be English. The award of the arbitrators shall be final and binding upon the Parties. Any reference under the sub-clause 16.2 shall be deemed to be a reference to arbitration within the meaning of Part IV of the Arbitration Act (Chapter 387 of the Laws of Malta).

## *IV STATEMENT OF CLAIM.*

4. The "Nature of the Claim" as stated by Claimants in the Notice of Arbitration and in the Statement of Claim is a claim for payment of an amount allegedly owed to the Claimants by the Respondents pursuant to the provisions of the SPA and the Supplementary Agreement and also a claim for damages arising from the respondents' failure to honour their contractual obligations.





*V CLAIMANTS' STATEMENT OF FACTS.*

5. The Claimants' Statement of Facts in support of the claim, states that "Claimants are special purpose investment vehicles owned by Xingxing Ductile Iron Pipes Co. Ltd ("Xinxing Pipes"), to invest in the area of solar power.

6. Xinxing Pipes is a public company listed on the Shenzen Stock Exchange in the People's Republic of China ("PRC"). It is a leading manufacturing company in the PRC for ductile iron pipes.

7. SinSin Renewable Investment Limited ("SinSin Renewable") is a limited liability company registered in Malta. It is the project company established by Claimants for the purpose of investing and developing solar power farms in Greece. The 1st Claimant SinSin Europe owns 99,999 ordinary shares of SinSin Renewable and the 2nd Claimant, SinSin Solar, owns 1 ordinary share of SinSin Renewable.

8. Sin Sin Renewable directly or indirectly hold four Greek subsidiaries, namely Orion Energy SA, Astraios Energy SA, Jasper Pv Makedonia energy SA and Photovoltaica Parka Veroia I SA (collectively the "SPV's). The ours SPV's operate eight solar power farms in Greece, with a total power output of 26.75 MW (the "Greek PV Farms").

9. The 2nd Respondent, SPI Energy Co., Ltd ("SPI Energy"), is the successor of Solar Power Inc, which originally entered into the Share Sale and Purchase Agreement together with the 1st Respondent and the Claimants on the 6th September 2014.

10. The 1st Respondent, SPI China (HK) Limited (SPI HK") was originally a subsidiary of Solar Power Inc. After Solar Power Inc was converted and taken over by SPI Energy, SPI HK became a subsidiary of SPI Energy.

11. SPI Energy and its subsidiaries (collectively referred to as the "SPI Energy Group) are involved in the business of providing photovoltaic solutions for businesses, developing, owning and operating solar PV projects, providing EPC contractor services to PV farm projects and internet commerce and investment products.

12. On the 6th September 2014, the Claimants ("Vendors") and the respondents ("Purchasers") entered into the SPA for the sale and purchase of the shares in SinSin Renewable.

13. Clause 2.1 of the SPA provides that the total consideration payable by both Purchasers to the Vendors for the purchase of the shares in SInSIn Renewable, shall be an amount equivalent to seventy million, six hundred sixty thousand Euro (€70,660,000) ("Sale Amount"), payable to the Vendors in accordance with their shareholding portions to be acquired and as set out below:

(a) the First Respondent undertakes to pay an amount equivalent to 70% of the Sale Amount to the 1st Claimant, payable in cash; and

(b) Solar Power Inc undertakes to pay an equivalent to 30% of the Sale Amount to the vendors, up to their respective shareholdings in SinSin Renewable Investment Limited, payable by way of its own stock in favour of the 1st Claimant.

14. Clause 2.2 of the SPA provides that the Purchasers shall, by no later than 30 September 2014, transfer to Vendors a certain amount of the shares of the common stock of Solar Power Inc in the value of 30% of the Sale Amount. On or around November 2014, 38,225,800 shares in Solar Power Inc, which were then trading at USD 0.717 per share on the OTCBB, were transferred to the Vendors. 23.

15. Clause 2.2.1 of the SPA provides that the remaining 70% of the Sale Amount shall be paid in cash over a period of slightly less than 2 years, according to the following payment schedule:

a) 5% of the Sale Amount by no later than 30 October 2014;
b) 5% of the Sale Amount by no later than 30 December 2014;
c) 30% of the Sale Amount by no later than 30 November 2015; and
d) 30% of the Sale Amount by no later than 20 June 2016.

16. Clause 2.2.2 of the SPA provides that until the Purchasers have paid in full the Sale Amount, all equity held directly or indirectly by the Purchasers in the SPVs should be pledged to the Vendors.

17. Pursuant to this, four Share Pledge Agreements were executed on the same date as the SPA (6 September 2014) in order for all the SPVs' shares to be pledged.

18. As mentioned above, the remaining 70% of the Sale Amount was agreed to be paid in four instalments. The Purchasers paid the first and second instalment. The third instalment of payment was due on 30 November 2015. In view of the fact that until March 2016, the Purchasers had not yet paid the third instalment of payment, the Vendors, following a request made by the Purchasers, entered into a Supplementary Agreement on 15 March 2016.

19. Clause I of the Supplementary Agreement provides that within ten days from the execution of the Supplementary Agreement, the Purchasers shall pay EUR 2,000,000 to the Vendors, and further pay an amount equal to the 2015 net profit of the 4 SPVs by 15 April 2016.

20. Clause 2 of the Supplementary Agreement provides that any unpaid amount of the Sale Amount shall accrue interest at an annual interest rate of 6%.

21. Clause 3 of the Supplementary Agreement provides among other things, that, all income from the sale of electricity shall be used to repay the outstanding Sale Amount.

22. Furthermore, the Purchasers, in Clause 5 of the Supplementary Agreement undertook the obligation to fully mortgage the Greek PV Farms (which have a total output of 26.57 MW) operated by the SPV's in favour of the Vendors as security for the payment of the outstanding balance of the Sale Amount by 30th November 2017. These mortgages were to be in addition to pledges take in terms of the Share Pledge Agreements.





23. Despite the extension of time to pay the remaining EUR 42,396,000 as provided under the Supplementary Agreement, the Purchasers only paid a further EUR 4.34 million to the Vendors after the execution of the Supplementary Agreement. The Purchasers are clearly in breach of the SPA and the Supplementary Agreement. Up to today, EUR 38,054 000 of the Sale Amount together with interest is still outstanding.

24. Due to the Purchasers' failure to make payment of the remaining 60% of the Sale Amount, an Event of Default under the Share Pledge Agreements had occurred and the Vendors proceeded to enforce their rights under the Share Pledge Agreements. However, the Purchasers and the SPVs refused and failed to adhere to the terms of the Share Pledge Agreements. The Vendors therefore commenced lawsuits in the Greek courts against the four SPVs on 25 January 2018 and 14 March 2018, seeking to obtain control ofthe SPVs and auction the pledged shares pursuant to the Share Pledge Agreements (the "Greek Suits").

25. It was only after the Vendors sought to enforce their rights under the Share Pledge Agreements, that the Purchasers alleged for the first time in November 2017 that the Vendors were in breach of the SPA and it was on the basis of such breach that the Purchasers did not affect full payment of the Sale Amount under the SPA. This breach alleged by the Purchasers, is clearly an excuse to avoid their clearly undertaken contractual obligations. Indeed, in the Supplementary Agreement the Purchasers clearly and unequivocally acknowledged their debt, agreed to pay the outstanding Sale Amount and fully pledged the shares in the SPVs that owned the Greek PV Farms to secure the full payment of the outstanding Sale Amount.

26. Moreover, as recently as December 2016, the Purchasers had agreed to pledge their shares in SinSin Renewable Investment Limited in order to further secure the repayment of the outstanding Sale Amount and had gone to the extent of sending an executed pledge agreement to the Vendors on 24 December 2016. A certified translation of the said email is attached to the Statement of Claim and marked Doc. "G". In particular, the Purchasers clearly acknowledged in the recitals of this pledge agreement their obligation to pay the outstanding Sale Amount. However, the Vendors did not execute this pledge agreement as they did not agree with the terms of the release of the pledge.

27. After the Vendors initiated the Greek Suits to enforce their interest under the Share Pledge Agreements, the Purchasers falsely claimed at a hearing on 2 February 2018 that they had already filed an arbitration under the SPA to dispute the debt. However, it was not until 20 March 2018 that the Purchasers filed arbitration proceedings before the Malta Arbitration Centre, claiming that the Vendors breached the SPA, which Arbitration proceedings bear the reference number I.5320/2018.

28. It is clear from the above that the sole intention of the Purchasers in commencing the above-mentioned arbitration proceedings and the ancillary intervention in Greece is to attempt to avoid having to pay the outstanding Sale Amount owing to the Vendors and to block the enforcement of the Share Pledge Agreements.

29. The Purchasers have clearly breached the SPA and the Supplementary Agreement by failing to pay the remaining EUR 38,054,000 of the Sale Amount, and it is clear that the Purchasers only instituted the arbitration proceedings in order to seek to mask their defaults under the said agreements.





30. Furthermore, the first Claimant had granted on loan the amount of EUR 64,989,000 to SinSin Renewable by means of three agreements - two of which are dated 10 June 2013 and the other is dated 10 September 2013. In order to provide such a loan to SinSin Renewable, the second Claimant had to take a loan from China Minsheng Banking Corporation Limited, which was subsequently refinanced by Industrial and Commercial Bank of China (Euro) S.A. (Amsterdam Branch and Bank of China, Paris Branch.

31. The said loan granted by the first Claimant to SinSin Renewable was taken into consideration in the Sale Amount as provided for in terms of Clause 2.4 of the SPA. Had the Respondents fully adhered to the terms and conditions of both the SPA and Supplementary Agreement and paid the Sale Amount in accordance with such terms as contained in the said agreements, the said loan granted to SinSin Renewable would have been paid in full and final settlement and the first Claimant would have then been able to repay the loans it was granted by the second Claimant, which in turn would have been able to repay the facilities originally taken from China Minsheng Banking Corporation as subsequently refinanced and which are now due to Bank of China, Paris Branch earlier than the term agreed to with the said Bank. However, as a result of the Respondents' breach of the SPA and the Supplementary Agreement, the second Claimant has had to:

(a) delay its loan repayments to their existing lender/creditor, i.e. Bank of China, Paris Branch;
(b) incur further costs and interest; and
(c) enter into new loan agreements with Bank of China in order to extend the relevant facilities at less favourable interest rates and conditions.

32. In view of such serious breaches and great monetary losses that the Claimants are suffering because of such breaches, the Claimants had no other option other than to institute these proceedings against both respondents in accordance with clause 16.2 of the SPA.

33. The Claimants are claiming that the Respondents are in breach of the SPA and Supplementary Agreement and are therefore requesting the Arbitral Tribunal to order the Respondents to pay hem or to any one of them (as applicable):

i. the amount of EUR 38,054,000 plus interests, which amount represents the outstanding amount due by the Respondents to the Claimants under the SPA and the Supplemental Agreement; and

ii. damages consisting of interests accruing over the loans granted by several Banks to the second Claimant and any bank charges, expenses and fees incurred in relation to the obtaining of such loans, which interests, bank charges, expenses and fees have only been incurred as a result of the Respondents' failure to pay the amounts due in terms of the SPA and the Supplemental Agreements;

iii. any other damages suffered as a result of the Respondents' breach of the SPA.

The amount of damages for points ii and iii are to be quantified by the Arbitral Tribunal and if necessary with the assistance of the appropriate experts as appointed by the said tribunal for such purpose."





## *VI THE RELIEF / REMEDY SOUGHT BY CLAIMANTS.*

34. The relief/remedies sought by Claimants are as follows:

i- A declaration that the Respondents are in breach of their contractual obligations under the SPA, the Supplementary Agreement and/or any ancillary agreement thereto;

ii- A declaration that the Respondents are jointly and severally liable towards both Claimants for the payment of the outstanding balance of the Sale Amount of EUR 38,054,000 together with interests;

iii- A final award ordering the Respondents, jointly and severally between them, to pay the Claimants the outstanding balance of the Sale Amount of EUR 38,054,000;

iv- A final award ordering the Respondents, jointly and severally between them, to pay interest at the rate of six per cent on the outstanding balance of the Sale Amount of EUR 38,054,000, accruing from the date that such amount was to be paid until the date of eventual payment;

v- A declaration that over and above the outstanding balance of the Sale Amount of EUR 38,054,000 and interest accruing thereon, the Respondents are also jointly and severally liable for the payment of all damages suffered by the Claimants (or any of them) as a consequence of the Respondents' breach of their contractual obligations under the SPA, the Supplementary Agreement and/or any other ancillary agreement thereto;

vi- The liquidation/quantification of the damages suffered by the Claimants (or any of them) in relation to the request in (v) above, if need be with the assistance of experts appointed by the Arbitral Tribunal;

vii- A final award ordering the Respondents (or any of them) to pay the Claimants (or any of them) the amounts of damages liquidated/quantified by the Arbitral Tribunal under request (vi);

viii- A final award ordering the Respondents (or any of them) to pay interests over the amount of damages liquidated/quantified by the Arbitral Tribunal under request (vi) at the highest rate permitted under Maltese law, which interests shall accrue as from the date of the award until the date of eventual payment; and

ix- A final award ordering the Respondents, jointly and severally between them, to pay all the costs of the Arbitration proceedings, including filing fees, arbitration fees and fees due to the Claimants' counsel in accordance with the applicable rules.





## *VII STATEMENT OF DEFENCE.*

35. Respondents deny that they are in breach of the SPA and/or the Supplementary Agreement;

i- Respondents deny that they are indebted towards the Claimants for amounts outstanding Under the SPA and/or the Supplementary Agreement;

ii- Respondents deny that they are responsible for any damages caused to the Claimants or that they are indebted to pay any damages or losses to the Claimants;

iii- Respondents deny that Claimants are entitled to any relief whatsoever in connection with the claims being made by them in this arbitration including in relation to costs.

iv- Respondents reserve all rights to bring further defences as may be required and reserve all their rights against the Claimants in relation to the claims already submitted by them to arbitration in case number I 5320/2018 pending before this Tribunal.

## *VIII RESPONDENTS' STATEMENT OF FACTS.*

36. The Respondents declare that this case is closely related to and is being presided over by the same arbitral tribunal as case number I/5320/2018 filed by Respondents against Claimants. Indeed, this case is effectively a counterclaim and following the preliminary sitting held on the 22nd October 2018, it was agreed that these proceedings will be heard concurrently with the aforesaid case number I 5320/2018.

37. Accordingly, Respondents make reference to the statement of facts submitted by them with the Statement of Claim in case number I 5320/208 (as subsequently amended and clarified) and reiterate the said facts for the purposes of this Statement of Defence.

38. In addition, the Respondents declare as follows:

The Respondents contest all allegations made against them with regard to the purported default of their payment obligations under the Share Purchase Agreement (SPA) and the Supplementary Agreement. They also refute all allegations and claims relating to the damages allegedly suffered by the Claimants as set out in their Statement of Claim;

39. The Respondents reiterate that no payments are due by them pursuant to the SPA and the Supplementary Agreement due to the material breaches by the Claimants to fulfil the contractual obligations assumed by them thereunder, as set out in detail in the Statement of Claim filed by Respondents (SPI) in case number I53201 20I8 and as will be further substantiated by virtue of the evidence already submitted and yet to be submitted with regard to the said material breaches;





40. The Claimants in this case are fully aware that the Supplementary Agreement (drafted as it was by their own legal counsel) was discussed and agreed in the context of the Respondent group's application for listing on NASDAQ at that time and in the context of which certain debt restructuring was requested at the behest of the auditors of the Respondents. That Agreement was also discussed, signed and agreed at a time when the Claimants (SinSin) were still in time to fulfil their contractual obligations under the SPA. It is for these and other justifiable reasons that no reference was made therein to the contractual breaches of the Claimants under the SPA;

41. The Supplementary Agreement was not intended to and indeed does not in any way constitute a waiver of the Respondents' rights to ensure that the Claimants abide by their contractual obligations under the SPA. Claimant's position with regard to the Supplementary Agreement is opportunistic, to say the least;

42. Furthermore, and without prejudice, the plea of non adimplenti contractus is relevant also with regard to the Supplementary Agreement itself because Claimants are also in breach of this Agreement itself. In terms of clause 4 of the Supplementary Agreement the Claimants undertook to offer the Respondents support through their limited partner Xingxing Ductile Iron Pipes Co., Ltd for the purposes of raising finance for the 2657MW photovoltaic power stations in Greece also with a view to facilitating the payment of the balance then due on the purchase price of the shares. Yet again, the Claimants ignored this undertaking in the most absolute manner, in flagrant breach of the Supplementary Agreement and, more particularly of a provision which was intended to facilitate the payments claimed by them in this case;

43. Furthermore, and without prejudice, the Respondents make the following more specific observations with regard to statements of fact made by the Claimants in their Statement of Claim:

44. With reference to paragraph 22 of the Statement of Claim and the correspondence submitted by the Claimants with regard to the discussions relating to the pledge of shares in SinSin Renewable Investments Limited (the Maltese holding company), it ought to be noted that these discussions were held in December 2016 at a time when the Claimants were still in time to fulfil their obligations under clause 2.3.1 of the SPA and at a time when the Respondents were still harbouring the impression (wrongly, as it eventually turned out) that the Claimants were acting in good faith and would eventually award the 360MW EPC contracts to the Respondents as per the SPA. Again, such discussions relating to security for the payment obligations under the SPA can in no way be interpreted as a waiver of the Respondents' rights under the agreement nor do they entitle the Claimants to enforce purported rights obtained in bad faith;





45. With reference to paragraph 23 of the Statement of Claim, it is absolutely untrue that the Respondents made a false claim in the Greek court proceedings with regard to the time of commencement of the arbitration proceedings in Malta. First of all, and for sake of correctness, the date of commencement of arbitration proceedings in case I. 5320/2018 is 12 March 2018 and not 20 March 2018 as erroneously indicated by the Claimants. Secondly, what was stated in the Greek proceedings was that at the time, namely February 2018, the Respondents had "taken steps" towards the commencement of arbitration proceedings and indeed, by this time, Respondents had already engaged legal counsel in Malta for this purpose;

46. With reference to the statement in paragraph 24 of the Statement of Claim that the intention of the Respondents in filing the arbitration proceedings in case I.5320/2018 is the avoidance of its payment obligations, the opposite is true. Unlike the Claimants, the Respondents entered into the SPA in good faith and in the hope of achieving a longstanding relationship with the SinSin Group so much so that it even invited SinSin to become a shareholder in the SPI Group and thereby to participate with it in the success it intended to make of the business relationship, starting with the award of 360MW EPC contracts, no less. It turned out, however, that the only motivation that SinSin had in entering the SPA was to get rid of a troubled asset without incurring a loss. It achieved that goal clandestinely and abusively by assuming contractual obligations that it never intended to fulfil but that it knew would entice SPI to take the proverbial bait. Claimant's actions have caused serious losses to Respondents, losses which they hope to recover through the arbitration proceedings filed by them. Meanwhile, Claimants have no right to enforce their claims for payment against Respondents because they are in breach of their contractual obligations for all the reasons stated above and further discussed in the Statement of Claim filed in case I.532012018;

47. Finally, and with reference to Claimants' additional claim for damages as set out in paragraphs 26-27 of their Statement of Claim these additional claims are completely unfounded and untenable. Apart from the defences and grounds set out above and without prejudice to those defences and grounds, Respondents can never be held liable for the finance risks assumed by the Claimants and for losses that could never have been foreseen by them. While the SPA makes reference to the shareholders' loan that existed prior to completion of the transfer of shares (in clause 2.4 of the SPA), it makes absolutely no reference to the fact that that loan was financed through banks or otherwise and, in any event, the purchase price agreed in the SPA was net of that loan.

48. Respondents deny that Claimants are entitled to any relief whatsoever in connection with the claims being made by them in this arbitration including in relation to costs.

49. Respondents reserve all rights to bring further defences as may be required and reserve all their rights against the Claimants in relation to the claims already submitted by them to arbitration in case number I 5320/2018 pending before this Tribunal.





## *IX RELIEF REMEDY/SOUGHT BY RESPONDENTS.*

50. The relief or remedy sought:

i. An order that all Claimants' claims be dismissed;

ii. An order that all costs and fees relating to these arbitration proceedings be borne by the Claimants (including but not limited to registration and administrative costs, arbiters' fees', legal fees and other expenses. legal costs, arbitration related fees, interests and expenses): and

iii. An order including any other relief for the benefit of the Respondents as the Tribunal may deem fit in the circumstances.

## *X CLAIMANTS' LIST OF WITNESSES.*

51. In view of Procedural Order Number 2 dated 20th December 2018, in terms of which it was decided that that following agreement between the parties, testimony and/or evidence, documentary or otherwise, submitted in SPI China (HK) Limited and SPI Energy Co. Ltd versus SinSin Europe Solar Asset Limited Partnership and SinSin Solar Capital Limited Partnership (I 5320/2018) shall for all intents and purposes of law form part of the evidence of these arbitration proceedings, the Arbitrators are reproducing hereunder the list of witnesses mentioned in the said proceedings. In order not to confuse matters the Tribunal has for the purpose of reproducing the list of witnesses retained the terms "Claimants" and "Respondents" as listed in arbitral proceedings I 5320/2018, without inverting the terms. Accordingly solely for the purposes of Section X and XI of this Award, the terms Claimants is referring to SPI China (HK) Limited of RM1702, 17/F, Tung Hip Commercial Building, 248 Des Voeux Rd Central, Hong Kong and SPI Energy Co. Ltd of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands and the term Respondents is referring to SinSin Europe Solar Asset Limited Partnership of Suite 716, 10, Market Street, Grand Cayman KY1-9006, Cayman Islands and SinSin Solar Capital Limited Partnership of Suite 716, 10, Market Street, Grand Cayman KY1-9006, Cayman Islands.

52. By means of a letter dated 20th July 2018 addressed to the Arbitral Tribunal, counsel to Claimants provided a list of witnesses together with an indication of the scope of the respective testimonies. Claimants' list of witnesses was as follows: Mr. Xiaofeng Peng, Mr. Hoong Kheong Cheong, Mr. Mario Zen, Mr. Min Xihao, Mr. Mark Ikauniks, Mr. Roger Yu, Mr. Steve Zha, Mr. Vassili Orfanos, Mr. Stelios Loumakis, Mr. Tairan Guo, Mr. Jamie Zhang and Mr. Evangelos Politis.

53. On the 29th September 2018, Claimants submitted witness statements by Mr. Xiaofeng Peng (who provided a further witness statement on the 31st May 2019), Mr. Hoong Kheong Cheong, Mr. Mario Zen, Mr. Min Xihao, Mr. Mark Ikauniks, Mr. Roger Yu, Mr. Vassili Orfanos, Mr. Stelios Loumakis (who provided a further witness statement on the 31st May 2019), Mr. Jamie Zhang and Mr. Evangelos Politis. By way of letter dated 29th September

2018 Claimants renounced to the testimony of Mr. Mark Ikauniks, Mr. Steve, Zha and Mr. Tairan Guo.

54. On the 29th November 2018, Mr. Xiaofeng Peng was cross-examined by Respondents' counsel, Mr. Mr. Hoong Kheong Cheong was cross-examined by Respondents' counsel and re-examined by Claimants' counsel and Mr. Jamie Zhang was cross-examined by Respondents' legal counsel.

55. On the 30th November 2018, Mr. Roger Yu was cross-examined by Respondents' counsel, Mr. Vassilios Orfanos was cross-examined by Respondents' counsel, re-examined by Claimants' counsel and further cross-examined and re-examined, Mr. Mario Zen was cross-examined Respondents' counsel and re-examined Claimants' counsel, Mr. Stelios Loumakis was cross-examined by Respondents' counsel and Mr. Min Xiahou was cross-examined by Respondents' counsel.

## *XI RESPONDENTS' LIST OF WITNESSES.*

56. By means of letter dated the 8th November 2018, addressed to the Arbitral Tribunal, counsel to Respondents provided a list of witnesses together with an indication of the scope of the respective testimonies. Respondents' list of witnesses was as follows: Mr. Zeng Yaogan, Mr. Pan Guihao, Ms Yang Fan, Mr. Gus Papamichalopoulos, Mr Evi Dimitropoulou, Mr. Apostolos Kourtis, Mr. Charalampos Karampelis, Bank representative from China Merchant's Bank, Expert in the PV Energy Industry (to be determined).

57. Respondents submitted witness statements by Mr. Charalampos Karampelis, Mr. Tian Dan, Yang Yisheng, Ye Dejun, Zen Yaogan, Eduard Saura and Laura Cozar.

58. On the 11th April 2019, Mr. Zeng Yaogan was cross-examined by Claimants' counsel. On the 11th and 12 April 2019, Mr. Roger Dejun Ye was cross-examined by Claimants' counsel. On the 12th April 2019, Mr. Yang Yisheng was cross-examined by Claimants' counsel. Ms. Tian Dan was cross-examined by counsel to Claimants and was further examined by counsel to Claimants and Respondents respectively.

59. On the 17th July 2019 Mr. Zeng Yaogan was re-examined by Respondents and further cross-examination by Claimants. Mr. Roger Ye was re-examined by Respondents and further cross-examined by Claimants.

60. On the 18th July 2019 Mr. Xiaofeng Peng was cross examined by Respondents.

61. On the 19th July 2019 Mr. Stelios Loumakis was cross-examined by Respondents and re -examined by Claimants. Mr. Xiaofeng Peng was re-examined by Claimants.





## *XII DECLARATION RE CLOSURE OF EVIDENCE.*

62. Both Claimants and Respondents declared that, saving the documents expressly referred to by Arbitrator Dr. Cassar Pullicino during the sitting of the 19th July 2019 which documents had been mutually agreed to by the parties, Claimants and Respondents declared that they had no further evidence.

63. As mutually agreed between the parties, on the 12th August 2019, Respondents filed the documents XDP44-XDP52 and Claimants filed Exhibits JQ-1 and ZYG-40.

## *XIII WRITTEN SUBMISSIONS.*

64. As was agreed by the legal representatives for both parties respectively during the sitting held on the 19th July 2019, in view of this Counterclaim and in order to ensure equality of treatment between Claimants and Respondents in both arbitral proceedings I 5320/2018 and this Counterclaim, final written submissions were filed by all parties on 2nd December 2019. Written submissions of rebuttal were filed by Claimants and Respondents on the 2nd March 2020. Following a request by Claimants and pursuant to an order of the Tribunal dated the 22nd April 2020, on the 20th May 2020, Claimants filed additional legal submissions limitedly and exclusively for the purposes of responding to the additional legal submissions made by Respondents in paragraphs 138-153 (both inclusive) of their Written Submissions of Rebuttal dated 2 March 2020.

## *XIV DECISION ON THE MERITS OF THE CLAIM.*

65. In essence the claims put forward by the Claimants in these proceedings are two, namely a claim for payment of an amount allegedly owed to the Claimants by the Respondents pursuant to the provisions of the SPA and the Supplementary Agreement and also a claim for damages arising from the Respondents' failure to honour their contractual obligations.

66. In accordance with clause 2.1 of the SPA, the Purchasers agreed and undertook to pay the Vendors the total consideration of EUR 70,600,000 (seventy million six hundred thousand euro) and which amount is defined as the "Sale Amount." The First Respondent undertook to pay an amount equivalent to seventy per cent (70%) of the Sale Amount payable in cash to the First Claimant whereas Solar Power Inc undertook to pay an amount equivalent to thirty per cent (30%) of the Sale Amount to the Claimants, up to their respective shareholdings in SinSin Renewable Investment Limited, payable by way of its own stock in favour of the First Claimant.

67. Clause 2.2 of the SPA provides that the Purchasers shall, by no later than 30 September 2014, transfer to the Vendors a certain amount of the shares of the common stock of Solar Power Inv in the value of thirty per cent (30%) of the Sale Amount. In or around 2014





38,225,800 shares in Solar Power trading at US$ 0.717 per share were transferred to the Vendors.

68. Clause 2.2.1 of the SPA then outlines the modalities regulating payment of the remaining seventy per cent (70%) of the Sale Amount as follows :-

(a) Cash payment equivalent to five per cent (5%) of the Sale Amount by no later than 30 October 2014;

(b) Cash payment equivalent to five per cent (5%) of the Sale Amount by no later than 30 December 2014;

(c) Cash payment equivalent to thirty per cent (30%) of the Sale Amount by not later than 30 November 2015;

(d) Cash payment equivalent to thirty per cent (30%) of the Sale Amount by not later than 20 June 2016.

69. The Purchasers paid the first and second instalment for a combined sum of ten per cent (10%) of the Sale Amount but defaulted on the payments due by 30 November 2015 and 20 June 2016.

70. The Supplementary Agreement was entered into by the Parties on the 15th March 2016 and was clearly intended to address the Respondent's default in relation to the payments which fell due on 30 November 2015 and 20 June 2016. It was agreed that the Respondents would pay within ten days from execution of the said Supplementary Agreement the sum of EUR 2,000,000 and further pay an amount equal to the 2015 net profit of the 4SPVs by not later than 15th April 2016. It was further agreed that interest at the rate of six per cent (6%) shall accrue on the unpaid share transfer price.

71. There is no dispute between the Parties that the Respondents only paid the sum of EUR 4,340,000 to the Claimants after the conclusion of the Supplementary Agreement thus leaving an outstanding balance of Eur 38,054,000 of the Sale Amount and interest at the rate of six per cent (6%).

72. In their defence to the claims put forward by the Claimants in these proceedings, the Respondents have advanced the defence of *exceptio non adimpleti contractus* and accordingly they refute the claims advanced by the Claimants due to the material breaches which they allege were committed by the Claimants in the performance of their contractual obligations under the SPA. This defence mirrors entirely the claims which the Respondents have in turn advanced against the Claimants in the arbitration proceedings I 5320/2018.

73. In the Award being delivered concurrently in the arbitration proceedings I 5320/2018 the Tribunal has reached the conclusion that the Respondents in those proceedings (Claimants in the current proceedings) are not in breach of their contractual obligations in terms of the SPA based on applicable law, including the application of Maltese law rules on interpretation of contracts. The Tribunal further concluded that it does not find convincing evidence to the





degree required by law to support the claims of the Claimants in arbitration proceedings I 5320/2018 (Respondents in the current proceedings) that SinSin acted in bad faith during the negotiation stage, execution stage or contract implementation stage whether in respect of the Share Sale and Purchase Agreement or the Supplementary Agreement. For the purposes of the present award, the Tribunal adopts the same conclusions in their entirety for the same reasoning and arguments adopted in the motivation of their award in arbitral proceedings I 5320/2018 and for ease of reference a copy of the said award is being attached hereto (Annex 1) and which is to be construed as an integral part of the present award. In the Tribunal's view, therefore, the Respondents defence to the claims of the Claimants for payment of the outstanding balance of the Sale Amount and interest is without merit and is being rejected in its entirety.

74. In addition to the payment of the outstanding balance due under the terms of the SPA and Supplementary Agreement together with interest, Claimants are also claiming payment of damages consisting in interest accruing over the loans granted by several banks to the Second Claimant and any bank charges, expenses and fees incurred in relation to the obtaining of such loans, which interest, bank charges and fees have been specifically incurred as a result of the Respondents' failure to pay the amounts due in terms of the SPA and Supplementary Agreement.

75. Claimants argue that as a direct and immediate result of the Respondents' failure to comply with their payment obligations under the SPA and Supplementary Agreement, SinSin Solar Capital Limited Partnership had no option but to extend loan facilities with its banks with the obvious consequence that it incurred additional financing costs including fees in connection with the issuance of guarantee letters, apart from having had to part pay such loans out of its own funds.

76. In support of such claim, Claimants produced a witness statement of Mr. Yang Yisheng confirming that SinSin Solar Capital Limited Partnership had obtained a loan from China Minsheng Bank Hong Kong Branch for the sum of Eur 67,300,000 in order to finance the acquisition of the corporate structure owning the Greek PV Farms. Subsequently Sinsin Solar Capital Limited Partnership entered into new loan agreements in order to re-finance these facilities each year. It results that Sinsin Funds paid/borrowed from its limited partners XinXing Pipes the following amounts :-

i. RMB 3,682,320 to cover the guarantee letter fees incurred for the loans taken in 2015, which fees covered the guarantee letters which were issued;
ii. RMB 5,473,300.85 to cover fees incurred for the loans of Eur 12,300,000 and Eur 45,700,000, which fees covered guarantee letters;
iii. RMB 7,786.767.07 to cover guarantee letters fees for the 22nd June 2017 loan;
iv. RMB 9,249,290.58 to cover guarantee letters in respect of the loan taken in July 2019.

77. In terms of interest incurred on the bank loans for the period commencing after the date on which the balance of the purchase price should have been paid by Respondents, Claimants have quantified this part of their claim in the amount of EUR 1,810,825.88 as calculated from





the 20th June 2016 to 31st December 2018 (Vide Paras. 26 and 29 of Mr. Yang's witness statement dated 18 February 2019). Additionally, Claimants claim further interest which accrued between 1st January 2019 and 30th October 2019 which amounts to EUR 540,566.17.

78. The Respondents have rebutted this claim for damages in addition to legal interest as legally inadmissible. Apart from issues concerning the actual value and quantification of this claim, the Respondents argue that the Claimants have not produced the evidence which was incumbent on them to produce in accordance with article 1047 of the Civil Code. In order to sustain a valid claim for such additional damages, Respondents argue that the Claimants had the onus of proving that SPI acted maliciously in its decision to stop making any payments to Claimants.

79. The Tribunal has taken cognizance of the evidence and the submission of the Parties on this specific claim put forward by the Claimants. The starting point in the consideration of such claim is the application and interpretation of article 1047 of the Civil Code which reads as follows :-

"1. The damage which consists in depriving a person of the use of his own money shall be made good by the payment of interest at the rate of eight per cent a year.

2. If, however, the party causing the damage has acted maliciously, the Court may, according to circumstances, grant also to the injured party compensation for any other damage sustained by him, including every loss of earnings, if it is shown that the party causing the damage, by depriving the party injured of the use of his own money, had particularly the intention of causing him such other damage, or if such damage is the immediate and direct consequence of the injured party having been so deprived of the use of his own money."

80. The Tribunal has not identified any evidence supporting the claim that the Respondents acted maliciously within the meaning of article 1047 of the Civil Code quoted above. Moreover the Claimants have not even made the slightest attempt to argue in their written submissions that the Respondents have in any way acted maliciously or with the specific intention of causing harm to the Claimants. In the absence of such evidence, this particular claim of the Claimants cannot succeed as it is not sufficient to prove that the Respondents were in default of their payment obligations under the terms of the SPA and the Supplementary Agreement. Indeed such default is covered by the contractual rate of interest agreed to by the parties to the SPA and Supplementary Agreement and is quite distinct and separate to the kind of damages being considered in this part of the Award.

For the above reasons, the Tribunal considers that this particular claim advanced by the Claimants is without merit and should be dismissed.





## XV. AWARD

81. The Arbitration Tribunal therefore FINDS and AWARDS, as follows :-

(A) The relief and remedies sought by Claimants in their Statement of Claim, consisting in:

(i) A declaration that the Respondents are in breach of their contractual obligations under the SPA, the Supplementary Agreement and/or any ancillary agreement thereto;

(ii) A declaration that the Respondents are jointly and severally liable towards both Claimants for the payment of the outstanding balance of the Sale Amount of EUR 38,054,000 together with interest;

(iii) A final award ordering the Respondents, jointly and severally between them, to pay the Claimants the outstanding balance of the Sale Amount of EUR 38,054,000;

(iv) A final award ordering the Respondents jointly and severally between them to pay interest at the rate of six per cent (6%) on the outstanding balance of the Sale Amount of EUR 38,054,000 accruing from the date that such amount was to be paid until the date of the eventual payment;

Are acceded to in their entirety and accordingly the Tribunal orders and condemns the Respondents jointly and severally to pay the Claimants the sum of thirty eight million and fifty four thousand Euro (EUR 38,054,000) ( the "Debt") together with interest at the rate of six per cent (6%) accruing from the 30 November 2015 on half of the Debt and from the 20 June 2016 on the remaining half of the debt up to the date of eventual payment.

(B) The relief and remedies sought by Claimants in their Statement of Claim, consisting in:

(i) A declaration that over and above the outstanding balance of the Sale Amount of EUR 38,054,000 and interest accruing thereon, the Respondents are also jointly and severally liable for the payment of all damages suffered by the Claimants (or any of them) as a consequence of the Respondents' breach of their contractual obligations under the SPA, the Supplementary Agreement and/or any other ancillary agreement thereto;

(ii) The liquidation/quantification of the damages suffered by the Claimants (or any of them) in relation to the request above, if need be with the assistance of experts appointed by the Arbitral Tribunal;

(iii) A final award ordering the Respondents (or any of them) to pay the Claimants (or any of them) the amount of damages liquidated /quantified by the Arbitral Tribunal;

(iv) A final award ordering the Respondents (or any of them) to pay interest over the amount of damages liquidated / quantified by the Arbitral Tribunal at the highest rate permitted under Maltese law, which interest shall accrue as from the date of the award until the date of eventual payment;

Are dismissed in their entirety.

82. Costs are being awarded as follows :-

The Fees of the arbitral tribunal, as agreed between the parties of €180,000 (one hundred and eighty thousand euro) are to be borne as to 4/5$^{ths}$ (four fifths) by the Respondents and as to 1/5th (one fifth) by the Claimants;

The Fees and expenses payable to the Malta Arbitration Centre are to be borne as to 4/5$^{ths}$ (four fifths) by the Respondents and as to 1/5th (one fifth) by the Claimants;

The costs for legal representation of Claimants up to the amount of €381,100 (three hundred and eighty one thousand one hundred euro), which amount, is in the circumstances, deemed by the Arbitral Tribunal to be a reasonable ceiling are to be borne as to 4/5$^{ths}$ (four fifths) by the Respondents and as to 1/5th (one fifth) by the Claimants; the costs for the legal representation of the Respondents are to be borne by them;

The travel and expenses of witnesses are to be borne by the Respondents.

Each party is to bear its own travel expenses.

Fees and expenses for logistical and translation services are to be borne 50% (fifty per centum) by Claimants and 50% (per centum) by Respondents.

The fees and costs of garnishee order and warrant of prohibitory injunction filed by Claimants before the First Hall of the Civil Court, bearing the reference numbers 1714/2018 and 3/2019 respectively (the "Precautionary Warrants") are to be borne by the Claimants. The said precautionary warrants were not formally included or notified as part of these arbitral proceedings and on the basis of the principle "Quod non est in actis non est in mundo" they cannot, at this stage, be taken cognizance of by the Tribunal. Accordingly, the Claimants request for the fees and costs of the Precautionary Warrants is being dismissed.

There is being attached to this Award by way of Annex 1 a copy of the Award bearing today's date in the names SPI China (HK) Limited and SPI Energy Co. Ltd versus SinSin Europe Solar Asset Limited Partnership and SinSin Solar Capital Limited Partnership Arbitration Ref No I 5320/2018, which forms an integral part of this Award.

Signed at Valletta, Malta today the 29 day of October 2020

Arthur Galea Salomone

Louis Cassar Pullicino

Louis de Gabriele

CERTIFIED TRUE COPY OF ORIGINAL
22/6/2022
REGISTRAR
MALTA ARBITRATION CENTRE

Annex 1.

In the Matter of an Arbitration Ref No I 5320/2018

Between

SPI China (HK) Limited and SPI Energy Co. Ltd

(Claimants)

And

SinSin Europe Solar Asset Limited Partnership and SinSin Solar Capital Limited Partnership

(Respondents)

# FINAL AWARD

Members of the Tribunal

Arthur Galea Salomone, Presiding Arbitrator

Louis Cassar Pullicino

Louis de Gabriele

29 October 2020.

Contents


I. THE PARTIES ... 3
II PROCEDURAL HISTORY ... 3
III THE GOVERNING LAW AND THE ARBITRATION CLAUSE. ... 5
IV STATEMENT OF CLAIM. ... 6
V CLAIMANTS' STATEMENT OF FACTS. ... 6
VI THE RELIEF / REMEDY SOUGHT BY CLAIMANTS. ... 9
VII STATEMENT OF DEFENCE. ... 10
VIII RESPONDENTS' STATEMENT OF FACTS. ... 10
IX RELIEF REMEDY/SOUGHT BY RESPONDENTS. ... 18
X CLAIMANTS' LIST OF WITNESSES. ... 18
XI RESPONDENTS' LIST OF WITNESSES. ... 19
XII DECLARATION RE CLOSURE OF EVIDENCE. ... 19
XIII WRITTEN SUBMISSIONS. ... 20
XIV DECISION ON THE MERITS OF THE CLAIM. ... 20
A. THE FACTUAL MATRIX ... 20
B. LEGAL CONSIDERATIONS ... 24
1. CLAUSE 2.3 OF THE SHARE SALE AND PURCHASE AGREEMENT ... 26
2. MALTESE LAW ON INTERPRETATION OF CONTRACTS ... 28
3. APPLICATION OF THE RULES TO THE SPA ... 31
4. OTHER RULES ON INTERPRETATION OF CONTRACTS ... 38
5. THE ARGUMENT BASED ON ARTICLE 1004 OF THE CIVIL CODE ... 38
6. THE "CONTRA PROFERENTEM" RULE ARGUMENT ... 39
7. ALLEGED BREACH OF CLAUSE 14 ... 40
8. THE SUBSEQUENT DISPOSAL OF SHARES ... 40
9. THE ISSUE OF BAD FAITH ... 41
XV. CONCLUSIONS ... 43






The undersigned Arbitrators, having been appointed pursuant to Clause 16.2 of the Share Sale and Purchase Agreement dated 6th September 2014 ("SPA" or the Share Sale and Purchase Agreement")[1], having heard witness and expert testimony, having received documentary evidence and written submissions of Claimants and Respondents, having duly reviewed and considered all oral testimony and documentary evidence, as well as the Parties' submissions and arguments, do hereby FIND and AWARD as follows.

## *I. THE PARTIES*

1. The claimants in these arbitration proceedings are:

SPI China (HK) Limited of RM1702, 17/F, Tung Hip Commercial Building, 248 Des Voeux Rd Central, Hong Kong (the "First Claimant") and SPI Energy Co. Ltd of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "Second Claimant") (both jointly referred to as the "Claimants").

The initial legal representative of the Claimants, formally notified to the Arbitral Tribunal, was Dr. Nicolai Falzon of Fenech & Fenech Advocates of 198, Old Bakery Street, Valletta, Malta. By means of letter dated 4th April 2019, the Malta Arbitration Centre (The "Centre") was notified that the following were added as co-counsel for the Claimants; Dr. Vangelis Politis of Politis and Partners of 14, Solonos St. GR 10673 Athens and Dr. Thomas Bugeja of Fenech & Fenech Advocates of 198, Old Bakery Street, Valletta, Malta.

2. The respondents in these arbitration proceedings are SinSin Europe Solar Asset Limited Partnership of Suite 716, 10, Market Street, Grand Cayman KY1-9006, Cayman Islands (the "First Respondent") and SinSin Solar Capital Limited Partnership of Suite 716, 10, Market Street, Grand Cayman KY1-9006, Cayman Islands (the "Second Respondent") (both jointly referred to as the "Respondents").

The legal representatives of the Respondents, formally notified to the Arbitral Tribunal, are Dr. Michael Psaila, Dr. Frank Testa and Dr. Maria Lisa Buttigieg of MAMO TCV Advocates of Palazzo Pietro Stiges, 103, Strait, Street, Valletta, Malta.

## *II PROCEDURAL HISTORY*

3. Claimants filed the Notice of Arbitration at the Malta Arbitration Centre (the "Centre") on the 20th March 2018, which notice was duly served on the Respondents.

4. A Preliminary Meeting was held at the Centre on the 3rd April 2018, which meeting was attended by Dr. Vella Falzon, counsel to Claimants and Dr. Fiona Galea Farrugia, Registrar of the Malta Arbitration Centre. Dr. Galea Farrugia informed Dr. Vella Falzon that the

[1] Document NVF 1

Respondents were duly notified with the Notice of Arbitration as well as the date and time of the Preliminary Meeting. During the said meeting a copy of the Share Sale and Purchase Agreement was submitted. The Share Sale and Purchase Agreement includes an arbitral clause at Clause 16.2.

5. The Claimants filed the Statement of Claim at the Centre on the 12th April 2018. By means of a Letter dated 18th June 2018, Claimants made minor amendments to the Statement of Claim. The Statement of Claim and amendments thereto were duly served on the Respondents.

6. The Respondents filed the Statement of Defence at the Centre on the 9th May 2018.

7. Pursuant to Clause 16.2 of the Share Sale and Purchase Agreement, the Claimants appointed Dr. Louis de Gabriele as arbitrator, the Respondents appointed Dr. Louis Cassar Pullicino as arbitrator and the said arbitrators appointed Dr. Arthur Galea Salomone as the presiding arbitrator.

8. A preliminary meeting was held between the three arbitrators, the legal counsel for Claimants and legal counsel for Respondents on the 18th June 2018.

9. The preliminary meeting was followed by the issuance of Procedural Order Number 1, dated 27th September 2018 laying down, *inter alia*, the procedural rules and the proposed arbitration schedule as discussed and agreed between the Parties' legal counsel at the preliminary meeting.

10. The Arbitral Tribunal issued a further eight Procedural Orders as follows:

Procedural Order Number 2, dated 20th December 2018, in terms of which it was decided that following agreement between the parties, testimony and/or evidence, documentary or otherwise, submitted in SinSin Europe Solar Asset Limited Partnership and SinSin Solar Capital Limited Partnership versus SPI China (HK) Limited and SPI Energy Co. Ltd (I 5532/2018) shall for all intents and purposes of law form part of the evidence of these arbitration proceedings;

Procedural Order Number 3, dated 25th January 2019, extending the deadline for filing of evidence by Affidavit by Respondents to the 18th February 2019;

Procedural Order Number 4, dated 4th March 2019, extending deadline for Claimants to file a note specifying the names of witnesses they would like to cross-examine to Friday 8th March 2019;

Procedural Order Number 5, dated 21st March 2019, dealing, *inter alia*, the purpose of the sittings of the 11th and 12th April 2019 respectively and the postponement of the cross examination in respect of the Accuracy Report;

Procedural Order Number 6, dated 4th July 2019 rejecting, *inter alia*, the striking out or redaction of the Loumakis Report;

Procedural Order Number 7, dated 22nd July 2019, establishing the 30th November 2019 as the deadline for filing of written submissions by Claimants and the 29th February 2020 as the deadline for filing of written submissions by Respondents.

Procedural Order Number 8, dated 18th September 2019 striking Doc XDP 44 from the record of the Proceedings and ordering its replacement by a corrected translation provided by Mr. Liu Ling of BARE Translation Co Ltd in which paragraph 128 of the said translation was amended to read;

"Before the execution of the Supplementary Agreement, SinSin had told me that they would need to apply to a bank to provide project financing and that SinSin did not have the means to secure the approval by such bank."

Procedural Order Number 9 dated 9th September 2020 requesting both Claimants and Respondents to submit a Schedule of Costs.

## *III THE GOVERNING LAW AND THE ARBITRATION CLAUSE.*

11. In terms of Clause 16.1 of the Share Sale and Purchase Agreement, the "Agreement shall be governed by and construed in accordance with Maltese law."

In terms of Clause 16.2 of the Share Sale and Purchase Agreement it is provided that "Any question or difference which may arise concerning the construction, meaning or effect of this Agreement or concerning the rights, duties, obligations and liabilities of parties hereunder, or any other matter arising out of or in connection with this Agreement, shall be referred to and settled by arbitration. The venue of such arbitration shall be Malta. the number of arbitrators shall be three (3). The appointing authority shall be the Malta Arbitration Centre save as provided below. Each party to the arbitration proceedings shall appoint one (1) arbitrator. If within fifteen (15) days after receipt of the claimant's notification of the appointment of an arbitrator the respondent has not notified the claimant of the name of the arbitrator he appoints, the second arbitrator shall be appointed by the Malta Arbitration Centre. The two (2) arbitrators thus appointed shall choose the third arbitrator who will act as the presiding arbitrator of the tribunal. If within fifteen (15) days after the appointment of the second arbitrator, the two arbitrators have no agreed upon the choice of the presiding arbitrator, then, at the request of either Party to the arbitration proceedings, the presiding arbitrator shall be appointed by the Malta Arbitration Centre. The language of the arbitration shall be English. The award of the arbitrators shall be final and binding upon the Parties. Any reference under the sub-clause 16.2 shall be deemed to be a reference to arbitration within the meaning of Part IV of the Arbitration Act (Chapter 387 of the Laws of Malta).





## *IV STATEMENT OF CLAIM.*

12. The "Nature of the Claim" as stated by Claimants in the Notice of Arbitration and in the Statement of Claim is a claim for damages arising as a result of a breach of the Respondents' contractual obligations in terms of the Share Sale and Purchase Agreement, entered into by and between the Respondents as sellers and the Claimants as purchasers in relation to all of the shares in Sinsin Renewable Investment Limited (C 60350), a company registered in Malta with registered address at 192, Old Bakery Street, Valletta (the "Company").

## *V CLAIMANTS' STATEMENT OF FACTS.*

13. The Claimants' Statement of Facts in support of the claim, provides that "By way of background, the Respondents are investment vehicles co-owned by two Chinese State-owned companies namely Xingxing Cathay International Group Co. Ltd (formerly Xingxing Ductile Iron Pipes Co. Ltd) and China Railway Trust Co. Ltd.

14. The Respondents were the indirect owners of a number of photovoltaic farms ("PV Farms") in Greece having a total power output of 26.57 MW (the "Greek PV Farms"). The Greek PV Farms were held through a structure comprising the Company (as a holding company) and four fully owned Greek subsidiaries named Astraios Energiaki A.E., Photovoltaic Parks Veroia I A.E., Orion Energiaki A.E. and Jasper PV Macedonia A.E.

15. Claimant SPI Energy Co., Ltd. is a global provider of photovoltaic (PV) solutions which is listed on the Nasdaq stock Market. SPI Energy Co., Ltd. is the successor of Solar Power Inc following a merger between the two companies at the end of 2015.

16. Claimant SPI China (HK) Limited is a subsidiary of SPI Energy Co. Ltd.

17. The SPI Energy Group is an international engineering, procurement and construction contractor ("EPC Contractor") specializing in PV Farms and its business is predominantly the development, financing, installation, operation and sale of utility-scale and residential solar power projects in China, Japan, Europe and North America.

18. In 2014, influenced by the unfavorable economic situation in Greece, the Respondents decided to divest of the Greek PV Farms and, aware of the fact that the SPI Energy Group was already active in Greece in the field of photovoltaic projects (both as investor and as EPC Contractor), they approached the Claimants with an offer to sell their interest in the Greek PV Farms by selling and transferring to the Claimants all of their shares in the Company.

19. At the time, due to the very poor state of the Greek economy and other prevailing economic conditions the market for large scale PV projects was very small, if at all existent, and interest in the Greek PV Farms was limited. The prevailing market price was in the region of €1.60-€1.70 per kW (€1.6m to €1.7m per MW), possibly less for very large projects such as the PV Farms proposed to be sold by the Respondents. Nevertheless, the price requested by the Respondents for the disposal of the Greek PV Farms was a total of €70,660,000 which works

out at a price per Kw of €2.66 (€2.66m per MW). Accordingly, at a meeting of the board of directors of the Solar Power Inc (now Claimant SPI Energy Co. Ltd) held on 25 July 2014, the offer made by the Respondents was rejected by the directors as being "not favorable for the company".

20. Subsequently, with a view to enticing the Claimants to accept their offer, the Respondents made a number of clear and unequivocal representations which found their way into the eventual SPA. The two principal undertakings made by the Respondents were intended to forge a long term strategic collaboration between the Xingxing/Sinsin Group and the SPI Energy Group and were to be achieved as follows: (i) pursuant to the acquisition of the Greek PV Farms, the Respondents' Group (XingXing/Sinsin) would acquire a stake in the SPI Energy Group (through shares in the listed company SPI Energy Co., Ltd) thus; and (ii) that, the Respondents' Group (XingXing/SinSin) would grant Claimants a number of international EPC contracts with a total power capacity of at least 360MW within three years from the date of acquisition of the Greek PV Farms.

21. In support of these undertakings, during the summer of 2014 and in anticipation of the signing of the eventual SPA, Mr. Roger Dejun Ye, a senior manager of the XingXing/Sinsin Group, sent to the Chairman of the SPI Group, Mr Xiaofeng Peng, a series of emails with catalogs, technical descriptions and photographs of various PV park projects that the XingXing/SinSin Group had allegedly already examined and studied and in which they had allegedly decided to invest in various regions around the world (including Chile and China). In total, during that period, information relating to the alleged PV Farm projects having an aggregate power output of 417.5 MW were sent to the Claimants.

22. The undertakings put forward by the Respondents were of sufficient appeal to the Claimants to entice them to accept the Respondents' offer because the anticipated returns from the PV Farm projects promised to be awarded to them would have made up for the inflated acquisition price requested by the Respondents. Furthermore, the Claimants perceived considerable value in forging a strategic partnership with the Respondents' Group given its size and connections in China.

23. Accordingly, at a meeting of the board of directors of the Solar Power Inc (now Claimant SPI Energy Co, Ltd) held on 5 September 2014, the Claimants resolved to proceed with the acquisition of the Company at the price offered by the Respondents on the basis of the undertakings made by the Respondents.

24. The two principal undertakings referred to above were reflected in the SPA. In the first place, it was agreed that 30% of the acquisition price of the shares in the Company would be settled by the transfer of shares in Solar Power Inc (now Claimant SPI Energy Co. Ltd) to the Respondents.

25. In the second place, the following provision was agreed and included in clause 2.3 of the SPA:

"2.3 The Parties hereby agree that pursuant to the conclusion of the transfer of shares contemplated herein and in recognition of their mutual desire for future co-operation, the Vendors, or one of their representative affiliated entities as the case may be, undertake to appoint Purchaser Two as the EPC contractor in connection with future projects undertaken by them, or one of their respective affiliated entities as the case may be, subject to the conclusion of an ad hoc contract/s for the purpose and the below conditions:

2.3.1 the Vendors hereby confirm that either one of them or one of their respective affiliated entities, as the case may be, shall be investing in photovoltaic plants with a capacity of over 360M within three (3) years from the Closing Date, and that the Vendors, or one of their respective affiliated entities as the case may be, shall appoint Purchasers as the EPC Contractor in connection with such project; and

2.3.2 provided that the price of the EPC contract work and the relative terms of payment set by Purchasers for the EPC work in question shall not be less than the then current market price/levels for comparable work".

26. Following signature of the SPA, the Claimants duly procured the transfer of 38,225,800 shares in SPI Energy Co. Ltd to the Respondents (the "SPI Shares"). The SPI Shares were trading at the price of US$0.717 each on NASDAQ and the number of shares transferred was calculated on this basis. As a further sign of Claimants' commitment to the spirit of the SPA and the long-term strategic relationship discussed between the parties prior to its signature, the Claimants also procured the appointment of Mr. Roger Dejun Ye of the Xing-xing/SinSin group to the position of Chief Executive Officer of SPI Energy Co. Ltd.

27. Following the relative announcements made on the NASDAQ exchange with regard to the deal struck with the Respondents' Group including the strategic relationship forged between the two organisations, the prospected EPC Contracts to be awarded to the Claimants for PV Farm projects with a power output of at least 360MW over the next three years and the appointment of a key XingXing/SinSin representative to oversee the implementation of this strategic relationship, the market price of SPI Energy's shares shot up by some 840%.

28. Much to the surprise of the Claimants, with a view to capitalizing on the increased market price, and with total disregard for the long term strategic partnership envisaged between the parties, on perceiving this increase in share value, the Respondents disposed of more than 65% of their shares in SPI Energy Co within just a few months from the date of signature of the SPA, thereby realizing a profit of almost US$30,000,000 in this short time. This was done at a time when the said Roger Dejun Ye, a member of the top management of the Respondents' Group, was sitting as CEO of the Claimant group, with complete indifference to the evident conflict of interest, the damage to the supposed long-term strategic relationship that was promised and the negative impact that this would have on the market price of the shares in SPI Energy Co Ltd. Indeed, shortly after this disposal, when it became evident to the market that the Respondents were only interested in short term profits rather than forging a long-lasting relationship with the Claimant Group, the share price of SPI Energy Co. Ltd plummeted dramatically.

29. Furthermore, and in direct and flagrant breach of their obligations in terms of the SPA, during the three-year period following conclusion of the SPA and indeed to date, the Respondents failed to award any EPC contracts to the Claimants as required in terms of article 2.3 of the SPA so much so that it is appearing evident that the representations made and undertakings given by the Respondents were made and given in bad faith with the sole purpose of enticing the Claimants to accept the exorbitant price requested for the purchase of shares in the Company.

30. In view of the clear breaches of contract perpetrated by the Respondents, the Claimants ceased effecting payment of the purchase price under the SPA.

31. The parties have exchanged numerous extra-judicial intimations with regard to the matters in dispute, which remain unresolved, hence the necessity to resort to these arbitration proceedings".

32. By means of a letter dated the 18th June 2018 addressed to the Arbitral Tribunal, legal counsel to Claimants made two amendments to the Statement of Claim as follows:

i. In the second line of the ninth paragraph of part 1 of the Statement of Claim the word 'SPI' was replaced by 'SPA'.

ii. The fourth paragraph from the end of Part 1 of the Statement of Claim was replaced by the following:

"Much to the surprise of the Claimants, with a view to capitalizing on the increased market price and with total disregard for the long term strategic partnership envisaged between the parties, on perceiving this increase in share value, the Respondents made an attempt to dispose of more than 65% of this shares in SPI Energy Co within just a few months form the date of the signature of the SPA, with a view to realizing a profit of almost US$30,000,000 in this short time. This attempt was made at a time when the said Roger Dejun Ye, a member of the top management of the Respondent Group was sitting as CEO of the Claimant Group, with complete indifference to the evident conflict of interest, the damage to the supposed long term strategic relationship that was promised and the negative impact such disposal would have on the market price of the shares in SPI Energy Co Ltd. Indeed, shortly after the relative public announcements was made, when it became evident to the market that the Respondents were only interested in short term profits rather that forging a long-lasting relationship with the Claimant Group, the share price of SPI Energy Co., Ltd plummeted dramatically".

## *VI THE RELIEF / REMEDY SOUGHT BY CLAIMANTS.*

33. The relief or remedies sought by Claimants are as follows:

A declaration that Respondents are in breach of their contractual obligations under the SPA;

A declaration that Respondents are jointly and severally liable for the damages caused thereby to the Claimants;

The liquidation/quantification of the damages suffered by the Claimants or any one of them;

A final award ordering Respondents, jointly and severally between them, to pay to the Claimants the amount/s of damages so liquidated/quantified by the Arbitral Tribunal within a time to be established by the Tribunal;

A final award ordering Respondents to pay interest at the highest rate allowed by Maltese law on the amount of damages established to be due to the Claimants accruing as from the date of the award until date of eventual payment; and

A final award ordering Respondents to pay the costs of the Arbitration proceedings, including arbitrators' fees and fees due to counsel of Claimants in terms of applicable rules.

## *VII STATEMENT OF DEFENCE.*

34. The Respondents deny the Claimants' claim that the Respondents are in breach of the SPA. Furthermore, the Respondents deny that the Claimants suffered damages or that they are entitled to the reliefs claimed or any relief at all. The denial was made without prejudice to any other defence that may be brought by the Respondents in the course of the proceedings.

## *VIII RESPONDENTS' STATEMENT OF FACTS.*

35. In their Statement of Facts "The Respondents deny that they are in breach of the SPA and deny all of the Claimants' requests for relief. The Respondents request that the Tribunal dismiss the Claimants' case and order that the Claimants pay their own costs and the costs incurred by the Respondents in this arbitration.

36. For the avoidance of doubt, Respondents clarified that the fact that they have not responded to each and every allegation in the Statement of Claim is not to be construed as an admission of the same.

37. The Claimants

i. The 2nd Claimant, SPI Energy Co., Ltd. ("SPI Energy"), is a successor of Solar Power Inc, which originally entered into the Share Sale and Purchase Agreement ("SPA") together with the 1st Claimant and the Respondents on 6 September 2014.

ii. Solar Power Inc is a company incorporated in California, United States. At the time, it entered into the Share Sale and Purchase Agreement with the Respondents, it was a listed company at the Over the Counter Bulletin Board ("OTCBB") in the United States.

iii. SPI Energy Co., Ltd. was incorporated in the Cayman Islands on May 4, 2015. In May 2015, Solar Power Inc was reversely taken over by the 2nd Claimant for the purpose of moving from the OTCBB to the major exchange of Nasdaq. On 19 January 2016, SPI Energy went public on Nasdaq.

iv. The 1st Claimant, SPI China (HK) Limited ("SPI HK"), was originally a subsidiary of Solar Power Inc. After Solar Power Inc was converted and taken over by SPI Energy, SPI HK became a subsidiary of SPI Energy.

v. SPI Energy and its subsidiaries. collectively referred to as SPI Energy Group, are involved in businesses of providing photovoltaic solutions for business, developing, owning and operating solar PV projects, providing EPC contractor services to PV farm projects. and internet commerce and investment products.

vi. In April 2015, SPI Energy Group launched its internet investment platform (www.solarbao.com) which allows investors to purchase PV-project based investment products with promised interest and fixed maturity date to cash out.

However, the operation of Solarbao was unsuccessful. From April 2017, investors on the Solarbao platform started to have difficulties getting their investment to cash out, and so far, Solarbao is in default to cash out matured investments of approximately 600 million RMB from the public investors in the PRC, sparking investigations by the police. Some of the senior managers including the CFO, ex CFO and COO of SPI Energy Group were investigated and later prosecuted by relevant Chinese law enforcement authorities.

38. The Respondents

vii. The Respondents are special purpose investment vehicles owned by Xinxing Ductile Iron Pipes Co Ltd ("Xinxing Pipes"), to invest in the area of solar power.

viii. Xinxing Pipes is a public company listed on Shenzhen Stock Exchange in the People's Republic of China ("PRC"). It is a leading manufucturing company in the PRC for ductile iron pipes.

ix. Xinxing Pipes is a subsidiary of Xinxing Cathay International Group Co., Ltd ("Xinxing Cathay"), which is a central state-owned company under the supervision of the State-owned Assets Supervision and Administration Commission of the State Council in the PRC. Xingxing Cathay is a Fortune 500 company, it has main business in metal smelting and processing, textile and garment, special equipment making and etc. Its main products include ductile cast iron pipes, pipe fittings. steel gratings, steel. engineering machineries and etc. Xingxing Cathay has more than 60,000 employees. with a capital volume of approximately 100 billion RMB.

39. SinSin Renewable Investment Limited ("SinSin Renewable") is a limited liability company registered in Malta. It is the project company established by the Respondents for the purpose of investing and developing solar power farms in Greece. The 1st Respondent, SinSin Europe, owns 99,999 ordinary shares of SinSin Renewable and the 2nd Respondent, SinSin Solar, owns 1 ordinary share of SinSin Renewable.

40. SinSin Renewable directly or indirectly holds four Greek subsidiaries, namely, Orion Energy SA, Astraios Energy SA, Jasper PvMakedonia Energy SA and Photovoltaica Parka Veroia I SA (collectively "SPVs"). The four SPVs each operate a solar power farm in Greece, with a total power output of 26.75 MW ("Greek PV Farms").

41. In order to support the investment in the construction and operation of the Greek PV Farms, the 2nd Respondent executed three Long Term Unsecured Loan Agreements with SinSin Renewable in June 2013 and September 2013, granting loans to SinSin Renewable for a total principal amount of EUR 64,989,000.

42. Mr Roger Ye Dejun ("Mr Ye") is one of the three individual partners of Solar Asset Management, which comprise the General Partner of the Respondents. XinXing Pipes is the Limited Partner of the Respondents. Mr Ye is not "a senior manager of the XinXing/Sinsin Group" nor is he "a member of the top management of the Respondents' Group " as alleged by the Claimants. He is not employed and does not hold a position in the wider Xinxing group of companies.

43. In or about May 2014, the Chairman and the controlling person of the 1st Claimant and Solar Power, Inc (collectively, the "Purchasers"), Mr Peng Xiaofeng ("Mr Peng") approached the Respondents expressing interest in buying over the Greek PV Farms. It was the Respondents' understanding that Solar Power, Inc, which was then trading on the OTCBB, wished to acquire more assets in order to prepare to list on the Nasdaq.

44. At that time, the Respondents were agreeable to selling the Greek PV Farms as the Greek government had already announced and started to reduce the feed-in tariff by cutting back on grants on solar power energy and as a result, the revenue (100% generated from the sales of electricity to national grid of Greece based on feed-in-tariff) from the Greek PV Farms were not meeting the Respondents' Limited Partner which is, Xinxing Pipes' expectations when making the investment.

45. Contrary to the Claimants' allegation that the purchase price was "exorbitant", the Sale Amount (as defined at paragraph 22 below) of EUR 70,660,000 for the shares in SinSin Renewable was a fair price, heavily negotiated between experienced parties in the industry. The Sale Amount takes into consideration the following, including but not limited to:

(a) That 70% of the Sale Amount would be made in cash payments over a period of nearly 2 years;

(b) That 30% of the Sale Amount would be paid in the form of shares in Solar Power Inc, which carry an inherent risk that the share prices may fall (as they eventually did in this case) and the trade volume in OTCBB is not active; and

(c) That the revenues from the Greek PV Farms for selling electricity were consistent and relatively good, it was expected that the Greek PV Farms can generate over EUR 8 million gross revenues each year;





(d) That the Sale Amount takes into consideration and includes the loans made by the 1st Respondent to SinSin Renewable to fund the construction of the Greek PV Farms, the amount of which is EUR 64,989,000.

46. Further, it is emphasised that the Purchasers and the Respondents were either listed companies or subsidiaries of listed companies, and the sale and purchase was only completed after the necessary assessment and due diligence.

47. During the course of the negotiations, the Purchasers were painting a rosy future for the SPI Energy Group, including the prospective listing on Nasdaq within one year and listed company' shares shall be free to trade at prevailing market value. The Respondents were therefore convinced that it would be beneficial to cooperate with the SPI Energy Group and invest in Solar Power Inc by taking shares in the company as part of the consideration for the sale of the Greek PV Farms. At that time, the Respondents intended to cooperate with the SPI Energy Group on future solar farm projects by appointing Solar Power Inc as the EPC contractor in connection with such projects (subject to the conclusion of further contracts and other conditions), as a form of support to Solar Power Inc. It was anticipated that as a shareholder of Solar Power Inc, this would be a win-win situation if the company performed well as a result of these business opportunities from the Respondents and its affiliates. However, the Respondents' were not guaranteeing that it would award EPC contracts to the Claimants regardless.

48. The Respondents deny that it made any representation or undertaking to "entice" the Claimants to accept the purchase price. In this regard, the Respondents refer to the Entire Agreement Clause at Clause 12 in the SPA.

49. The Claimants allege that during the summer of 2014 and in anticipation of the signing of the eventual SPA, Mr. Ye sent to the Chairman of SPI Energy Group, Mr Peng, a series of emails relating to various PV park projects, totally an aggregate power output of 417.5 MW, that the Xinxing Group had already examined and studied and in which they had decided to invest in various regions around in the world including Chile and the PRC. The Claimants appear to be insinuating that the Respondents used these projects to induce the Claimants to enter into the SPA. However, the Respondents would like to clarify that in 2014, at around the same time the parties were negotiating the SPA, Mr Ye was also in discussion with Mr Peng, regarding other possible investment projects in the solar power industry.

50. Following negotiations, on or around 6 September 2014, the Respondents entered into the SPA with the Purchasers for the sale and purchase of the shares in Sinsin Renewable.

51. Clause 2.1 of the SPA provides that the total consideration payable by both Purchasers to the Respondents (as Vendors) for the purchase of the shares in Sinsin Renewable, shall be an amount equivalent to EUR 70,660,000 ("Sale Amount"), payable to the Respondents in accordance with their shareholding portions to be acquired and as set out below:

(a) the 1st Claimant undertakes to pay an amount equivalent to 70% of the Sale Amount to the 1st Respondent, payable in cash; and

(b) Solar Power, Inc undertakes to pay an amount equivalent to 30% of the Sale Amount to the Respondents, up to their respective shareholdings in SinSin Renewable Investment Limited, payable by way of its own stock in favour of the 1st Respondent.

52. Clause 2.2 of the SPA provides that the Purchasers shall, by no later than 30 September 2014, transfer to the Respondents a certain amount of the shares of the common stock of Solar Power Inc in the value of 30% of the Sale Amount. On or around November 2014, 38,225,800 shares in Solar Power Inc., which were then trading at USD 0.717 per share on the OTCBB, were transferred to the Respondents.

53. Clause 2.2.1 of the SPA provides that the remaining 70% of the Sale Amount shall be paid in cash over a period of around 2 years, according to the following payment schedule:

(a) 5% of the Sale Amount by no later than 30 October 2014;

(b) 5% of the Sale Amount by no later than 30 December 2014;

(c) 30% of the Sale Amount by no later than 30 November 2015; and

(d) 30% of the Sale Amount by no later than 20 June 2016.

54. It is undisputed that the Purchasers made payment of the two 5% cash payments, totaling EUR 7,066,000. However, the balance 60% of the Sale Amount, amounting to EUR 42,396,000, remains unpaid to date.

55. The Respondents hereby reserve all and any rights of action that they may have against the Claimants, including but not limited to the payment of Sale Amount under the SPA.

56. The Pledge of Shares Agreements

Clause 2.2.2 of the SPA provides that until the Purchasers have paid in full the Sale Amount, all equity held directly or indirectly by the Purchasers in the SPVs should be pledged to the Respondents.

57. Pursuant to this Clause, the parties entered into the following agreements:

(a) Pledge of Shares Agreement between the Respondents, the Purchasers, Veltimo Limited Cyprus and Astraios Energy SA dated 6 September 2014;

(b) Pledge of Shares Agreement between the Respondents, the Purchasers, SinSin Renewable and Jasper PvMakedonia SA dated 6 September 2014;

(c) Pledge of Shares Agreement between the Respondents, the Purchasers, Veltimo Limited Cyprus and Orion Energy SA dated 6 September 2014;

(d) Pledge of Shares Agreement between the Respondents, the Purchasers, Photovoltaica Parka Veroia I Malta Limited and Photovoltaica Parka Veroia I SA dated 6 September 2014;

58. Under the Pledge agreements above, all shares of the four SPVs ("Pledged Shares") were pledged to the Respondents as security for the payment of the Sale Amount under the

SPA. In the event of default under the SPA, the Respondents may exercise all rights relating to the Pledged Shares including but not limited to the rights to dividends, rights of voting, calling meetings, appointing and removing board of directors and other powers.

59. The Supplementary Agreement and Personal Guarantee

On or around 15 March 2016, at the request of the Claimants, the Respondents and the Claimants entered into the Supplementary Agreement. The Supplementary Agreement provides the following:

(a) The rights and obligations of Solar Power Inc has been assumed by SPI Energy from 31 December 2015;

(b) The Respondents agree to extend the payment obligations of the Claimants for the remaining EUR 42,396,000 Sale Amount under the SPA to 30 November 2017; and

(c) The Claimants agree to pledge the Greek PV Farms to the Respondents to secure the payment of the remaining Sale Amount, and the revenues of the Greek PV Farms should be entirely used to make the payments under the SPA.

60. The Claimants had requested more time to pay as they were facing difficulties in raising cash to pay the remaining 60% of the Sale Amount. The Respondents were reluctant, but eventually agreed as the Claimants claimed that if the payment obligations were not extended, SPI Energy's performance on the Nasdaq may be adversely affected.

61. Further, on or around 15 March 2016, Mr. Peng, the Chairman and controlling person of SPI Energy, entered into the Agreement Concerning the Payment of the Sale Amount. Mr. Peng acknowledged that 60% of the Sale Amount has been due but not paid yet, and Mr. Peng will personally and unconditionally guarantee the payment of the Sale Amount to the Respondents with his entire personal assets.

62. Despite the extension of time to pay the remaining EUR 42,396,000 as provided under the Supplementary Agreement, the Claimants failed to make payment of the remaining 60% of the Sale Amount by 30 November 2017. The Claimants are clearly in breach of the SPA and the Supplementary Agreement.

63. Due to the Claimants' failure to make payment of the remaining 60% of the Sale Amount, the Respondents commenced a suit in the Greek courts on 26 January 2018 seeking to obtain control of the SPVs and auction the pledged shares.

64. The Respondents state that The Claimants' allegations in the Statement of Claim are inaccurate and misleading

65. The Respondents deny that they acted in breach of the SPA.

66. It is clear from the chronology of the relevant events set out below that the Claimants' allegations in the Statement of Claim are inaccurate and calculated to mislead:

(a) Following the signing of the SPA in September 2014, Solar Power Inc issued an announcement on the OTCBB regarding the completion of acquisition of SinSin Renewable, which "immediately adds 26.57 megawatts of solar PV projects in Greece to SPI's portfolio". Further, the announcement stated " [i]n addition, following the close of the transaction, the agreement contains a provision specifying that Sinsin or its affiliates may appoint SPA and its subsidiaries to provide engineering, procurement and construction ("EPC") services on up to 360 MW of additional solar PV projects that Sinsin intends to invest in and/or develop over the next three years" (emphasis added).

(b) In or about March 2015, the Respondents entered into three agreements for the sale of approximately 65% of their shares in Solar Power Inc. The Respondents had entered into these agreements in order to raise funds to repay the loans they have taken in order to fund the construction and purchase of the Greek PV Farms. However, under these agreements, the purchasers only paid an initial deposit of around 10%, with the remaining amount to be paid approximately one year later (the exact terms and conditions of each agreements varied). None of the purchasers completed the share purchase in Solar Power Inc, due to the fall in share prices. To date, the Respondents still own and retain all their shares in Solar Power Inc (and thereafter, SPI Energy) transferred under the SPA.

(c) It was only later in July 2015 that Mr Ye was appointed Chief Executive Officer of Solar Power Inc. Solar Power Inc appointed Mr Ye as the CEO under pressure of the investors and it wanted Mr Ye to assist the company on focusing on the listing on Nasdaq, as there had been little progress since the parties entered into the SPA in 2014. After the signing of the SPA, Solar Power Inc had been busy diversifying into internet commence and launching its solar investment platform, Solarbao, in April 2015, thus had not made any big progress towards uplisting on the Nasdaq.

(d) The Claimants were unable to make payment of the 30% of the Sale Amount by 30 November 2015 due to their financial situation and requested that the Respondents delay their payment obligations under the SPA, in order to not jeopardize their listing on the Nasdaq.

(e) Within half a year of Mr Ye's appointment as CEO of Solar Power Inc. and following a reverse takeover by SPI Energy, SPI Energy was listed on Nasdaq on 19 January 2016.

(f) On or around 15 March 2016, at the request of the Claimants, the Respondents and the Claimants entered into the Supplementary Agreement extending the payment obligations of the Claimants for the remaining EUR 42,396,000 Sale Amount plus interests under the SPA to 30 November 2017.

B. There is no restriction on the disposal of shares in Solar Power Inc after the initial lock-up period of 3 months.

67. The Claimants appear to allege in their Statement of Claim that the Respondents had an obligation of sorts to retain all their shares in Solar Power Inc/SPI Energy in order to effect the future cooperation between the parties and claim that "shortly after this disposal, when it became evident to the market that the Respondents were only interested in short term profits





rather than forging a long-lasting relationship with the Claimant Group, the share price of SPI Energy Co., Ltd plummeted dramatically". The Respondents deny these allegations.

68. Clause 2.2 of the SPA provides among other things, that "[t]he Purchasers shall, by no later than 30th September 2014, transfer to [the 1st Claimant] a certain number of shares of the common stock of [Solar Power Inc] (the "Common Shares") which has a lock-up period of three (3) months ..."(emphasis added). There are no other restrictions on the transfer of Solar Power Inc/SPI Energy's shares by the Respondents. By March 2015 when the Respondents entered into the share sales agreements, the lock-up period of 3 months had already lapsed.

69. Further, Clause 2.2 of the SPA which explicitly provides for a lock-up period of only three months undermines any suggestion that the Respondents were obliged to retain all their shares in Solar Power Inc/SPI Energy.

70. In fact, it should be noted that under the shares sale agreements referenced in paragraph 36(g), the Respondents did not even dispose of all their shares in Solar Power Inc. In any event. the Respondents are currently still shareholders of the SPI Energy.

71. The Respondents also deny any suggestion that their sale of the shares in Solar Power Inc or otherwise, caused the fall in Solar Power Inc's share prices. The Respondents believe that the poor performance of Solar Power Inc/SPI Energy's share prices is related to its poor financial performance.

72. The Respondents deny that they are in breach of Clause 2.3 of the SPA.

73. Clause 2.3 simply records the Respondents' gesture of goodwill and acknowledges the parties' intention regarding future co-operation on solar power projects, however these future projects were "subject to the conclusion of an ad hoc contract/s for the purpose". The parties still had to discuss the terms and conditions of each EPC contract, including price, delivery date, profit margin, etc. The Respondents were therefore under no binding and unconditional obligation to award and enter into such EPC contracts to the Claimants regardless.

74. In any case, the Respondents did engage in discussions with the Claimants regarding possible solar power projects during the 3 year period, however for various reasons the parties did not enter into any EPC contracts. In particular, due to the financial difficulties of SPI Energy, it was unable to provide the performance bond required under the EPC contracts. Further, SPI Energy has also been embroiled in numerous disputes in relation to EPC contracts entered into with other parties, casting doubt on their ability to perform these projects satisfactorily.

75. In addition, the Claimants' claim that "[i]n view of the clear breaches of contract perpetrated by the Respondents, the Claimants ceased effecting payment of the purchase price under the SPA", is a blatant and weak excuse to attempt to justify the breaches of their payment obligations under the SPA and the Supplementary Agreement. It is clear from the chronology of events that the Claimants entered into the Supplementary Agreement in March 2016, almost one year after the sale of shares by the Respondents complained of, thereby acknowledging and admitting that they were liable to pay the outstanding EUR 42,396,000 under the SPA.

76. For the reasons set out above, the Respondents have not acted in breach of the SPA and the Claimants are not entitled to the reliefs claimed or any relief at all.

77. Further, the Respondents deny that the Claimants have suffered any loss or damages. The Claimants have not set out clearly what loss or damages they have allegedly suffered or how the Respondents' actions allegedly cause these loss or damages. The Respondents reserve their right to fully respond to the Claimants' claim for damages at a later stage if the Claimants provide further particulars.

## *IX RELIEF REMEDY/SOUGHT BY RESPONDENTS.*

78. The relief or remedy sought:

i. An order that the Claimants' case be dismissed in its entirety;

ii. An order that the Claimants' and Respondents' costs and expenses in these proceedings be borne by the Claimant (including but not limited to legal costs, arbitration related fees, interests and expenses): and

iii. Any such further or other relief as the Tribunal deems fit.

iv. The above is without prejudice to any right of action that the Respondents' may have against the Claimants."

## *X CLAIMANTS' LIST OF WITNESSES.*

79 By means of a letter dated 20th July 2018 addressed to the Arbitral Tribunal, counsel to Claimants provided a list of witnesses together with an indication of the scope of the respective testimonies. Claimants' list of witnesses was as follows: Mr. Xiaofeng Peng, Mr. Hoong Kheong Cheong, Mr. Mario Zen, Mr. Min Xihao, Mr. Mark Ikauniks, Mr. Roger Yu, Mr. Steve Zha, Mr. Vassili Orfanos, Mr. Stelios Loumakis, Mr. Tairan Guo, Mr. Jamie Zhang and Mr. Evangelos Politis.

80. On the 29th September 2018, Claimants submitted witness statements by Mr. Xiaofeng Peng (who provided a further witness statement on the 31st May 2019), Mr. Hoong Kheong Cheong, Mr. Mario Zen, Mr. Min Xihao, Mr. Mark Ikauniks, Mr. Roger Yu, Mr. Vassili Orfanos, Mr. Stelios Loumakis (who provided a further witness statement on the 31st May 2019), Mr. Jamie Zhang and Mr. Evangelos Politis. By way of letter dated 29th September 2018 Claimants renounced to the testimony of Mr. Mark Ikauniks, Mr. Steve, Zha and Mr. Tairan Guo.

81. On the 29th November 2018, Mr. Xiaofeng Peng was cross-examined by Respondents' counsel, Mr. Mr. Hoong Kheong Cheong was cross-examined by Respondents' counsel and





re-examined by Claimants' counsel and Mr. Jamie Zhang was cross-examined by Respondents' legal counsel.

82. On the 30th November 2018, Mr. Roger Yu was cross-examined by Respondents' counsel, Mr. Vassilios Orfanos was cross-examined by Respondents' counsel, re-examined by Claimants' counsel and further cross-examined and re-examined, Mr. Mario Zen was cross-examined Respondents' counsel and re-examined Claimants' counsel, Mr. Stelios Loumakis was cross-examined by Respondents' counsel and Mr. Min Xiahou was cross-examined by Respondents' counsel.

## *XI RESPONDENTS' LIST OF WITNESSES.*

83. By means of letter dated the 8th November 2018, addressed to the Arbitral Tribunal, counsel to Respondents provided a list of witnesses together with an indication of the scope of the respective testimonies. Respondents' list of witnesses was as follows: Mr. Zeng Yaogan, Mr. Pan Guihao, Ms Yang Fan, Mr. Gus Papamichalopoulos, Mr Evi Dimitropoulou, Mr. Apostolos Kourtis, Mr. Charalampos Karampelis, Bank representative from China Merchant's Bank, Expert in the PV Energy Industry (to be determined).

84. Respondents submitted witness statements by Mr. Charalampos Karampelis, Mr. Tian Dan, Yang Yisheng, Ye Dejun, Zen Yaogan, Eduard Saura and Laura Cozar.

85. On the 11th April 2019, Mr. Zeng Yaogan was cross-examined by Claimants' counsel. On the 11th and 12 April 2019, Mr. Roger Dejun Ye was cross-examined by Claimants' counsel. On the 12th April 2019, Mr. Yang Yisheng was cross-examined by Claimants' counsel. Ms. Tian Dan was cross-examined by counsel to Claimants and was further examined by counsel to Claimants and Respondents respectively.

86. On the 17th July 2019 Mr. Zeng Yaogan was re-examined by Respondents and further cross-examination by Claimants. Mr. Roger Ye was re-examined by Respondents and further cross-examined by Claimants.

87. On the 18th July 2019 Mr. Xiaofeng Peng was cross examined by Respondents.

88. On the 19th July 2019 Mr. Stelios Loumakis was cross-examined by Respondents and re examined by Claimants. Mr. Xiaofeng Peng was re-examined by Claimants.

## *XII DECLARATION RE CLOSURE OF EVIDENCE.*

89. Both Claimants and Respondents declared that, saving the documents expressly referred to by Arbitrator Dr. Cassar Pullicino during the sitting of the 19th July 2019 which documents had been mutually agreed to by the parties, Claimants and Respondents declared that they had no further evidence.

90. As mutually agreed between the parties, on the 12th August 2019, Claimants filed the documents XDP44-XDP52 and Respondents filed Exhibits JQ-1 and ZYG-40.

## *XIII WRITTEN SUBMISSIONS.*

91. As was agreed by the legal representatives for Claimants and Respondents respectively during the sitting held on the 19th July 2019, in view of the Counterclaim filed in separate arbitral proceedings, SinSin Europe Solar Asset Limited Partnership and SinSin Solar Capital Limited Partnership versus SPI China (HK) Limited and SPI Energy Co. Ltd (I.5532/2018) and in order to ensure equality of treatment between Claimants and Respondents, final written submissions were filed by all parties on 2nd December 2019 ("First Round Submissions"). Written submissions of rebuttal were filed by Claimants and Respondents on the 2nd March 2020 ("Second Round Submissions"). Following a request by Respondents and pursuant to an order of the Tribunal dated the 22nd April 2020, on the 20th May 2020, Respondents filed additional legal submissions limitedly and exclusively for the purposes of responding to the additional legal submissions made by Claimants in paragraphs 138-153 (both inclusive) of their written submissions of rebuttal dated 2 March 2020.

## *XIV DECISION ON THE MERITS OF THE CLAIM.*

### *A. THE FACTUAL MATRIX*

92. By way of backdrop, the Arbitral Tribunal will provide a brief account of the principal facts of the case and the chronology of the principal events. The account is not intended to be exhaustive. However, to the extent that the facts and/or events do have a material legal bearing on the claims made by either Party they will be discussed in the analysis of the legal considerations.

93. Claimant SPI Energy Co., Ltd. is a global provider of photovoltaic (PV) solutions which is listed on the Nasdaq Stock Market. SPI Energy Co., Ltd. is the successor of Solar Power Inc, a signatory to the Share Sale and Purchase Agreement, which is the subject of these arbitral proceedings, following a merger between the two companies at the end of 2015. Claimant SPI China (HK) Limited is a subsidiary of SPI Energy Co., Ltd.

94. Claimants are involved in the business of provision of photovoltaic solutions for business, including developing, owning and operating solar PV projects as well as provision of EPC contractor services to PV farm projects.

95. Respondents are investment vehicles co-owned by two Chinese State-owned companies namely Xingxing Cathay International Group Co. Ltd (formerly Xingxing Ductile Iron Pipes Co. Ltd) and China Railway Trust Co. Ltd.

96. The Respondents were the indirect owners of a number of photovoltaic farms ("PV Farms") in Greece having a total power output of 26.57 MW (the "Greek PV Farms"). The Greek PV Farms were held through a structure comprising Sinsin Renewable Investment Limited (C 60350) (as a holding company) and four fully owned Greek subsidiaries named Astraios Energiaki A.E., Photovoltaic Parks Veroia I A.E., Orion Energiaki A.E. and Jasper PV Macedonia A.E.

97. There are conflicting versions of the Parties and their principal witnesses[2], as to the *iter* of the negotiations and as to who made the first suggestion relating to the possible sale of the Greek PV Farms to SPI, though there appears to be consensus that the matter was first discussed in early 2104.[3]

98. The parties have expressed divergent views and there are conflicting versions as to the motivating reasons for the initial discussions and subsequent negotiations. Claimants argue that Mr. Ye was eager to dispose of the Greek PV Farms because the investment made by Respondents at his behest turned out to be a bad investment. Whilst Respondents concede that as a result of the 2014 reduction in feed-in tariff for PV plants in Greece, the profitability of the Greek PV farms was impacted negatively, they argue that they were not a "toxic asset or one that needed to be sold off without delay" and they continued to operate profitably.[4] On the other hand, Respondents argue that the SPI Group was interested in acquiring the Greek PV Farms because they operate in the PV Business and they also suggest that in view of a prospective listing on NASDAQ, they were interested to build a portfolio of assets, a suggestion which is refuted by Claimants.

99. A first term sheet was signed at the end of July 2014 for a share price of €71,350,000 (seventy-one million, three hundred and fifty thousand euro).[5] The first term sheet makes no reference to the EPC Clause. Mr. Peng failed to secure board approval for the transaction during a board meeting of the 25th July 2014 and was directed to obtain improved terms. A due diligence investigation of the Greek PV farms by the SPI Group followed.[6]

100. The Parties also expressed divergent views as to the reason/s for the EPC stipulation and the time when the EPC stipulation was first discussed. The Claimants argue strongly that the EPC Clause was "an integral and fundamental ingredient of the financial provision of the SPA" given that the "anticipated return on the deal was completely disproportionate without additional consideration."[7] Mr. Peng testified that "the only way therefore that the SPI Group could agree to enter into the transaction at the purchase price of €70.66 million was for it to

[2] Mr Xiaofeng Peng for the Claimants and Mr Roger Deyun Ye (Roger Ye) for the Respondents.
[3] Para.49 of Roger Ye's Affidavit where he states "In early 2014, I mentioned to Mr. Peng the Greek PV farms as a possible investment opportunity [...]). The negotiations were led by Mr. Peng on behalf of the SPI Group and on the other hand by Mr. Roger Ye and Zeng Yaogan on behalf of the SinSin Funds. See also Exhibit-HK2 annexed to Mr. Hoong Kheong Cheong's solemn affirmation dated 27 September 2018).
[4] Para 87 of the Respondents' First Round Submissions.
[5] Paragraph 63 of Mr Ye's witness statement dated 18 February 2019 and Exhibit-HK2 annexed to Mr. Hoong Kheong Cheong's solemn affirmation dated 27 September 2018).
[6] Exhibit-HK2 annexed to Mr. Hoong Kheong Cheong's solemn affirmation dated 27 September 2018).
7 Para 35 of the Claimants' First Round Submissions.

obtain a side benefit (a *quid pro quo*) at least equal to the amount of the premium over true value.[8]

101. The Respondents, on the other hand, maintain *inter alia*, that the EPC Clause was only included in order to assist the SPI Group to deal with certain issues that may have been raised by its auditors.[9] More particularly, it could be of value in the context of a goodwill impairment test that may have been conducted by the auditors,[10] besides being of value to SPI as it sought to acquire more assets in its preparations to list on the NASDAQ.

102. Claimants' justification for an added "benefit" is predicated on their view that the valuation of the four Greek SPV's was far less than the agreed purchase price of €70,660,000 (seventy million six hundred and sixty thousand euro). In support of their, view Claimants' submitted three expert reports drawn up Mr Stelios Loumakis which indicates, *inter alia*, that a fair valuation for the Greek Plants would have been in the region of €42,000,000 (forty two million euro).[11] Respondents on their part, rebutted the valuation methodology and conclusions of expert reports submitted by Claimants' in their own 'ex parte' expert reports drawn up by Mr. Eduard Saura and Ms Laura Cozar dated 18th February 2019.[12]

103. As to timing of the negotiation of the EPC stipulation, Mr. Peng testified that the matter was broached early in the negotiations.[13] Respondents, on the other hand, submitted that the matter was raised for the first time on the 2nd September 2014, that is a mere four days prior to the execution of the Share Purchase Agreement.[14]

104. Exhibit YDJ-50 includes an email sent by SPI's director of Mergers and Acquisitions, Mr Huiyuan Zha (known as Steve Zha), at 13.03hrs on the 2 September 2014 requesting insertion of the EPC clause. The email reads as follows:

"In addition, we request SIN-SIN to promise that it will preferentially select SPI as its EPC partner in its future PV plant business. Also, it promises that among the PV plants invested by it or its affiliated companies within the next three years, project with a capacity of not less than 300MW shall be awarded to SPI and its affiliated companies for EPC works, while the price for the EPC contract works shall not be less than the then current market price and the terms

---

8 Affidavit by Mr Peng at page 3 para 7.

9 Respondents' First Round Submissions at para 140.

10 Para 100 of Mr Ye's witness statement dated 18 February 2019, Para 56 of Mr Zeng's witness statement dated 18 February 2019 and Exhibit ZYG-9 annexed to the said statement.

11 Page 12 of the September Technical Analysis and Opinion for the selling price from SIN SIN to SPI of a portfolio of 8 PV plants with a total capacity of 26.4 MWp in Northern Greece at the end of 2014 which states in conclusion "A reasonable price for the sale would be around 42 mls euros, offering both parties a Project IRR of 11%, that is satisfactory for Euro-Eurozone terms......... The only reasonable reason we could find for SPI to sign such an extremely high buying price of 70.6 mls, is the compensatory benefit of undertaking as an EPC contractor to build the worldwide PV portfolio of SIN SIN amounting to 360 MWp."

12 At page 62 of the Expert Report of Edward Saura & Laura Cozar of the 18th February 2019, they concluded that the "the conclusions of the Claimants' Expert Report are fundamentally flawed and do not assist in determining the value of the Greek PV Plants or the reasonableness of the Transaction."

13 Para 59 (d) of Mr. Peng's Second Affidavit.

14 Para 98 of Mr. Ye's witness Statement dated the 18th February 2019 and Exhibit YDJ-50 annexed to the said statement.





of payment shall not be less than the market levels. The above clause shall be written into the purchase agreement or the relative supplementary agreement."

105. SinSin submitted in evidence[15] an email from Liu Yilong to Mr. Zhao dated 2nd September 2014 attesting their go ahead to the SPI request for the inclusion of an EPC Clause, which go ahead was couched with a request to "pay attention not to add any term with other punishing obligations because of this term."

106. On the 27th August 2014, a first draft of the Sale and Share Purchase Agreement was forwarded to Mr. Peng who requested a number of amendments thereto. A Term sheet was issued on the 28th August 2014 indicating agreement on a total price of €70,660,000 (seventy million six hundred and sixty thousand euro).[16] The Investment Committee of SinSin Funds approved the transaction on the 29th August 2014.[17] A Board Meeting was held on the 5th September 2014 wherein the "Board approved the management (*sic*) to enter into the SPA with Sinsin"[18] and the Share Sale and Purchase Agreement was signed by the Parties on the 6th September 2014.

107. On the same day, that is, the 6th September 2014, as security for the fulfilment of SPI Group's obligations under the SPA, four Pledge of Shares Agreements were executed in terms of which the shares in the SPVs were pledged in favour of the SinSin Funds as follows:

(a) Pledge of Shares Agreement between the Respondents, the Purchasers, Veltimo Limited Cyprus and Astraios Energy SA dated 6 September 2014;

(b) Pledge of Shares Agreement between the Respondents, the Purchasers, SinSin Renewable and Jasper PvMakedonia SA dated 6 September 2014;

(c) Pledge of Shares Agreement between the Respondents, the Purchasers, Veltimo Limited Cyprus and Orion Energy SA dated 6 September 2014;

(d) Pledge of Shares Agreement between the Respondents, the Purchasers, Photovoltaica Parka Veroia I Malta Limited and Photovoltaica Parka Veroia I SA dated 6 September 2014.[19]

108. A public announcement was made by SPI on the OTCBB on the 9th September and 3 October 2014 notifying the market that SPI executed a share purchase agreement with SinSin, which included provisions "specifying that SinSin or its affiliates may appoint SPI and its subsidiaries to provide engineering, procurement and construction (EPC) services up to 360MW of additional solar PV projects that SinSin intends to invest in and/or develop over the next three years".

---

[15] Exhibit ZYG 9.

[16] Paragraph 68-72 of Mr Ye's witness statement dated 18 February 2019 and Exhibits YDJ-35 and YDJ-36 annexed to the said statement.

[17] Para 75 of Mr. Ye's witness statement dated 18th February 201).

[18] Exhibit-HK3 annexed to Mr. Hoong Kheong Cheong's solemn affirmation dated 27 September 2018).

[19] Vide Paragraphs 78 and 79 of Mr Ye's witness statement dated 18 February 2019 and also Paragraph 52 of Mr Zeng's witness statement dated 18 February 2019, together with Exhibits ZYG-6 and ZYG-7 annexed to the said witness statement.





109. The execution of the Share Sale and Purchase Agreement was ratified by the Board of Directors of XinXing Pipes at a board meeting duly held on the 10th September 2014. [20]

110. Claimants procured the transfer of 38,225,800 shares in SPI Energy Co. Ltd to the Respondents (the "SPI Shares"). The SPI Shares were trading at the price of US$0.717 each on NASDAQ and the number of shares transferred was calculated on this basis.[21]

111. Claimants made two cash payments, totaling EUR 7,066,000.[22]

112. In early November 2015, SPI Group requested an extension for the payment of the third and fourth instalments under the Share Sale and Purchase Agreement (each instalment mounting to €21,198,000) due respectively on the 30th November 2015 and the 20th June 2016.[23]

113. There were protracted negotiations between the parties which culminated in the execution of the Supplementary Agreement and the Personal Guarantee Agreement on or around the 14th March 2016.

114. Meanwhile SPI Energy Co Ltd transferred from OTCBB to NASDAQ and successfully listed its securities on NASDAQ on the 19th January 2016.

115. On the 30th October 2017, SinSin Funds sent a Notice of Default and Notice of Enforcement to SPI, notifying them as a result of the failure to pay the Sale Amount, an Event of Default under the Pledge Agreements had occurred and SinSin Funds would execute the Pledge Agreements if such Event of Default was not cured. [24]

116. On the 9th of November 2017, SPI replied with an Extrajudicial Response denying the claims made in SinSin Funds' Notices of Default and Notices of Enforcement Event. [25]

117. SinSin Funds instituted Court proceedings in Greece, including on the 25th January 2018 proceedings for enforcement of the Share Pledge Agreements. Proceedings in Greece have been suspended until the conclusion of these Arbitral Proceedings.

## *B. LEGAL CONSIDERATIONS*

118. This process has been replete with conflicting versions on the motivating reasons leading to the negotiations between the parties, on the *iter* and timing of the negotiations, particularly on the reasons and timing of the EPC stipulation. As has been conceded by

---

[20] Para 59 of Mr Zeng's witness statement dated 18 February 2019 and Exhibit ZYG-10 annexed to the said statement.

[21] Claimants' Statement of Facts.

22 Ibid.

[23] Paragraph 153 of Mr Ye's witness statement dated 18 February 2019 and Paragraph 81 of Mr Zeng's witness statement dated 18 February 2019.

[24] Exhibit 1 to the Affidavit of Charalampos Karampelis.

[25] Exhibit 2 to the Affidavit of Charalampos Karampelis.

Claimants, some of those differences are "arguably irrelevant." In this respect, Claimants have submitted as follows[26]

**"Indeed, the whole discussion relating to the origins of the EPC Clause is very arguably irrelevant, because whatever those origins, the fact remains that the clause was agreed and inserted into the SPA and must therefore be given its full legal effect."**

The logic of Claimants as to the "irrelevance" of the origins of the EPC clause is applicable to other considerations in respect of which there are conflicting versions. Besides the conflicting versions as to the "origins" of the EPC clause, the timing of the insertion of the EPC Clause, the omission of the EPC commitment in the Terms Sheet are all matters which are similarly "arguably irrelevant", given that the EPC clause did find its way in the final Share Sale and Purchase Agreement.

119. The Tribunal is in agreement with Paragraphs 170 and 171 of Claimants' Second Round Submissions which sum up the principal legal issue at stake in a succinct and correct manner by stating as follows:

**"Such is the volume of evidence produced in these Cases (by the SinSin Funds in particular) and such is the ardently different interpretation of that evidence by the Parties, that it would not be difficult to get lost in the minute detail of that evidence and to miss the fundamental issue in dispute.**

**Aside from the distraction of the often-irrelevant facts and allegations underlying that evidence, the essence of the Cases lies in the question concerning the breach of a particular contractual provision within a share purchase agreement, that is clause 2.3 of the SPA – the EPC Clause."**

The Tribunal considers the interpretation, application and legal effect of Clause 2.3 of the Share Sale and Purchase Agreement as central to the resolution of this dispute. Part of the evidence describing pre contract conduct has had more of a distractive effect rather than being of assistance for the Tribunal to determine the central issue in dispute. Pre-contractual conduct may at times not be entirely irrelevant for a resolution of a contractual matter, however in this case that consideration is limited by Clause 12.1 of the Share Sale and Purchase Agreement which provides that;

**"The Agreement (together with the Schedules) sets forth the entire agreement and understanding between the parties in respect of the matters set out herein and, accordingly, this Agreement supersedes and overrides any other agreement or understanding between the Parties in respect of the subject-matter hereof."**

In this award, the Tribunal shall first address the issues which it considers are the key legal aspects of this dispute and shall subsequently address each of the arguments proffered by the Claimants in support of their claim.

[26] Para 40 of Claimants' SPI's First Round Submissions.





1. CLAUSE 2.3 OF THE SHARE SALE AND PURCHASE AGREEMENT

120. Claimants and Respondents have proffered diametrically opposed views in respect of the meaning and application of Clause 2.3 of the Share Sale and Purchase Agreement.

*Claimants Position*

121. Claimants' position is to the effect that **"on a proper and legal interpretation of its terms and applying the rules of interpretation referred to above, the EPC Clause is not a conditional obligation, but it is an unconditional, complete and binding obligation ….."** [27]

122. They maintain that the proper interpretation of the words "subject to the conclusion of an hoc contract/s" in the context of the entire EPC clause is **"merely a reference to the practical necessity to have an EPC contract between SPI and the relevant SinSin entity investing in the PV plant in question, because other than that, the EPC clause includes a complete, clear, categorical and unconditional undertaking that SinSin (or their affiliated entities) shall be investing in PV plants with a capacity of more than 360MW and 'shall' appoint SPI as the EPC contractor for those projects"**. [28]

123. Claimants submit that **"Indeed, the Parties included in the EPC Clause all the components of the EPC contracts that they could possibly agree at the time. The object of the contracts was agreed: EPC contracts for PV projects with an output of at least 360MW. The EPC contract parties were agreed: SinSin or their affiliates as principals and SPI as contractor. The contract period was agreed: three years from completion of the SPA. The price was agreed: no less than current market prices for comparable work. The terms of payment were also agreed: no less than current market terms for comparable work. There was nothing else that the Parties could have possibly added in the EPC Clause at the time. It was intended to be and is a complete agreement, and it comprehensively spells out everything that objectively could be spelt out at the time."** [29]

124. Claimants maintain that the EPC clause is in fact a 'financial' provision. This, they maintain, is manifest also from the language chosen by the parties in the provision itself where it states that the agreement contained therein is made **"[…] pursuant to the conclusion of the transfer of shares contemplated herein, that is, as an integral part of the financial consideration for the shares. The term "pursuant" denotes that the EPC commitment is in fact a consequence of the transfer of shares and a financial component of that transfer."**[30]

[27] Para 113 of Claimants' First Round Submissions.

[28] Para 120 of Claimants' First Round Submissions.

29 Para 123 of the Claimants' First Round Submissions.

[30] Para 117 of the Claimants' First Round Submissions.

*Respondents' position*

125. Respondents, on the other hand, have argued that "**even a literal reading of the clause still makes the interpretation given by SPI Group untenable and unsustainable**".[31] They submit that "**At the end of the first paragraph of the EPC Clause, there is a clear condition which states "subject to the conclusion of an ad hoc contract/s for the purpose and the below conditions.**"[32] They maintain that "**SPI Group cannot separate the word 'shall' (as used in Clause 2.3.1) from its context. The limb of the EPC Clause in para 2.3.1 only comes into play if and only if ad hoc contracts are successfully concluded**." They argue that "**The Clause therefore can clearly never be interpreted as being unconditional and, thus as adding considerable monetary value in order to bridge the alleged gap between the purchase price for the shares in SinSin Renewable and their fair market value.**"[33]

126. Clause 2.3 is, in Respondents' view, a "**a gesture of goodwill and acknowledges the parties' intention regarding future co-operation on solar power projects, a "best endeavours clause**"[34] that was intended to indicate that the SinSin Funds would favourably consider awarding EPC contracts to SPI in the future if (and only if) the Parties could conclude the relative EPC contracts.[35] Clause 2.3 is to SinSin "**a conditional promise of future collaboration,**"[36] a clause which "simply records (SinSin's) gesture of goodwill and acknowledges the Parties' intention regarding future co-operation on solar power projects. [37]

There is, in SinSin's view "**a considerable difference between:**

**(a) a binding and conditional clause in terms of which the SinSin Funds would have been happy to give SPI Group EPC work in appropriate circumstances and under the appropriate terms and conditions and if and only if the relative EPC contract could have been concluded to the satisfaction of both Parties; and**

**(b) an unconditional obligation to award EPC contracts that had a value that bridged the alleged "gap" between the fair market value of the shares in SinSin Renewable and the agreed purchase price.**" [38]

*The Issue of bad faith*

127. Claimants have also invoked bad faith on the part of Respondents, arguing that " **....SinSins's failure to even invest in the PV plants referred to in clause 2.3 of the SPA ( let alone to award EPC contracts for those plants to SPI) is in itself already a flagrant breach of the SPA because it manifests bad faith perpetrated by SinSin when agreeing the EPC Clause and the SPA and it is in direct breach of other provisions of the SPA itself.**"[39] This submission is developed further by the Claimants in paragraphs 135 *et seq* of

31 Para 254 of the Respondents' First Round Submissions.
32 Para 255 of the Respondents' First Round Submissions.
33 Paras 254-258 of the Respondents' First Round Submissions.
34 Para 43 of the Respondents' Statement of Defence.
35 Para 17 of the Respondents' First Round Submissions.
36 Para 53 of the Respondents' First Round Submissions.
37 Para 43 of the Respondents' Statement of Defence.
38 Para 47 of the Respondents' First Round Submissions.
39 Para 109 of the Claimants First Round of Submissions.





their submissions. Claimants argue that SinSin acted in bad faith both during negotiations prior to the SPA, by withholding from them the fact that they were internally treating the EPC clause as non-binding and also after completion of the contract, as a result of SinSins's failure to invest in PV plants and their failure to award any EPC contracts, whether to SPI or to anyone else.

128. The Respondents, on the other hand, refute any suggestion that their actions are tantamount to bad faith and counter argue that the suggestion that SinSin never entered into PV investments after the Share Sale and Purchase Agreement was concluded and that they did not award any EPC contracts is to say the least incorrect and misleading. Respondents submit that, as a matter of fact, they performed all of their obligations under the Share Purchase Agreement in good faith and in effect it is SPI and other group entities which acted in utmost bad faith by undertaking to make various payments but never honoured such obligations. SinSin further submit that Claimants went so far as to sign a Supplementary Agreement pursuant to which it confirmed its indebtedness to SinSin unconditionally but ultimately defaulted on its obligations. Claimants also emphasise the point that the first time that a reference to their interpretation of the EPC Clause and the purported obligations resulting therefrom was made was in October 2017, that is after the SinSin Funds had sought to enforce the pledges over the shares in the Greek SPVs.

## 2. MALTESE LAW ON INTERPRETATION OF CONTRACTS

129. In the Tribunal's view, the resolution of the dispute under consideration is ultimately a matter of contractual interpretation and proper application of Clause 2.3 of the Share Sale and Purchase Agreement, coupled with an ascertainment whether the allegation of bad faith propounded by the Claimants has been proven to the degree required by law. It is therefore in this context that the Tribunal will refer to the rules of interpretation of contracts under Maltese law.

130. The fundamental principle regulating effects of contracts is that the will of the parties, as expressed in the contractual provisions, should prevail and should be observed, *Pacta sunt servanda.* This stems from the legal principle that "Contracts legally entered into shall have the force of law for the contracting parties." [40]

Accordingly, a court or arbitral tribunal should not disturb the balance that contracting parties would have, at times painstakingly, tried to achieve in their commercial negotiations, nor to substitute its discretion for the parties' will and should restrain itself from interfering in the parties' mutual agreement, unless the contract is vitiated at law or is otherwise unlawful, null or annullable.

The Maltese Courts have, on innumerable occasions, made reference to this fundamental principle of the law of contracts. The words of the Court of Appeal in Gloria wife of Jonathan

40 Article 992 (1) of the Civil Code.

Beacom et vs Architect and Civil Engineer Anthony Spiteri Staines,[41] sum up the matter succinctly as follows:

**"The cardinal principle which regulates the institute of contracts remains at all times that the binding effect of a contract must be respected and that it is the will of the parties as expressed in the agreement which must be observed and fulfilled. Pacta sunt servanda."**

In truth, both Claimants and Respondents have invoked the "pacta sunt servanda" principle, each to a different end. The diametrically opposed views of Claimants and Respondents arise from a differing interpretation of Clause 2.3 of the Share Sale and Purchase Agreement.

131. It is therefore the adjudicators' task to ascertain the parties' will, **as expressed in the agreement** (words emboldened for emphasis only.) Trabucchi in his Institutes of Civil Law[42] underlines this succinctly;

**Quando si dice che oggetto dell'interpretazion contrattuale e' in sostanza una *quaestio voluntatis,* bisogna intendere bene. *Questio voluntatis* non vuol dire ricerca di quella che puo'essere stata l'intenzione o lo scopo intimamente perseguito dall'uno o dall'altro contraente. Cio' che si deve ricercare e' il "voluto", cosi' come tradotto nelle dichiarazioni negoziali."**

"When one states that the objective of contractual interpretation is in substance a matter of *quaestio voluntatis,* one should understand carefully. *Quaestio voluntatis* does not mean a research into the possible intention or the objective intimately sought by either one of the contractual parties. What should be ascertained is what was "willed" (by the parties) as translated in the contractual stipulations."

132. Equally important as the fundamental tenet of "Pacta sunt servanda" is the principle of good faith which is enunciated in Article 993 of the Civil Code which provides that "Contracts must be carried out in good faith."[43] The terminology echoes the principle enunciated in the Napoleonic Code[44] which is the principal source of the Maltese Civil Code.

In Lawrence Fenech vs Simon Interiors Limited[45], the Court observed that it is on the basis of (the principle of) good faith, that Articles 1002 et sequitur of Chapter 12 on the Interpretation of Contracts are draw up and particularly Article 1003, which provides that "Where the literal meaning differs from the common intention of the parties as clearly evidenced by the whole of the agreement, preference shall be given to the intention of the parties.

---

[41] Court of Appeal; 5th October 1998.
[42] Trabucchi Istituzioni di Diritto Civile, 22 Edizione, Cedam pg 681.
[43] Carmelo Mifsud vs Joseph Spiteri et (Civil Court, First Hall, Mr. Justice Wallace Gulia, 30th April 1987); Chris Cachia & Associates Limited vs Damian u Roseanne spouses Formosa (Civil Court First Hall, Mr. Justice Raymond Pace, 1st October 2002.
[44] Marcade V. Spiegazione Teorico-Pratica del Codice Napoleone (Napoli 1875), Volume VI, Para 466.
45 First Hall, Civil Court Mr. Justice Raymond Pace, 27th June 2002.

133. Good faith permeates contractual relations and is considered as a rule of conduct to be observed by contractual parties during negotiation, execution and performance of one's contractual obligations.[46] Mr. Justice Philip Sciberras summed up the matter as follows:

**"Good faith does not have mere theoretical value. On the contrary, in an objective sense, it is understood as a rule of conduct of reasonableness and above all loyalty and correctness. In general terms it constitutes an ethical-juridical principle in the exercise of rights."[47]**

As the Court of Appeal stated, an adjudicator should not allow a party to take advantage of "mala fides" as "no business should be immune from the fundamental principle of *fraus ommia corrumpit*."[48]

134. The parties have gone to great lengths to provide their respective interpretations to Clause 2.3. In support of their respective positions, the parties have adduced voluminous evidence in respect of pre and post contractual conduct and behavior, in an attempt to show the underlying intention and motive behind Clause 2.3. Not all of that evidence necessarily has weight in a determination of the proper meaning and application of the provisions of Clause 2.3.

The legislator has not left contractual interpretation up to an adjudicator's arbitrariness or subjectivity. The interpretation and construction of contracts is itself governed by rules and the Maltese Civil Code has provided a number of rules of interpretation in Articles 1002 to 1011.[49] It is these norms of interpretation which the Tribunal is bound to apply in its interpretation of the disputed clauses in the Share Sale and Purchase Agreement.

135. The starting point for an adjudicator is to attribute to the words of an agreement the meaning attached to them by usage at the time of the agreement with a view to an objective reading of the disputed clause. The words which the contracting parties use to articulate and express their intent are the prime keys available to an adjudicator to understand what the parties intended to achieve. If by giving to the words used their ordinary meaning, the contractual provision is clear, the contractual provision should be applied according to that meaning. It is therefore the words used in the context of the clause and the agreement as a whole that are the first principal determinants of the mutual intention of the contracting parties. The first rule of interpretation enunciated by the Civil Code[50] is in fact:

**"Where, by giving to the words of an agreement the meaning attached to them by usage at the time of the agreement, the terms of such agreement are clear, there shall be no room for interpretation."**

46 Francis Carbone vs Bart Attard, First Hall Civil Court Mr. Justice Philip Sciberras 3th June 2004.
47 Carmelo Bonello et vs Concetta Farrugia, Mr. Justice Philip Siciberras, Appeal form the Rent Regulation Board.
48 Anthony Xuereb vs Debono Developments Ltd (Court of Appeal, Inferior Jurisdiction 14th January 2015.)
49 L-Alfabett tal-Kodici Civili, Volume K, by Mr. Justice Philip Sciberras, pages 641 et seq, refers to a long list of judgements which have applied Articles 1002 et seq of the Civil Code regulating Interpretation of Contracts.
50 Article 1002 of the Civil Code.





As has been repeatedly observed by the Court of Appeal, **"it is not the interpretation given by the parties to the agreement or the diverse meaning given by them to the agreement which matters but rather it is the objective reading by the judge who attributes to the words their ordinary meaning in the context in which they were used by the contracting parties that matters."**[51]

136. Article 1003, which is the second rule of interpretation contemplated by the Civil Code does refer to the parties' intention by providing that:

**"Where the literal meaning differs from the common intention of the parties as clearly evidenced by the whole of the agreement, preference shall be given to the intention of the parties".**

Article 1003 is not an open invitation to the Arbitral Tribunal to embark upon a search of the parties' intention in all circumstances. Neither does Article 1003 suggest that when, *ex post*, the parties disagree on the interpretation of their contractual stipulations, intention should prevail over the written agreement. The Maltese Courts have had occasion to point out that Article 1003 is applied in circumstances where it results in an unequivocal manner from a reading of the whole agreement that the words expressed in the written agreement do not reflect the intention of both contractual parties (and not merely the intention or view of one of the parties) as clearly evidenced by the whole of the agreement. In those circumstances, preference is given to the parties' common intention over the written word. [52] Indeed, reference to article 1003 should only be resorted to if by applying the rule in article 1002, the adjudicator cannot properly come to the conclusion that the language of the agreement is clear, and therefore needs to resort to further interpretative tools in order to determine the mutual will of the parties.

3. APPLICATION OF THE RULES TO THE SHARE SALE AND PURCHASE AGREEMENT

137. In the dispute under consideration, rather than a matter of disjoint between the parties' common intention and the words as expressed in Clause 2.3, the dispute revolves around a differing interpretation of the meaning and import of Clause 2.3.

138. The disputed clause reads as follows. (Parts have been emboldened for emphasis only)

> *2.3 The Parties hereby agree that pursuant to the conclusion of the transfer of shares contemplated herein and in recognition of their mutual desire for future co-operation, the Vendors, or any one of their respective affiliated entities as the case may be, undertake to appoint Purchaser Two as the EPC contractor in connection with*

[51] John Zammit et vs Michael Zammit Tabona proprio et nominee (Court of Appeal in its Superior Jurisdiction 28th February 1997); TGS Company Limited vs Polidano Brothers Limited (Court of Appeal, 18th July 2017)

[52] J. Bartolo et vs A. Petroni et noe (Court of Appeal, 7th October 1997). See also Vincent Aquilina vs Caterina Micallef (Court of Appeal 12th May 1997); Mary Lanfranco vs Salvatore Vella et (Court of Appeal, 6th October 2000);Avv. Leslie Grech noe vs Ivan Burridge pro et noe Court of Appeal, 14th January 2002).





*future projects undertaken by them, or one of their respective affiliated entities as the case may be, **subject to the conclusion of an ad hoc contract/s for the purpose and the below conditions:***

*2.3.1. the Vendors hereby confirm that either one of them or one of their respective affiliated entitles, as the case may be, shall be investing in photovoltaic plants with a capacity of over 360M within three year from the Closing date and that the Vendors, or one of their respective affiliated entities as the case may be, shall appoint Purchasers as the EPC Contractor in connection with such project; and*

*2.3.2. provided that the price of the EPC contract work and the relative terms of payment set by the Purchasers for the EPC work in question shall not be less than the then current market price/levels for comparable work.*

139. Legal drafting is not a perfect science and it is the very imperfection of legal drafting that in most instances gives rise to disputes and the consequent need to interpret clauses in a contract. However imperfections in drafting are often the result of commercial negotiations with a view to achieve compromise and a balancing of interests. It is not the function of this Tribunal to upset that balance, if by attributing to the text and language used the common meaning attached to them by usage at the time of the agreement, it is satisfied that the mutual intent of the parties is clear.

The opening paragraph of clause 2.3 reads clearly enough; it is an undertaking by the Vendors or any one of their respective affiliated entities to appoint Purchaser Two as the EPC contractor in connection with future PV Investments, subject to the conclusion of an ad hoc contract. By attributing to the words used their ordinary meaning, one can only reasonably conclude that the undertaking to appoint Purchaser as an EPC contractor is a conditional undertaking; it is clearly stipulated as conditional upon the conclusion of a mutually agreed contract.

Nor is one able to argue convincingly that:

(i) the Respondent, through that provision, effectively and unconditionally bound itself to grant "future" EPC contracts; rather, the Tribunal is of the view that the obligation to appoint "Purchaser Two" as an EPC Contractor is <u>conditional</u> on (i) the Respondents actually making PV investments in the future; and (ii) the execution of an *ad hoc* contract for that purpose. To argue otherwise would be tantamount to ignoring the designation of Clauses 2.3.1 and 2.3.2 as "conditions";

(ii) all of the principal terms of the *ad hoc* contract were agreed to, subject only to their crystallization in a written agreement. EPC contracts are complex agreements which include mutual rights and obligations which go far beyond what has been indicated in Clause 2.3. As to Claimants' submission that the Parties included in the EPC Clause all the components of the EPC contracts that they could possibly agree at the time, the fact that all the components of an EPC contract which could have been agreed at the time were expressly contemplated in Clause 2.3 does not, of itself, create a comprehensibly regulated obligation which is unconditional and specifically enforceable. The Tribunal cannot concur with this position. Indeed the Tribunal





favours the view that in effect, the fundamental aspects of such an enforceable obligation such as (i) the specific contractual party, (ii) the precise object of the agreement, (iii) the price and (iv) the contract modalities are completely absent. Accordingly the Tribunal is of the view that it cannot be stated that Clause 2.3 of the Share Sale and Purchase Agreement contains all of the fundamental elements of an EPC contract, subject only to the formality of sign off.

140. The 'conclusion of an ad hoc contract' is not the only conditionality contemplated by Clause 2.3, the opening paragraph of which suggests that there are an additional two **"below conditions"**. Faced with the clear designation of Clauses 2.3.1 and 2.3.2 as "conditions", the Tribunal is, on the basis of Article 1002 of the Civil Code, bound to interpret them as nothing more nor less than what the contracting parties themselves have called them – **"conditions."** There is no ambivalence, no ambiguity, in the designation of these clauses as conditions, and therefore the Tribunal cannot set aside the designation and construction of Clauses 2.3.1 and 2.3.2 as "conditions" and opt to accord preference to any purported "intention'' that is not reflected in the "literal" meaning of the terms as expressed. Accordingly, the circumstances required for Article 1003 to trump Article 1002 are not evident.

Of the two 'below conditions,' the first 'condition' is stipulated in terms of 2.3.1. The designation of 2.3.1 as a **condition** is not inconsequential from an interpretational point of view. Once 2.3.1 is stipulated as a condition, as the opening paragraph to 2.3 clearly spells out, then it would read as an undertaking by the Vendors that either one of them or one of their respective affiliated entitles, will appoint Purchaser Two as the EPC Contractor (subject to the conclusion of an ad hoc contract) on condition that "they shall be investing in a photovoltaic plants with a capacity of over 360M within three year from the Closing date." The view propounded by Claimants[53] that the "element of uncertainty is categorically and unequivocally excluded" cannot be reconciled with the designation of 2.3.1 as one of the conditions to which the undertaking in terms of 2.3 is subject.

That being the case, then on the basis of Section 1058 (1) of the Civil Code, if the three year period lapses without Vendors, either one of them or their respective affiliated entities investing in a photovoltaic plants with a capacity of over 360M within three years from the Closing date, that condition would be deemed to have failed.

In terms of S.1058. (1) **"Where an obligation is contracted on condition that an event shall happen within an appointed time, such condition shall be deemed to have failed if the time expires without the event having happened."**

141. The second 'condition' of Clause 2.3 stipulates that the price of the EPC contract work and the relative terms of payment set by the Purchasers for the EPC work in question shall not be less than the then current market price/levels for comparable work. The condition sets guidelines for price and terms of payment but cannot be construed as establishing the "agreed price" as suggested by Claimants.[54] The price is as yet undetermined. Market conditions change over time and any intention to agree on price and terms of payment in line with market

[53] Para 124 of the Claimants' First Round Submissions.
[54] Para 123 of Claimants' First Round Submissions.

conditions at the time of a contract being executed, can only be construed as having established guidance for negotiations between the parties at a later stage; the parties could not envisage what those market conditions would be over the course of the three years contemplated in Clause 2.3 and therefore could never have had any actual price in mind. They left the matter open for further discussion and negotiation if the right circumstances presented themselves. The very words and context of Clause 2.3 clearly denote that it was clear or should have been clear to both parties that they would be required to enter into further negotiations with respect to the EPC contracts, in the event that Respondents made future PV investments.

In paragraph 116 of their Second Round Submissions SPI proffer the view that 2.3 is to be read in a manner that the obligation of the Vendors or their affiliated entities to appoint Purchaser Two as the EPC contractor is conditional upon the obligation of the Vendor itself to invest in in PV plants with a capacity of over 360MW within three years and to appoint SPI as EPC Contractor for those projects.

In this respect, Claimants state as follows: "Indeed, if anything, it is the entry into the specific EPC Contracts that is conditional upon the fulfilment by the SinSin Funds of the direct, unconditional and unequivocal obligations set out in clause 2.3.1, that is, the obligations to (i) invest in PV plants with a capacity of over 360MW within three years; and (ii) appoint SPI as EPC Contractor for those projects. The SinSin Funds' failure to invest in PV projects and to offer any EPC contracts to SPI made the fulfilment of the condition they now seek to invoke against SPI an impossibility."

In this context, if condition 2.3.1 were to be severed in this manner from the rest of the clause to be read, as suggested in para 116 of Claimants' Second Round Submissions, in such a manner so that the obligation of Vendor to appoint Purchaser as EPC contractor is conditional upon the unconditional obligation of the Vendor to (i) invest in PV plants with a capacity of over 360MW within three years; and (ii) appoint SPI as EPC Contractor for those projects, the clause could fall foul of Section 1056 of the Civil Code which provides as follows "(1) Where an obligation is contracted on a condition which makes the obligation depend solely upon the will of the obligor, the obligation is null."

142. Respondents have pointed out that the EPC commitment was not raised by Claimants during the negotiation of the Supplementary Agreement. No unfavorable consequences or implications could or should be drawn from that omission, even because at the time the three-year period was still running with a remaining eighteen months or so to go. More pointedly, in support of their view that Clause 2.3 was not intended as an unconditional and enforceable obligation, Respondents sought to point out that it was not until the 9th November 2017 in a letter sent by their Greek counsel and only as a reaction to the Notice of Default and Notice of Enforcement Event moved by Respondents, that they formally requested Respondents to fulfill the EPC obligation. Claimants have rebutted by asserting that they actively requested fulfillment of the EPC Clause via communications with Roger Ye. Though this informal goading, in lieu of a formal intimation to perform may, on the face of it be difficult to reconcile with Claimants' stand that to them the value of the unsecured EPC obligation ran into tens of millions of Euro, no unfavorable legal consequences or implications could or should be drawn





from that omission even had it been established. It is also not to be excluded that this approach may be attributed to cultural differences or strategic considerations and, in any event, this omission is no impediment to claim subsequently, even in view of Clause 11.1 of the Share Sale and Purchase Agreement which provides as follows:

"the failure of a Part to enforce or to exercise, at any time or for any period of time, any term of or any right arising under or pursuant to this Agreement does not constitute and shall not be construed as, a waiver of such term or right and shall in no affect that Party's right to enforce or exercise it later."

*Context and position of clause 2.3*

143. In conjunction with the consideration as to whether Clause 2.3 is a conditional or an unconditional obligation, the Tribunal has also considered the argument submitted by Claimants' that the EPC Clause was agreed as an integral and fundamental ingredient of the financial provisions of the Share Sale and Purchase Agreement[55] as further corroborated by the relevance of the 'location' of 2.3 within Clause 2 entitled 'Consideration for Sale Shares'. Claimants argue that the inclusion of the EPC obligation within the Consideration Clause is highly relevant. In this respect, Claimants submit that "it cannot be emphasized enough that the Parties chose to include this provision within clause 2 of the SPA which is that part of the SPA that deals with the Consideration for the Sale Shares. There can be no doubt that clause 2.3 is a fundamental ingredient of the pricing mechanism within the SPA, so that the financial rationale of the SPA is completely wiped out without it." [56]

Claimants have argued that the relevance of the context in which the clause was inserted is pointing, even in view of Article 1008 of the Civil Code which provides that "all the clauses of a contract must be interpreted with reference to one another, giving to each clause the meaning resulting from the whole instrument."

144. Context is of course key in the interpretation of contractual clauses; indeed interpretation and construction always depend on context. Context however does not and should not be considered as synonymous to location. Where a clause is located in a contract may have a material significance to context, but on its own will not determine context or meaning. Article 1008 of the Civil Code is indeed relevant for a proper interpretation of the disputed Clause. However, the Tribunal finds that there is no compelling grounding for the Claimants' argument based simply on the inclusion of Clause 2.3 under the general heading 'Consideration for Sale Shares'. A reading of the entirety of Clause 2 of the Share Sale and Purchase Agreement and of the whole of the agreement, reveals no language to suggest or evidence, that part of the stipulated consideration is a *quid pro quo* for the EPC obligation.

Indeed, the Tribunal finds that the more compelling view is that it is Clause 2.1 that unequivocally determines the consideration for the shares. To the contrary of Claimants'

[55] Para 35 of the Claimants' First Round Submissions.
[56] Para 11 of the Claimants' First Round Submissions.

argument, Clause 2.1 clearly states that the "Parties agree that **the total consideration** payable by both Purchasers to the Vendors **for the purchase of the Sale Shares (emphasis added)** under this Agreement shall be an amount equivalent to seventy million, six hundred sixty thousand Euro (€70,660,000)." From a reading of 2.1, it is clear that the consideration contemplated is for the **"purchase of Sale Shares."** Though Clause 2.3 may give rise to a number of interpretational issues, the same cannot be said for Clause 2.1 which is clear and unequivocal and leaves no room for interpretation.

145. The express and exclusive nexus of the price to the Sale Shares in Clause 2.1, the absence of any apportionment of the consideration to or for the EPC obligation, the absence of a deferred payment obligation for partial settlement of price to coincide with the performance of the EPC obligation or milestones in respect thereof, or the absence of any form of security for the fulfillment of the EPC obligation are all considerations which militate against the interpretation that the seventy million, six hundred sixty thousand Euro (€70,660,000) includes a component as consideration for the EPC obligation.

146. Neither does the text or location of the wording in Clause 2.3.1 necessarily bear out SPI's submissions (echoing Mr. Peng's words[57]) that without the EPC clause "SPI could not and would never have signed the SPA", whether in the Consideration Clause or in Warranties Clause. The Vendors do acknowledge at Clause 4.3.1 that the Purchasers have entered into the Share Sale and Purchase Agreement in reliance upon the Warranties but Clause 2.3.1 or wording to that effect is not stipulated as one of the Warranties.

*The company announcement and its significance*

SPI have adduced evidence to the effect that their understanding was that they had secured a firm and binding EPC commitment. Reference is made in fact to Exhibit XDP17 attached to Mr Peng's affidavit in terms of which it is recorded that he stated .... We will sign this Agreement with SinSin, a leading company in China to acquire their 26.57 MW PV projects base in Greece today or tomorrow. In the meantime, they will authorize 360MW PV Projects EPC Contracts During the next 3 years [...] this is a big milestone that SPI achieved. [...] In the meantime, build a strong relation with SinSin. It will get more support from Sinsin reosources in future SPI growth."

Mr. Peng could very well have assumed that he had secured, for the SPI Group, a series of EPC contracts for PV Projects with an output of at least 360 MW. He could indeed have had several reasons for that communication and it is not the Tribunal's task to determine what those reasons could have been. For the purposes of the resolution of this dispute, what is critically relevant is not what Mr. Peng assumed and communicated internally a few days before the Share Sale and Purchase Agreement but what was agreed to in the Share Sale and Purchase Agreement itself.

147. Claimants have also argued that the discussion and subsequent agreement to raise the 300MW commitment to 360MW is also indicative that the EPC Clause was binding.[58] In the

---

[57] Para 8 of Mr. Peng's First Affidavit

[58] Para of Claimants' First Round Submissions.

Tribunal's view, the critical point under consideration is not whether the clause is binding or not but rather whether the obligation is conditional or unconditional, and in the case of a conditional obligation, whether the conditions were satisfied. It is conceded that there would have not been much sense to renegotiate the megawattage if the matter were entirely discretionary and the renegotiation is indicative that Claimants did not regard this as a discretionary matter. However, by attributing utility and/or value to a 360MW commitment rather than a 300MW commitment, one cannot reasonably infer an unconditional obligation. The added mega wattage is still consistent with the thesis in favour of a binding conditional (as against a non-binding or discretionary) commitment, in the sense that in the event of the verification of the conditions upon which the obligation was contingent, there would have been added benefit in an increased megawattage obligation.

148. Both Claimants and Respondents have referred to the public announcement made by SPI on the OTCBB and its relevance for the purpose of interpreting the disputed clause. Respondents have argued that the language of the public announcement, particularly use of the word "may" is evidence of a 'discretion' and not an unconditional obligation.[59] Claimants have on the other hand argued that the public announcement makes it "abundantly clear that the SinSin transaction was perceived to be the beginning of a strategic collaboration in which SPI would act as SinSin's dedicated EPC partner." [60]

In the Tribunal's opinion the Company Announcement cannot be a decisive factor in the determination of the mutual intent of the parties to the contract and in the interpretation of Clause 2.3. The Tribunal however does not consider it as evidence of a discretion, which should be differentiated from an unconditional obligation. A discretion imposes no obligation, whether conditional or unconditional. A conditional obligation, on the other hand, brings on a binding enforceable obligation, once the condition verifies itself. Neither does the public announcement attest to an intention to appoint SPI as SinSin's dedicated EPC partner. In the Tribunal's view, the announcement could not be couched in definitive unconditional wording, not because there was a discretion on SinSin's part whether to appoint SPI or their affiliated entities as EPC contractors but because the obligation was contingent upon the verification of a number of conditions. The divergent submissions on the interpretation of the Company Announcement have not been critical for the Tribunal's deliberations on the meaning of Clause 2.3, however, if at all, the announcement itself resonates the view that Clause 2.3 cannot be read as an unconditional obligation. To couch the announcement in unconditional terms would in fact have been a misrepresentation of Clause 2.3 and may have been tantamount to misleading the market.

[59] Para 57 of the Respondents First Round Submissions.
[60] Para 53 of the Claimants' First Round Submissions.





4. OTHER RULES ON INTERPRETATION OF CONTRACTS

149. The Arbitral Tribunal finds that Clause 2.3 reads and was intended by the contracting parties as a conditional obligation. In its analysis, the Tribunal finds further comfort in other rules of interpretation which dispel any lingering doubts as to the alleged unconditionality of Clause 2.3 in favour of the obligee.

Section 1364 of the Civil Code, regulating sale, provides that **"Any provisions of a contract of sale which are doubtful or ambiguous shall be interpreted against the seller or the buyer according to the rules of interpretation relating to contracts in general."** The rules of interpretation relating to contracts in general do in fact contemplate an express provision to be applied for the resolution of doubts, in any. [61]

Section 1009 of the Civil Code provides that **"in case of doubt, the agreement shall be interpreted against the obligee and in favour of the obligor."** Accordingly, not only do Claimants have a more arduous probative task as the onus of proof lies with them (*onus probandi incumbit ei qui dicit*); additionally, as an obligee, Article 1009 of the Civil Code tilts the balance of any possible doubtful interpretation against them. In the absence of a clear interpretation of the contract, any doubt or ambiguity as to whether Clause 2.3 imposes an unconditional obligation to appoint an EPC contractor would, on the basis of Section 1009, have to be resolved in favour of the Respondents as the obligors.

5. THE ARGUMENT BASED ON ARTICLE 1004 OF THE CIVIL CODE

150. Claimants have referred to Article 1004 of the Civil Code[62] in terms of which "when a clause is susceptible of two meanings, it must be construed in the meaning in which it can have some effect rather than in that in which it can produce none." In the view of the Tribunal, the reference to Article 1004 is, in this context, misplaced. An interpretation of Clause 2.3 as a conditional obligation is not an interpretation that would render clause 2.3 without effect, but one that would have effect only subject to the satisfaction of one or more conditions. Clearly one has to distinguish between an interpretation which does not produce an effect; and one where no effect is produced because the conditions did not verify themselves or remained unsatisfied. The non-fulfillment of the conditionalities with the consequence that the obligation did not have a resultant effect does not mean that the clause was interpreted in a manner which had no effect. In this sense therefore Article 1004 cannot be validly invoked to favour an unconditional undertaking in lieu of a conditional undertaking or to tip the balance from conditionality to unconditionality; that would be re-writing the contract and displacing the will of the parties as expressed in Clause 2.3.

[61] Giovanni Bugeja vs Carmelo Pisani (Commercial Court, 14th November 1951).

[62] Para 53 of the Claimants' First Round Submissions.

## 6. THE "CONTRA PROFERENTEM" RULE ARGUMENT

151. The Tribunal has also considered the Claimants' arguments that, given the divergent interpretations of the parties, the benefit of doubt, rather than being accorded to the Respondents, should be accorded to the Claimants on the basis of the "Contra Proferentem" Rule.[63] This argument is predicated on the assumption that the Contra Proferentem rule forms part of Maltese law[64] or that it exists as a 'general rule of law' independently of the context of applicable national law.[65] Claimants submit that the rule has been "recognized by Maltese law and given practical application by the Maltese courts in the interpretation of contracts, particularly in the context of contracts of insurance."

152. The judgements cited by Claimants do invoke the Contra Proferentem rule but do not constitute authority to support the view that in the matter under consideration, Article 1009 is or can be thereby displaced and the doubt is to be resolved in favour of the Claimants, rather than the Respondents. The cited judgements refer to (i) contracts of insurance, (ii) in circumstances where the "contract is drawn up and prepared exclusively by the insurer,"[66] (iii) and in any event, judicial decisions do not make law, though they do have interpretative value.

153. Judgements of the Maltese Courts do not provide any judicial interpretative trend to suggest that the Contra Proferentem rule is one of general application. Neither can it be concluded that the restricted circumstances within which the Contra Proferentem rule has been limitedly invoked domestically are applicable in the matter under consideration. The Contra Proferentem rule has admittedly found its way into a number of systems of law, including those of a Roman and/or French tradition, the origins of which are also shared by Maltese Civil law. When adopted, the rule is ordinarily applied in the context of standard form or consumer contracts where there is disparity in the bargaining positions of contracting parties. There is no doubt that the Share Sale and Purchase Agreement is not a standard form or a consumer contract. There is evidence to the effect that the EPC Clause was requested by Claimants[67] and not imposed by Respondents. Both parties had access to their respective legal counsel[68] and there has been no suggestion that in the negotiations leading to the execution of the Share Sale and Purchase Agreement, there was a disproportionate imbalance in the bargaining powers of the contractual parties. Notwithstanding any financial disparity between the Claimants and Respondents, each of the contracting parties were free to make their own decisions as to whether to proceed to sign up to the Share Sale and Purchase Agreement.

154. Accordingly, there is no statutory or judicial authority to support Claimants' view that, on the basis of the Contra Proferentem 'rule', any doubt in interpretation of Clause 2.3 is to be

[63] Paragraphs 138-145 of the Claimants' Second Round Submissions.
[64] Para 138 of the Claimants Second Round Submissions.
[65] Para 143 of Claimants' Second Round Submissions.
[66] GasanMamo Insurance Limited vs Alexander Jan Edward Van Reeven et (First Hall, Civil Court, 8th May 2017.
[67] Para 98 of Mr Ye's witness statement dated 18th February 2019.
[68] Para 216 (c) of the Respondents' First Round Submissions and line 6 et seq of Page 131 of Mr. Peng's cross examination during the 29th November 2018 hearing.

resolved in their favour. On the contrary, on the basis of an express statutory provision, the doubt is, in terms of Article 1009 of the Civil Code, to be resolved in favour of the obligor, that is, the Respondents.

## 7. ALLEGED BREACH OF CLAUSE 14

155. Claimants have argued[69] that Respondents have also breached clause 14 of the Share Sale and Purchase Agreement which provides that;

"Each Party shall co-operate with the others and execute and deliver to the others such other instruments and documents and take such other actions as may be reasonably requested from time to time in order to carry out, evidence and confirm their rights and the intended purpose of this Agreement."

156. Clause 14 and clauses of similar wording are not uncommon and are often referred to as Further Assurance Clauses. A Further Assurance Clause is a boilerplate clause commonly used to require parties to act cooperatively to complete any actions, including the execution of instruments and documents and / or the taking of such action which may not have necessarily been anticipated or expressly contemplated at drafting stage or contract execution stage and which is reasonably requested to carry out the intent of the agreement or to implement its provisions. A Further Assurance Clause is however predicated on the existence of an underlying legal obligation or obligations. Accordingly, though broadly expressed, a Further Assurance Clause cannot be invoked to create or infer an independent legal obligation but is of relevance to the completion of an existing underlying obligation. In the absence of a finding that 2.3 stipulates an unconditional obligation to appoint Purchasers as the EPC contractor in connection with future projects, the Tribunal is not of the view that Clause 14 has been breached by Respondents.

## 8. THE SUBSEQUENT DISPOSAL OF SHARES

157. In the Statement of Claim, the alleged breach of Clause 2.3 is preceded by a reference to a "disregard for the long term strategic partnership envisaged between the parties" in view of the Respondents' disposal of more than 65% of their shares in SPI Energy Co within just a few months from the date of signature of the SPA, which disposal resulted in the realization "of profit of almost US$30,000,000 in this short time."

158. The Tribunal has considered whether the disposal of shares is in breach of the Agreement and/or whether there was an enforceable obligation which bound Respondents to forge "a long term strategic partnership" with Claimants. The only reference to a "mutual desire for future co-operation" is made within the context of Clause 2.3. Indeed it is expressed as a 'desire', which the Tribunal cannot quite consider as a contractual obligation and in any

69 Para 141 of the Claimants' First Round Submissions.

event that 'desire' cannot be considered outside of the ambit of Clause 2.3, the interpretation of which has been considered and determined above.

The Share Sale and Purchase Agreement expressly stipulates a lock-up period of three months. In the context of a specific term expressly set out in that agreement, the Tribunal can hardly not consider that the Respondents were entirely within their contractual rights to dispose of the shares or any part of them, upon expiry of the lock-up period. Accordingly, the Tribunal finds that the sale of shares in SPI Energy Co, following the expiry of the lock-up period, was not in breach of the Agreement. Neither can it be concluded that the Share Sale and Purchase Agreement, whether by reference to future co-operation in 2.3 or otherwise, constituted an enforceable obligation to forge a long term strategic partnership or mutual co-operation beyond the ambit of any enforceable obligations contracted in the Share Sale Purchase Agreement.

## 9. THE ISSUE OF BAD FAITH

159. Having concluded that on the basis of the rules of interpretation enunciated by the Maltese Civil Code, Respondents did not breach their obligations in terms of the Share Sale and Purchase Agreement, the Tribunal also considered the allegations of bad faith raised by the Claimants, as no contractual party should be allowed to take advantage of its own bad faith. Claimants alleged that Respondents acted in bad faith in the negotiations preceding the execution of the Share Sale and Purchase Agreement as well as in its implementation[70] and that accordingly their "manifest bad faith" ….. preclude them (SinSin) from enforcing their rights under the same agreements (the SPA and the Supplementary Agreements).[71]

160. The burden of proof of bad faith clearly lies on whosoever alleges it. Once Claimants have alleged bad faith, the onus of proof within the degree required of law, lies on them. It must be stated at the outset that for any allegation of bad faith to be substantiated, there must be clear and convincing evidence to the degree required by law of dishonesty in one's conduct, falsity in one's behaviour, or, as has been alleged in the matter under consideration, of a deliberate refusal to perform a contractual duty or obligation.[72]

161. The Claimants have argued that the late introduction of the EPC clause was nothing more than a "lure" or a "bait" or a "ruse." All three terms imply deception or trickery of sorts, in order to achieve a desired objective. The reference to "lure", "bait" or "ruse" recurs in a number of Witness Statements submitted in evidence by Claimants,[73] though pointedly, in

[70] Para 139 of Claimants' first Round Submissions "SinSin acted in bad faith booth during the course of the negotiations, by withholding from SPI the fact that they were internally treating the EPC clause as non-binding, and after the signature of the SPA, by ignoring completely and absolutely their obligations under the EPC Clause.

[71] Para 140 of the Claimants; First Round Submissions.

72 In Borg vs Grech Appell Court of Appeal, 30th January 1869. "Mala fides si deve desumere da circostanze ineluttabili ed affatto non equivoche."

[73] Mr. Xiaofeng Peng, Mr. Hoong Kheong Cheong, Mr. Mario Zen.

cross examination, Mr. Peng did not convince the Tribunal that he understood the term itself.[74] Even if one were to attribute Mr. Peng's unconvincing reply in cross-examination to linguistic difficulties, convincing evidence of deceptive behaviour or dishonest conduct of sorts is required in order to satisfy the probative burden required to sustain the claim of bad faith or to substantiate the allegation that the EPC clause was a "lure" a "bait" or a "ruse". For this purpose, the Tribunal has examined all of the evidence submitted by Claimants in respect of the negotiation, execution and implementation of the Share Sale and Purchase Agreement as well as the Supplementary Agreement.

162. The Tribunal does not endorse the view propounded by Claimants[75] that the so called EPC teasers, constitute evidence of "bad faith" and "deceptive intent" or that Documents YDJ-50 and YDJ-51 are tantamount to "compelling evidence of this ruse"[76] or the "greatest attestation of the bad faith perpetrated by SinSin"[77] Neither is the Tribunal satisfied that Claimants have proven that the Respondents intentionally withheld from Claimants the "fact" (disputed by Respondents) that they internally regarded the EPC clause as non-binding.[78] Subjecting an obligation to a conditionality which subsequently does not verify itself need not necessarily infer or imply that *'ab initio'* Respondents did not attribute binding effect to the EPC clause.

Claimants have invoked what, in their view, is subsequent contractual non-performance as evidence of pre-existing bad faith.[79] Claimants have in fact submitted that "It has been shown that SinSin and their affiliated entities never entered into the investments in PV plants after the signature of the SPA nor did they engage in the award of any EPC contracts whatsoever, whether to SPI or to anyone else. This evidences that SinSin never intended to comply with the provisions of the EPC Clause ......".

In the view of the Tribunal, the statement "This evidences that SinSin never intended to comply with the provisions of the EPC Clause ......" is a *non sequitur* as subsequent non-performance does not suffice to prove pre-existing bad faith.

163. In addition to alleging bad faith *in contrahendo,* Claimants have also alleged bad faith of the Respondents in performance. The Tribunal is of the view that non-performance of an established contractual obligation, as of itself, is not necessarily tantamount to or conclusive evidence of bad faith. Even if one were to set aside Respondents thesis (disputed by Claimants) that (i) "the Sin Sin Funds and/or its affiliates have indeed invested in PV plants"[80] and (ii) the Almaden Fund Project and Chiping City Project were offered to Claimants[81], in the absence of satisfactory evidence of behaviour which is dishonest, deceptive or intentionally incorrect, one cannot necessarily infer or imply bad faith merely on the basis of purported non-performance.

---

[74] Line 25 et seq at Page 37 of Mr. Peng's criss-examination during the 29th November hearing.
[75] Para 56 of Claimants' First Round Submissions
[76] Para 91 of Claimants' First Round Submissions.
[77] Para 94 of Claimants' First Round Submissions.
[78] Para 139 of Claimants' First Round Submissions.
[79] Para 136 of Claimants' First Round Submissions.
[80] Para 93 of Respondents' Second Round Submissions.
[81] Para 53 and 73 of Respondents' Second Round Submissions.





The degree of proof required for a claim of bad faith to be sustained in a court of law exceeds conjectures, argumentation or mere inferences from contractual non-performance. The observation is being made without prejudice to the Tribunals' finding that Claimants were not in fact in breach of contract.

## *XV. CONCLUSIONS*

164. In conclusion, (i) the Tribunal finds that, on the basis of applicable law, including the application of Maltese law rules on interpretation, it cannot be concluded that Respondents are in breach of their contractual obligations in terms of the Share Sale and Purchase Agreement; (ii) the Tribunal does not find convincing evidence to the degree required by law to support Claimant's view that SinSin acted in bad faith either at negotiation stage, execution stage or contract implementation stage, whether in respect of the Share Sale and Purchase Agreement or the Supplementary Agreement.

## *XVI. AWARD*

The Arbitral Tribunal therefore FINDS and AWARDS, as follows

(i) The relief and remedies sought by Claimants as requested in their Statement of Claim, that is:

A declaration that the Respondents are in breach of their contractual obligations under the Share Purchase Agreement;

A declaration that Respondents are jointly and severally liable for the damages caused thereby to the Claimants;

The liquidation/quantification of the damages suffered by the Claimants or any one of them;

A final award ordering Respondents, jointly and severally between them, to pay to the Claimants the amount/s of damages so liquidated/quantified by the Arbitral Tribunal within a time to be established by the Tribunal;

A final award ordering Respondents to pay interest at the highest rate allowed by Maltese law on the amount of damages established to be due to the Claimants accruing as from the date of the award until date of eventual payment; and

A final award ordering Respondents to pay the costs of the Arbitration proceedings, including arbitrator fees and fees due to counsel of Claimants in terms of applicable rule;

Are dismissed in their entirety.

(ii) The relief and remedies sought by Respondents are being upheld as follows:

Claimant's case is being dismissed in its entirety.

Costs are being awarded as follows:

The Fees of the arbitral tribunal, as agreed between the parties of €240,000 (two hundred and forty thousand euro) are to be borne by the Claimants;

The Fees and expenses payable to the Malta Arbitration Centre are to be borne by the Claimants;

The costs and expenses for legal representation of Claimants are to be borne by them. The costs and expenses for legal representation incurred by the Respondents are recoverable from the Claimants up to the amount of €511,600 (five hundred and eleven thousand, six hundred euro), which amount is, in the circumstances, deemed by the Arbitral Tribunal to be a reasonable ceiling;

The travel and expenses of witnesses are to be borne by the Claimants, provided that the professional fees of Accuracy, incurred by the Respondents, are recoverable from the Claimants up to the amount of €100,000 (one hundred thousand euro), which, in the circumstances, is deemed by the Arbitral Tribunal to be a reasonable ceiling. For the purposes of the Costs order, the expenses of the expert witnesses Mr. Stelios Lumakis and Accuracy have been deemed by the Tribunal to be expenses incurred in the arbitral proceedings I 5320.

Each party is to bear its own travel expenses.

Fees and expenses for logistical and translation services are to be borne 50% (fifty per centum) by Claimants and 50% (fifty per centum) by Respondents.

Signed at Valletta, Malta today the 29 day of October 2020

Arthur Galea Salomone

Louis Cassar Pullicino

Louis de Gabriele



