# EXHIBIT E

**COURT OF APPEAL**

**(Inferior Jurisdiction)**

**HON. JUDGE**

**LAWRENCE MINTOFF**

Sitting of the 12th of November, 2021

Dr Frank B. Testa B.A., LL.D.
Mamo TCV Advocates
Palazzo Pietro Stiges
103, Strait Street
Valletta VLT 1436, Malta

*Certified true
Translation*

12.07.2022

Inferior Appeal Number 79/2020 LM

**SPI China (HK) Limited and SPI Energy Co. Ltd**

('*the appellants*')

**vs.**

**SinSin Europe Solar Asset Limited Partnership**

**and SinSin Solar Capital Limited Partnership**

('*the defendants*')

**The Court,**

**Preliminarily**

1.      This is an appeal presented by the plaintiff companies **SPI China (HK) Limited and SPI Energy Co. Ltd** [hereinafter referred to as 'the appellants'] from an arbitral award delivered in Arbitration number I.5320/2018 of the 29th October 2020, [hereinafter referred to as 'the arbitral award'], by the Arbitration Tribunal [hereinafter referred to as 'the Tribunal'] in the Malta Arbitration Centre [hereinafter referred to as 'the Centre'], by means of which it decided on the pleas made by the plaintiff companies with respect to the defendant companies **SinSin Europe Solar Asset Limited Partnership** and **SinSin Solar Capital Limited Partnership** [hereinafter referred to as 'the defendants'] as follows:

*"The Arbitral Tribunal therefore FINDS and AWARDS, as follows*

*(i)     The relief and remedies sought by Claimants as requested in their Statement of Claim, that is:*

*A declaration that the Respondents are in breach of their contractual obligations under the Share Purchase Agreement;*

*A declaration that Respondents are jointly and severally liable for the damages caused thereby to the Claimants;*

*The liquidation/quantification of the damages suffered by the Claimants or any one of them;*

*A final award ordering Respondents, jointly and severally between them, to pay to the Claimants the amount/s of damages so liquidated/quantified by the Arbitral Tribunal within a time to be established by the Tribunal;*

*A final award ordering Respondents to pay interest at the highest rate allowed by Maltese law on the amount of damages established to be due to the Claimants accruing as from the date of the award until date of eventual payment; and*

*A final award ordering Respondents to pay the costs of the Arbitration proceedings, including arbitrator fees and fees due to counsel of Claimants in terms of applicable rule;*

*Are dismissed in their entirety.*
*(ii)    The relief and remedies sought by Respondents are being upheld as follows:*

*Claimant's case is being dismissed in its entirety.*

*Costs are being awarded as follows:*

*The Fees of the arbitral tribunal, as agreed between the parties of €240,000 (two hundred and forty thousand euro) are to be borne by the Claimants;*

*The Fees and expenses payable to the Malta Arbitration Centre are to be borne by the Claimants;*

*The costs and expenses for legal representation of Claimants are to be borne by them. The costs and expenses for legal representation incurred by the Respondents are recoverable from the Claimants up to the amount of €511,600 (five hundred and eleven thousand, six hundred euro), which amount is, in the circumstances, deemed by the Arbitral Tribunal to be a reasonable ceiling;*

*The travel and expenses of witnesses are to be borne by the Claimants, provided that the professional fees of Accuracy, incurred by the Respondents, are recoverable from the Claimants up to the amount of €100,000 (one hundred thousand euro), which, in the circumstances, is deemed by the Arbitral Tribunal to be a reasonable ceiling. For the purposes of the Costs order, the expenses of the expert witnesses Mr. Stelios Lumakis and Accuracy have been deemed by the Tribunal to be expenses incurred in the arbitral proceedings I 5320.*
*Each party is to bear its own travel expenses.*

*Fees and expenses for logistical and translation services are to be borne 50% (fifty per centum) by Claimants and 50% (fifty per centum) by Respondents."*

### Facts

2.    The facts of the present case are as follows. The parties had signed between themselves a Share Sale & Purchase Agreement on the 6th September 2014, in which the defendants had agreed to sell their shares in the company SinSin Renewable Investment Limited (C 60350) to the appellants according to those pacts and conditions agreed upon therein, including the obligation that any dispute arising between the parties should be decided by means of arbitration proceedings in Malta. A dispute arose between the parties after the defendants allegedly sold more than 65% of their shares in the aforementioned company to third parties, and they also allegedly failed to charge the appellants as was intended in clause 2.3 of the Share Sale and Purchase Agreement. On the part of the appellants, by means of a reply to the actions of the defendants, they unilaterally decided not to continue effecting payments for the acquisition of shares according to the abovementioned contract.

### Merits

3.    The appellants therefore initiated Arbitration proceedings by presenting a Notice for Arbitration at the Centre on the 20th March 2018, followed by the Claim in writing of the 12th April 2018, where while stating that their claim was one of a payment of damages resultant from a breach on the part of the defendants of their contractual obligations as defined in the Share Sale and Purchase Agreement, they requested the following from the Tribunal:

   *• A declaration that Respondents are in breach of their contractual obligations under the SPA;*

   *• A declaration that Respondents are jointly and severally liable for the damages caused thereby to the Claimants;*

   *• The liquidation/quantification of the damages suffered by the Claimants or any one of them;*

   *• A final award ordering Respondents, jointly and severally between them, to pay to the Claimants the amount/s of damages so liquidated/quantified by the Arbitral Tribunal within a time to be established by the Tribunal;*

• A final award ordering Respondents to pay interest at the highest rate allowed by Maltese law on the amount of damages established to be due to the Claimants accruing as from the date of the award until date of eventual payment; and

• A final award ordering Respondents to pay the costs of the Arbitration proceedings, including arbitrators' fees and fees due to counsel of Claimants in terms of applicable rules".

4. The defendants responded by means of a reply presented on the 9th May 2018, wherein they stated that by no means had they breached that which was provided in the Share Sale and Purchase Agreement and therefore the appellants were not entitled to the remedies claimed.

**The Arbitral Award**

5. The Tribunal arrived at the arbitral award after it made the following considerations relevant to this appeal:

**"XIV DECISION ON THE MERITS OF THE CLAIM.**

**A.     THE FACTUAL MATRIX**

92.     By way of backdrop, the Arbitral Tribunal will provide a brief account of the principal facts of the case and the chronology of the principal events. The account is not intended to be exhaustive. However, to the extent that the facts and/or events do have a material legal bearing on the claims made by either Party they will be discussed in the analysis of the legal considerations.

93.     Claimant SPI Energy Co., Ltd. is a global provider of photovoltaic (PV) solutions which is listed on the Nasdaq Stock Market. SPI Energy Co., Ltd. is the successor of Solar Power Inc, a signatory to the Share Sale and Purchase Agreement, which is the subject of these arbitral proceedings, following a merger between the two companies at the end of 2015. Claimant SPI China (HK) Limited is a subsidiary of SPI Energy Co., Ltd.

94.     Claimants are involved in the business of provision of photovoltaic solutions for business, including developing, owning and operating solar PV projects as well as provision of EPC contractor services to PV farm projects.

95.     Respondents are investment vehicles co-owned by two Chinese State-owned companies namely Xingxing Cathay International Group Co. Ltd (formerly Xingxing Ductile Iron Pipes Co. Ltd) and China Railway Trust Co. Ltd.

96.     The Respondents were the indirect owners of a number of photovoltaic farms ("PV Farms") in Greece having a total power output of 26.57 MW (the "Greek PV Farms"). The Greek PV Farms were held through a structure comprising Sinsin Renewable Investment Limited (C 60350) (as a holding company) and four fullyowned Greek subsidiaries named

*Astraios Energiaki A.E., Photovoltaic Parks Veroia I A.E., Orion Energiaki A.E. and Jasper PV Macedonia A.E.*

97.     *There are conflicting versions of the Parties and their principal witnesses (fn. 2 Mr Xiaofeng Peng for the Claimants and Mr Roger Deyun Ye (Roger Ye) for the Respondents.), as to the iter of the negotiations and as to who made the first suggestion relating to the possible sale of the Greek PV Farms to SPI, though there appears to be consensus that the matter was first discussed in early 2014. (fn. 3 Para. 49 of Roger Ye's Affidavit where he states "In early 2014, I mentioned to Mr. Peng the Greek PV farms as a possible investment opportunity [...]).The negotiations were led by Mr. Peng on behalf of SPI Group and on the other hand by Mr. Roger Ye and Zeng Yaogan on behalf of the SinSin Funds. See also Exhibit-HK2 annexed to Mr. Hoong Cheong's solemn affirmation dated 27 September 2018).*

98.     *The parties have expressed divergent views and there are conflicting versions as to the motivating reasons for the initial discussions and subsequent negotiations. Claimants argue that Mr. Ye was eager to dispose of the Greek PV Farms because the investment made by Respondents at his behest turned out to be a bad investment. Whilst Respondents concede that as a result of the 2014 reduction in feed-in tariff for PV plants in Greece, the profitability of the Greek PV farms was impacted negatively, they argue that they were not a "toxic asset or one that needed to be sold off without delay" and they continued to operate profitably. (fn. 4 Para 87 of the Respondents' First Round Submissions) On the other hand, Respondents argue that the SPI Group was interested in acquiring the Greek PV Farms because they operate in the PV Business and they also suggest that in view of a prospective listing on NASDAQ, they were interested to build a portfolio of assets, a suggestion which is refuted by Claimants.*

99.     *A first term sheet was signed at the end of July 2014 for a share price of €71,350,000 (seventy-one million, three hundred and fifty thousand euro). (fn. 5 Paragraph 63 of Mr Ye's witness statement dated 18 February 2019 and Exhibit-HK2 annexed to Mr. Hoong Kheong Cheong's solemn affirmation dated 27 September 2018). The first term sheet makes no reference to the EPC Clause. Mr. Peng failed to secure board approval for the transaction during a board meeting of the 25th July 2014 and was directed to obtain improved terms. A due diligence investigation of the Greek PV farms by the SPI Group followed. (fn. 6 Exhibit-HK2 annexed to Mr. Hoong Kheong Cheong's solemn affirmation dated 27 September 2018).*

100.    *The Parties also expressed divergent views as to the reason/s for the EPC stipulation and the time when the EPC stipulation was first discussed. The Claimants argue strongly that the EPC Clause was "an integral and fundamental ingredient of the financial provision of the SPA" given that the "anticipated return on the deal was completely disproportionate without additional consideration." (fn. 7 Para 35 of the Claimants' First Round Submissions) Mr. Peng testified that "the only way therefore that the SPI Group could agree to enter into the transaction at the purchase price of €70.66 million was for it to obtain a side benefit (a quid pro quo) at least equal to the amount of the premium over true value". (fn. 8 Affidavit by Mr Peng at page 3 para 7.)*

101.    *The Respondents, on the other hand, maintain inter alia, that the EPC Clause was only included in order to assist the SPI Group to deal with certain issues that may have been raised by its auditors. (fn. 9 Respondents' First Round Submissions at para 140) More particularly, it could be of value in the context of a goodwill impairment test that may have*

*been conducted by the auditors, (fn. 10 Para 100 of Mr Ye's witness statement dated 18 February 2019, Para 56 of Mr Zeng's witness statement dated 18 February 2019 and Exhibit ZYG-9 annexed to the said statement) besides being of value to SPI as it sought to acquire more assets in its preparations to list on the NASDAQ.*

*102.    Claimants' justification for an added* "benefit" *is predicated on their view that the valuation of the four Greek SPV's was far less than the agreed purchase price of €70,660,000 (seventy million six hundred and sixty thousand euro). In support of their, view Claimants' submitted three expert reports drawn up Mr Stelios Loumakis which indicates, inter alia, that a fair valuation for the Greek Plants would have been in the region of €42,000,000 (forty two million euro). (fn. 11 Page 12 of the September Technical Analysis and Opinion for the selling price from SIN SIN to SPI of a portfolio of 8 PV plants with a total capacity of 26.4 MWp in Northern Greece at the end of 2014 which states in conclusion* "A reasonable price for the sale would be around 42 mls euros, offering both parties a Project IRR of 11%, that is satisfactory for Euro-Eurozone terms………. The only reasonable reason we could find for SPI to sign such an extremely high buying price of 70.6 mls, is the compensatory benefit of undertaking as an EPC contractor to build the worldwide PV portfolio of SIN SIN amounting to 360 MWp."*) Respondents on their part, rebutted the valuation methodology and conclusions of expert reports submitted by Claimants' in their own 'ex parte' expert reports drawn up by Mr. Eduard Saura and Ms Laura Cozar dated 18th February 2019. (fn. 12 At page 62 of the Expert Report of Edward Saura & Laura Cozar of the 18th February 2019, theyconcluded that the* "the conclusions of the Claimants' Expert Report are fundamentally flawed and do not assist in determining the value of the Greek PV Plants or the reasonableness of the Transaction."*)

*103.    As to timing of the negotiation of the EPC stipulation, Mr. Peng testified that the matter was broached early in the negotiations. (fn. 13 Para 59 (d) of Mr. Peng's Second Affidavit.) Respondents, on the other hand, submitted that the matter was raised for the first time on the 2nd September 2014, that is a mere four days prior to the execution of the Share Purchase Agreement. (fn. 14 Para 98 of Mr. Ye's witness Statement dated the 18th February 2019 and Exhibit YDJ-50 annexed to the said statement.)*

*104.    Exhibit YDJ-50 includes an email sent by SPI's director of Mergers and Acquisitions, Mr Huiyuan Zha (known as Steve Zha), at 13.03hrs on the 2 September 2014 requesting insertion of the EPC clause. The email reads as follows:*

"In addition, we request SIN-SIN to promise that it will preferentially select SPI as its EPC partner in its future PV plant business. Also, it promises that among the PV plants invested by it or its affiliated companies within the next three years, project with a capacity of not less than 300MW shall be awarded to SPI and its affiliated companies for EPC works, while the price for the EPC contract works shall not be less than the then current market price and the terms of payment shall not be less than the market levels. The above clause shall be written into the purchase agreement or the relative supplementary agreement."

*105. SinSin submitted in evidence (fn. 15 Exhibit ZYG 9) an email from Liu Yilong to Mr. Zhao dated 2nd September 2014 attesting their go ahead to the SPI request for the inclusion of an EPC Clause, which go ahead was couched with a request to* "pay attention not to add any term with other punishing obligations because of this term."

*106.     On the 27th August 2014, a first draft of the Sale and Share Purchase Agreement was forwarded to Mr. Peng who requested a number of amendments thereto. A Term sheet was issued on the 28th August 2014 indicating agreement on a total price of €70,660,000 (seventy million six hundred and sixty thousand euro). (fn. 16 Paragraph 68-72 of Mr Ye's witness statement dated 18 February 2019 and Exhibits YDJ-35 and YDJ-36 annexed to the said statement). The Investment Committee of SinSin Funds approved the transaction on the 29th August 2014. (fn. 17 Para 75 of Mr. Ye's witness statement dated 18th February 201) A Board Meeting was held on the 5th September 2014 wherein the* "Board approved the management (sic) to enter into the SPA with Sinsin" *(fn. 18 Exhibit-HK3 annexed to Mr. Hoong Kheong Cheong's solemn affirmation dated 27 September 2018) and the Share Sale and Purchase Agreement was signed by the Parties on the 6th September 2014.*

*107.     On the same day, that is, the 6th September 2014, as security for the fulfilment of SPI Group's obligations under the SPA, four Pledge of Shares Agreements were executed in terms of which the shares in the SPVs were pledged in favour of the SinSin Funds as follows:*

*(a) Pledge of Shares Agreement between the Respondents, the Purchasers, Veltimo Limited Cyprus and Astraios Energy SA dated 6 September 2014;*

*(b) Pledge of Shares Agreement between the Respondents, the Purchasers, SinSin Renewable and Jasper PvMakedonia SA dated 6 September 20l4;*

*(c) Pledge of Shares Agreement between the Respondents, the Purchasers, Veltimo Limited Cyprus and Orion Energy SA dated 6 September 2014;*

*(d) Pledge of Shares Agreement between the Respondents, the Purchasers, Photovoltaica Parka Veroia I Malta Limited and Photovoltaica Parka Veroia I SA dated 6 September 2014. (fn. 19 Vide Paragraphs 78 and 79 of Mr Ye's witness statement dated 18 February 2019 and also Paragraph 52 of Mr Zeng's witness statement dated 18 February 2019, together with Exhibits ZYG-6 and ZYG-7 annexed to the said witness statement)*

*108.     A public announcement was made by SPI on the OTCBB on the 9th September and 3 October 2014 notifying the market that SPI executed a share purchase agreement with SinSin, which included provisions* "specifying that SinSin or its affiliates may appoint SPI and its subsidiaries to provide engineering, procurement and construction (EPC) services up to 360MW of additional solar PV projects that SinSin intends to invest in and/or develop over the next three years".

*109.     The execution of the Share Sale and Purchase Agreement was ratified by the Board of Directors of XinXing Pipes at a board meeting duly held on the 10th September 2014. (fn. 20 Para 59 of Mr Zheng's witness statement dated 18 February 2019 and Exhibit ZYG-10 annexed to the said statement.)*

*110. Claimants procured the transfer of 38,225,800 shares in SPI Energy Co. Ltd to the Respondents (the "SPI Shares"). The SPI Shares were trading at the price of US$0.717 each on NASDAQ and the number of shares transferred was calculated on this basis. (fn. 21 Claimants' Statement of Facts)*

*111.     Claimants made two cash payments, totaling EUR 7,066,000. (fn. 22 Ibid.)*

112.     In early November 2015, SPI Group requested an extension for the payment of the third and fourth instalments under the Share Sale and Purchase Agreement (each instalment mounting to €21,198,000) due respectively on the 30th November 2015 and the 20th June 2016. (fn. 23 Paragraph 153 of Mr Ye's witness statement dated 18 February 2019 and Paragraph 81 of Mr Zeng's witness statement dated 18 February 2019)

113.     There were protracted negotiations between the parties which culminated in the execution of the Supplementary Agreement and the Personal Guarantee Agreement on or around the 14th March 2016.

114.     Meanwhile SPI Energy Co Ltd transferred from OTCBB to NASDAQ and successfully listed its securities on NASDAQ on the 19th January 2016.

115.     On the 30th October 2017, SinSin Funds sent a Notice of Default and Notice of Enforcement to SPI, notifying them as a result of the failure to pay the Sale Amount, an Event of Default under the Pledge Agreements had occurred and SinSin Funds would execute the Pledge Agreements if such Event of Default was not cured. (fn. 24 Paragraph 153 of Mr Ye's witness statement dated 18 February 2019 and Paragraph 81 of Mr Zeng's witness statement dated 18 February 2019)

116.     On the 9th of November 2017, SPI replied with an Extrajudicial Response denying the claims made in SinSin Funds' Notices of Default and Notices of Enforcement Event. (fn. 25 Paragraph 153 of Mr Ye's witness statement dated 18 February 2019 and Paragraph 81 of Mr Zeng's witness statement dated 18 February 2019)

117.     SinSin Funds instituted Court proceedings in Greece, including on the 25th January 2018 proceedings for enforcement of the Share Pledge Agreements. Proceedings in Greece have been suspended until the conclusion of these Arbitral Proceedings.

## B. LEGAL CONSIDERATIONS

118.     This process has been replete with conflicting versions on the motivating reasons leading to the negotiations between the parties, on the iter and timing of the negotiations, particularly on the reasons and timing of the EPC stipulation. As has been conceded by Claimants, some of those differences are "arguably irrelevant." In this respect, Claimants have submitted as follows (fn. 26 Para 40 of Claimants' SPI's First Round Submissions.)

**"Indeed, the whole discussion relating to the origins of the EPC Clause is very arguably irrelevant, because whatever those origins, the fact remains that the clause was agreed and inserted into the SPA and must therefore be given its full legal effect."**

The logic of Claimants as to the "irrelevance" of the origins of the EPC clause is applicable to other considerations in respect of which there are conflicting versions. Besides the conflicting versions as to the "origins" of the EPC clause, the timing of the insertion of the EPC Clause, the omission of the EPC commitment in the Terms Sheet are all matters which are similarly "arguably irrelevant", given that the EPC clause did find its way in the final Share Sale and Purchase Agreement.

*119.       The Tribunal is in agreement with Paragraphs 170 and 171 of Claimants' Second Round Submissions which sum up the principal legal issue at stake in a succinct and correct manner by stating as follows:*

**"Such is the volume of evidence produced in these Cases (by the SinSin Funds in particular) and such is the ardently different interpretation of that evidence by the Parties, that it would not be difficult to get lost in the minute detail of that evidence and to miss the fundamental issue in dispute.**

**Aside from the distraction of the often-irrelevant facts and allegations underlying that evidence, the essence of the Cases lies in the question concerning the breach of a particular contractual provision within a share purchase agreement, that is clause 2.3 of the SPA – the EPC Clause."**

*The Tribunal considers the interpretation, application and legal effect of Clause 2.3 of the Share Sale and Purchase Agreement as central to the resolution of this dispute. Part of the evidence describing pre-contract conduct has had more of a distractive effect rather than being of assistance for the Tribunal to determine the central issue in dispute. Pre-contractual conduct may at times not be entirely irrelevant for a resolution of a contractual matter, however in this case that consideration is limited by Clause 12.1 of the Share Sale and Purchase Agreement which provides that;*

**"The Agreement (together with the Schedules) sets forth the entire agreement and understanding between the parties in respect of the matters set out herein and, accordingly, this Agreement supersedes and overrides any other agreement or understanding between the Parties in respect of the subject-matter hereof."**

*In this award, the Tribunal shall first address the issues which it considers are the key legal aspects of this dispute and shall subsequently address each of the arguments proffered by the Claimants in support of their claim.*

### 1. CLAUSE 2.3 OF THE SHARE SALE AND PURCHASE AGREEMENT

*120.       Claimants and Respondents have proffered diametrically opposed views in respect of the meaning and application of Clause 2.3 of the Share Sale and Purchase Agreement. Claimants Position*

*121.       Claimants' position is to the effect that* **"on a proper and legal interpretation of its terms and applying the rules of interpretation referred to above, the EPC Clause is not a conditional obligation, but it is an unconditional, complete and binding obligation ….."** *(fn. 27 Para 113 of Claimants' First Round Submissions.)*

*122.       They maintain that the proper interpretation of the words* "subject to the conclusion of an hoc contract/s" *in the context of the entire EPC clause is* **"merely a reference to the practical necessity to have an EPC contract between SPI and the relevant SinSin entity investing in the PV plant in question, because other than that, the EPC clause includes a complete, clear, categorical and unconditional undertaking that SinSin (or their affiliated entities) shall be investing in PV plants with a capacity of more than 360MW and**

'shall' appoint SPI as the EPC contractor for those projects". *(fn. 28 Para 120 of Claimants' First Round Submissions.)*

123.    *Claimants submit that* "Indeed, the Parties included in the EPC Clause all the components of the EPC contracts that they could possibly agree at the time. The object of the contracts was agreed: EPC contracts for PV projects with an output of at least 360MW. The EPC contract parties were agreed: SinSin or their affiliates as principals and SPI as contractor. The contract period was agreed: three years from completion of the SPA. The price was agreed: no less than current market prices for comparable work. The terms of payment were also agreed: no less than current market terms for comparable work. There was nothing else that the Parties could have possibly added in the EPC Clause at the time. It was intended to be and is a complete agreement, and it comprehensively spells out everything that objectively could be spelt out at the time." (fn. 29 Para *123 of the claimants' First Round Submissions.)*

124.    *Claimants maintain that the EPC clause is in fact a* 'financial' *provision. This, they maintain, is manifest also from the language chosen by the parties in the provision itself where it states that the agreement contained therein is made* "[…] pursuant to the conclusion of the transfer of shares contemplated herein, that is, as an integral part of the financial consideration for the shares. The term "pursuant" denotes that the EPC commitment is in fact a consequence of the transfer of shares and a financial component of that transfer." *(fn. 30 Para 117 of the Claimants' First Round Submissions)*
*Respondents' position*

125.    *Respondents, on the other hand, have argued that* "even a literal reading of the clause still makes the interpretation given by SPI Group untenable and unsustainable". (fn. 31 *Para 254 of the Respondents' First Round Submissions) They submit that* "At the end of the first paragraph of the EPC Clause, there is a clear condition which states "subject to the conclusion of an ad hoc contract/s for the purpose and the below conditions." (fn. 32 *Para 255 of the Respondents' First Round Submissions) They maintain that* "SPI Group cannot separate the word 'shall' (as used in Clause 2.3.1) from its context. The limb of the EPC Clause in para 2.3.1 only comes into play if and only if ad hoc contracts are successfully concluded." They argue that "The Clause therefore can clearly never be interpreted as being unconditional and, thus as adding considerable monetary value in order to bridge the alleged gap between the purchase price for the shares in SinSin Renewable and their fair market value." (fn. 33 *Paras 254-258 of the Respondents' First Round Submissions)*

126.    *Clause 2.3 is, in Respondents' view, a* "a gesture of goodwill and acknowledges the parties' intention regarding future co-operation on solar power projects, a "best endeavours clause" (fn. 34 *Para 43 of the Respondents' Statement of Defence) that was intended to indicate that the SinSin Funds would favourably consider awarding EPC contracts to SPI in the future if (and only if) the Parties could conclude the relative EPC contracts. (fn. 35 Para 17 of the Respondents' First Round Submissions) Clause 2.3 is to SinSin* "a conditional promise of future collaboration," (fn. 36 *Para 53 of the Respondents' First Round Submissions) a clause which* "simply records (SinSin's) gesture of goodwill and acknowledges the Parties' intention regarding future co-operation on solar power projects". (fn. 37 *Para 43 of the Respondents' Statement of Defence)*

*There is, in SinSin's view* "**a considerable difference between:**

**(a) a binding and conditional clause in terms of which the SinSin Funds would have been happy to give SPI Group EPC work in appropriate circumstances and under the appropriate terms and conditions and if and only if the relative EPC contract could have been concluded to the satisfaction of both Parties; and**

**(b) an unconditional obligation to award EPC contracts that had a value that bridged the alleged "gap" between the fair market value of the shares in SinSin Renewable and the agreed purchase price.**" (fn. 38 *Para 47 of the Respondents' First Round Submissions*)

*The Issue of bad faith*

127.    *Claimants have also invoked bad faith on the part of Respondents, arguing that* "**….SinSins's failure to even invest in the PV plants referred to in clause 2.3 of the SPA (let alone to award EPC contracts for those plants to SPI) is in itself already a flagrant breach of the SPA because it manifests bad faith perpetrated by SinSin when agreeing the EPC Clause and the SPA and it is in direct breach of other provisions of the SPA itself.**" (fn. 39 *Para 109 of the Claimants First Round of Submissions) This submission is developed further by the Claimants in paragraphs 135 et seq of their submissions. Claimants argue that SinSin acted in bad faith both during negotiations prior to the SPA, by withholding from them the fact that they were internally treating the EPC clause as non-binding and also after completion of the contract, as a result of SinSins's failure to invest in PV plants and their failure to award any EPC contracts, whether to SPI or to anyone else.*

128.    *The Respondents, on the other hand, refute any suggestion that their actions are tantamount to bad faith and counter argue that the suggestion that SinSin never entered into PV investments after the Share Sale and Purchase Agreement was concluded and that they did not award any EPC contracts is to say the least incorrect and misleading. Respondents submit that, as a matter of fact, they performed all of their obligations under the Share Purchase Agreement in good faith and in effect it is SPI and other group entities which acted in utmost bad faith by undertaking to make various payments but never honoured such obligations. SinSin further submit that Claimants went so far as to sign a Supplementary Agreement pursuant to which it confirmed its indebtedness to SinSin unconditionally but ultimately defaulted on its obligations. Claimants also emphasise the point that the first time that a reference to their interpretation of the EPC Clause and the purported obligations resulting therefrom was made was in October 2017, that is after the SinSin Funds had sought to enforce the pledges over the shares in the Greek SPVs.*

### 2.    MALTESE LAW ON INTERPRETATION OF CONTRACTS

129.    *In the Tribunal's view, the resolution of the dispute under consideration is ultimately a matter of contractual interpretation and proper application of Clause 2.3 of the Share Sale and Purchase Agreement, coupled with an ascertainment whether the allegation of bad faith propounded by the Claimants has been proven to the degree required by law. It is therefore in this context that the Tribunal will refer to the rules of interpretation of contracts under Maltese law.*

*130.    The fundamental principle regulating effects of contracts is that the will of the parties, as expressed in the contractual provisions, should prevail and should be observed,* Pacta sunt servanda. *This stems from the legal principle that* "Contracts legally entered into shall have the force of law for the contracting parties." (fn. 40 Article 992 (1) of the Civil Code)

*Accordingly, a court or arbitral tribunal should not disturb the balance that contracting parties would have, at times painstakingly, tried to achieve in their commercial negotiations, nor to substitute its discretion for the parties' will and should restrain itself from interfering in the parties' mutual agreement, unless the contract is vitiated at law or is otherwise unlawful, null or annullable.*

*The Maltese Courts have, on innumerable occasions, made reference to this fundamental principle of the law of contracts. The words of the Court of Appeal in Gloria wife of Jonathan Beacom et vs Architect and Civil Engineer Anthony Spiteri Staines, (fn. 41 Court of Appeal; 5th October 1998) sum up the matter succinctly as follows:*

**"The cardinal principle which regulates the institute of contracts remains at all times that the binding effect of a contract must be respected and that it is the will of the parties as expressed in the agreement which must be observed and fulfilled. *Pacta sunt servanda*."**

*In truth, both Claimants and Respondents have invoked the* "pacta sunt servanda" *principle, each to a different end. The diametrically opposed views of Claimants and Respondents arise from a differing interpretation of Clause 2.3 of the Share Sale and Purchase Agreement.*

*131.    It is therefore the adjudicators' task to ascertain the parties' will, **as expressed in the agreement** (words emboldened for emphasis only.) Trabucchi in his Institutes of Civil Law (fn. 42 Trabucchi Istituzioni di Diritto Civile, 22 Edizione, Cedam pg 681)* underlines this succinctly;

**Quando si dice che oggetto dell'interpretazione contrattuale è in sostanza una *quaestio voluntatis*, bisogna intendere bene. *Questio voluntatis* non vuol dire ricerca di quella che può essere stata l'intenzione o lo scopo intimamente perseguito dall'uno o dall'altro contraente. Ciò che si deve ricercare è il "voluto", così come tradotto nelle dichiarazioni negoziali."**

"When one states that the objective of contractual interpretation is in substance a matter of *quaestio voluntatis*, one should understand carefully. *Quaestio voluntatis* does not mean a research into the possible intention or the objective intimately sought by either one of the contractual parties. What should be ascertained is what was "willed" (by the parties) as translated in the contractual stipulations."

*132.    Equally important as the fundamental tenet of* "Pacta sunt servanda" *is the principle of good faith which is enunciated in Article 993 of the Civil Code which provides that* "Contracts must be carried out in good faith." (fn. 43 *Carmelo Mifsud vs Joseph Spiteri et (Civil Court, First Hall, Mr. Justice Wallace Gulia, 30th April 1987); Chris Cachia & Associates Limited vs Damian u Roseanne spouses Formosa (Civil Court First Hall, Mr. Justice Raymond Pace, 1st October 2002) The terminology echoes the principle enunciated in the Napoleonic Code (fn. 44 Marcade V. Spiegazione Teorico-Pratica del Codice Napoleone*

*(Napoli 1875), Volume VI, Para 466) which is the principal source of the Maltese Civil Code. In Lawrence Fenech vs Simon Interiors Limited* (fn. 45 *First Hall, Civil Court Mr. Justice Raymond Pace, 27th June 2002), the Court observed that it is on the basis of (the principle of) good faith, that Articles 1002 et sequitur of Chapter 12 on the Interpretation of Contracts are draw up and particularly Article 1003, which provides that* "Where the literal meaning differs from the common intention of the parties as clearly evidenced by the whole of the agreement, preference shall be given to the intention of the parties.".

*133.      Good faith permeates contractual relations and is considered as a rule of conduct to be observed by contractual parties during negotiation, execution and performance of one's contractual obligations. (fn. 46 Francis Carbone vs Bart Attard, First Hall Civil Court Mr. Justice Philip Sciberras 3th June 2004) Mr. Justice Philip Sciberras summed up the matter as follows:*

**"Good faith does not have mere theoretical value. On the contrary, in an objective sense, it is understood as a rule of conduct of reasonableness and above all loyalty and correctness. In general terms it constitutes an ethical-juridical principle in the exercise of rights." (fn. 47** *Carmelo Bonello et vs Concetta Farrugia, Mr. Justice Philip Siciberras, Appeal from the Rent Regulation Board)*

*As the Court of Appeal stated, an adjudicator should not allow a party to take advantage of* "mala fides" *as* "no business should be immune from the fundamental principle of fraus ommia corrumpit." (fn. 48 *Anthony Xuereb vs Debono Developments Ltd (Court of Appeal, Inferior Jurisdiction 14th January 2015.)*

*134.      The parties have gone to great lengths to provide their respective interpretations to Clause 2.3. In support of their respective positions, the parties have adduced voluminous evidence in respect of pre and post contractual conduct and behavior, in an attempt to show the underlying intention and motive behind Clause 2.3. Not all of that evidence necessarily has weight in a determination of the proper meaning and application of the provisions of Clause 2.3.*

*The legislator has not left contractual interpretation up to an adjudicator's arbitrariness or subjectivity. The interpretation and construction of contracts is itself governed by rules and the Maltese Civil Code has provided a number of rules of interpretation in Articles 1002 to 1011. (fn. 49 L-Alfabett tal-Kodiċi Ċivili, Volume K, by Mr. Justice Philip Sciberras, pages 641 et seq, refers to a long list of judgements which have applied Articles 1002 et seq of the Civil Code regulating Interpretation of Contracts) It is these norms of interpretation which the Tribunal is bound to apply in its interpretation of the disputed clauses in the Share Sale and Purchase Agreement.*

*135.      The starting point for an adjudicator is to attribute to the words of an agreement the meaning attached to them by usage at the time of the agreement with a view to an objective reading of the disputed clause. The words which the contracting parties use to articulate and express their intent are the prime keys available to an adjudicator to understand what the parties intended to achieve. If by giving to the words used their ordinary meaning, the contractual provision is clear, the contractual provision should be applied according to that meaning. It is therefore the words used in the context of the clause and the agreement as a whole that are the first principal determinants of the mutual*

*intention of the contracting parties. The first rule of interpretation enunciated by the Civil Code (fn. 50 Article 1002 of the Civil Code) is in fact:*

**"Where, by giving to the words of an agreement the meaning attached to them by usage at the time of the agreement, the terms of such agreement are clear, there shall be no room for interpretation."**

*As has been repeatedly observed by the Court of Appeal,* **"it is not the interpretation given by the parties to the agreement or the diverse meaning given by them to the agreement which matters but rather it is the objective reading by the judge who attributes to the words their ordinary meaning in the context in which they were used by the contracting parties that matters." (fn. 51** *John Zammit et vs Michael Zammit Tabona proprio et nominee (Court of Appeal in its Superior Jurisdiction 28th February 1997); TGS Company Limited vs Polidano Brothers Limited (Court of Appeal, 18th July 2017))*

*136.     Article 1003, which is the second rule of interpretation contemplated by the Civil Code does refer to the parties' intention by providing that:*

**"Where the literal meaning differs from the common intention of the parties as clearly evidenced by the whole of the agreement, preference shall be given to the intention of the parties".**

*Article 1003 is not an open invitation to the Arbitral Tribunal to embark upon a search of the parties' intention in all circumstances. Neither does Article 1003 suggest that when, ex post, the parties disagree on the interpretation of their contractual stipulations, intention should prevail over the written agreement. The Maltese Courts have had occasion to point out that Article 1003 is applied in circumstances where it results in an unequivocal manner from a reading of the whole agreement that the words expressed in the written agreement do not reflect the intention of both contractual parties (and not merely the intention or view of one of the parties) as clearly evidenced by the whole of the agreement. In those circumstances, preference is given to the parties' common intention over the written word. (fn. 52 J. Bartolo et vs A. Petroni et noe (Court of Appeal, 7th October 1997). See also Vincent Aquilina vs Caterina Micallef (Court of Appeal 12th May 1997); Mary Lanfranco vs Salvatore Vella et (Court of Appeal, 6th October 2000); Avv. Leslie Grech noe vs Ivan Burridge pro et noe Court of Appeal, 14th January 2002). Indeed, reference to article 1003 should only be resorted to if by applying the rule in article 1002, the adjudicator cannot properly come to the conclusion that the language of the agreement is clear, and therefore needs to resort to further interpretative tools in order to determine the mutual will of the parties.*

*3.     APPLICATION OF THE RULES TO THE SHARE SALE AND PURCHASE AGREEMENT*

*137.     In the dispute under consideration, rather than a matter of disjoint between the parties' common intention and the words as expressed in Clause 2.3, the dispute revolves around a differing interpretation of the meaning and import of Clause 2.3.*

*138.     The disputed clause reads as follows. (Parts have been emboldened for emphasis only)*

2.3     The Parties hereby agree that pursuant to the conclusion of the transfer of shares contemplated herein and in recognition of their mutual desire for future co-operation, the Vendors, or any one of their respective affiliated entities as the case may be, undertake to appoint Purchaser Two as the EPC contractor in connection with future projects undertaken by them, or one of their respective affiliated entities as the case may be, **subject to the conclusion of an ad hoc contract/s for the purpose and the below conditions:**

2.3.1.   the Vendors hereby confirm that either one of them or one of their respective affiliated entitles, as the case may be, shall be investing in photovoltaic plants with a capacity of over 360M within three year from the Closing date and that the Vendors, or one of their respective affiliated entities as the case may be, shall appoint Purchasers as the EPC Contractor in connection with such project; and

2.3.2.   provided that the price of the EPC contract work and the relative terms of payment set by the Purchasers for the EPC work in question shall not be less than the then current market price/levels for comparable work.

*139.     Legal drafting is not a perfect science and it is the very imperfection of legal drafting that in most instances gives rise to disputes and the consequent need to interpret clauses in a contract. However imperfections in drafting are often the result of commercial negotiations with a view to achieve compromise and a balancing of interests. It is not the function of this Tribunal to upset that balance, if by attributing to the text and language used the common meaning attached to them by usage at the time of the agreement, it is satisfied that the mutual intent of the parties is clear.*

*The opening paragraph of clause 2.3 reads clearly enough; it is an undertaking by the Vendors or any one of their respective affiliated entities to appoint Purchaser Two as the EPC contractor in connection with future PV Investments, subject to the conclusion of an ad hoc contract. By attributing to the words used their ordinary meaning, one can only reasonably conclude that the undertaking to appoint Purchaser as an EPC contractor is a conditional undertaking; it is clearly stipulated as conditional upon the conclusion of a mutually agreed contract.*

*Nor is one able to argue convincingly that:*

*(i)       the Respondent, through that provision, effectively and unconditionally bound itself to grant "future" EPC contracts; rather, the Tribunal is of the view that the obligation to appoint "Purchaser Two" as an EPC Contractor is conditional on*

*(i) the Respondents actually making PV investments in the future; and (ii) the execution of an ad hoc contract for that purpose. To argue otherwise would be tantamount to ignoring the designation of Clauses 2.3.1 and 2.3.2 as "conditions";*

*(ii)      all of the principal terms of the ad hoc contract were agreed to, subject only to their crystallization in a written agreement. EPC contracts are complex agreements which include mutual rights and obligations which go far beyond what has been indicated in Clause 2.3. As to Claimants' submission that the Parties included in the EPC Clause all the components of the EPC contracts that they could possibly agree at the time, the fact that all*

*the components of an EPC contract which could have been agreed at the time were expressly contemplated in Clause 2.3 does not, of itself, create a comprehensibly regulated obligation which is unconditional and specifically enforceable. The Tribunal cannot concur with this position. Indeed the Tribunal favours the view that in effect, the fundamental aspects of such an enforceable obligation such as (i) the specific contractual party, (ii) the precise object of the agreement, (iii) the price and (iv) the contract modalities are completely absent. Accordingly the Tribunal is of the view that it cannot be stated that Clause 2.3 of the Share Sale and Purchase Agreement contains all of the fundamental elements of an EPC contract, subject only to the formality of sign off.*

*140. The* 'conclusion of an ad hoc contract' *is not the only conditionality contemplated by Clause 2.3, the opening paragraph of which suggests that there are an additional two* **"below conditions"**. *Faced with the clear designation of Clauses 2.3.1 and 2.3.2 as* "conditions", *the Tribunal is, on the basis of Article 1002 of the Civil Code, bound to interpret them as nothing more nor less than what the contracting parties themselves have called them –* **"conditions."** *There is no ambivalence, no ambiguity, in the designation of these clauses as conditions, and therefore the Tribunal cannot set aside the designation and construction of Clauses 2.3.1 and 2.3.2 as* "conditions" *and opt to accord preference to any purported* "intention" *that is not reflected in the* "literal" *meaning of the terms as expressed. Accordingly, the circumstances required for Article 1003 to trump Article 1002 are not evident.*

*Of the two* 'below conditions', *the first* 'condition' *is stipulated in terms of 2.3.1. The designation of 2.3.1 as a **condition** is not inconsequential from an interpretational point of view. Once 2.3.1 is stipulated as a condition, as the opening paragraph to 2.3 clearly spells out, then it would read as an undertaking by the Vendors that either one of them or one of their respective affiliated entitles, will appoint Purchaser Two as the EPC Contractor (subject to the conclusion of an ad hoc contract) on condition that* "they shall be investing in a photovoltaic plants with a capacity of over 360M within three year from the Closing date." *The view propounded by Claimants (fn. 53 Para 124 of the Claimants' First Round Submissions) that the* "element of uncertainty is categorically and unequivocally excluded" *cannot be reconciled with the designation of 2.3.1 as one of the conditions to which the undertaking in terms of 2.3 is subject.*

*That being the case, then on the basis of Section 1058 (1) of the Civil Code, if the three year period lapses without Vendors, either one of them or their respective affiliated entities investing in a photovoltaic plants with a capacity of over 360M within three years from the Closing date, that condition would be deemed to have failed.*

*In terms of S.1058. (1)* **"Where an obligation is contracted on condition that an event shall happen within an appointed time, such condition shall be deemed to have failed if the time expires without the event having happened."**

*141. The second* 'condition' *of Clause 2.3 stipulates that the price of the EPC contract work and the relative terms of payment set by the Purchasers for the EPC work in question shall not be less than the then current market price/levels for comparable work. The condition sets guidelines for price and terms of payment but cannot be construed as establishing the* "agreed price" *as suggested by Claimants. (fn. 54 Para 123 of Claimants' First Round Submissions) The price is as yet undetermined. Market conditions change over time and any intention to agree on price and terms of payment in line with market conditions*

*at the time of a contract being executed, can only be construed as having established guidance for negotiations between the parties at a later stage; the parties could not envisage what those market conditions would be over the course of the three years contemplated in Clause 2.3 and therefore could never have had any actual price in mind. They left the matter open for further discussion and negotiation if the right circumstances presented themselves. The very words and context of Clause 2.3 clearly denote that it was clear or should have been clear to both parties that they would be required to enter into further negotiations with respect to the EPC contracts, in the event that Respondents made future PV investments.*

*In paragraph 116 of their Second Round Submissions SPI proffer the view that 2.3 is to be read in a manner that the obligation of the Vendors or their affiliated entities to appoint Purchaser Two as the EPC contractor is conditional upon the obligation of the Vendor itself to invest in in PV plants with a capacity of over 360MW within three years and to appoint SPI as EPC Contractor for those projects.*

*In this respect, Claimants state as follows:* "Indeed, if anything, it is the entry into the specific EPC Contracts that is conditional upon the fulfilment by the SinSin Funds of the direct, unconditional and unequivocal obligations set out in clause 2.3.1, that is, the obligations to (i) invest in PV plants with a capacity of over 360MW within three years; and (ii) appoint SPI as EPC Contractor for those projects. The SinSin Funds' failure to invest in PV projects and to offer any EPC contracts to SPI made the fulfilment of the condition they now seek to invoke against SPI an impossibility."

*In this context, if condition 2.3.1 were to be severed in this manner from the rest of the clause to be read, as suggested in para 116 of Claimants' Second Round Submissions, in such a manner so that the obligation of Vendor to appoint Purchaser as EPC contractor is conditional upon the unconditional obligation of the Vendor to (i) invest in PV plants with a capacity of over 360MW within three years; and (ii) appoint SPI as EPC Contractor for those projects, the clause could fall foul of Section 1056 of the Civil Code which provides as follows* "(1) Where an obligation is contracted on a condition which makes the obligation depend solely upon the will of the obligor, the obligation is null."

*142.        Respondents have pointed out that the EPC commitment was not raised by Claimants during the negotiation of the Supplementary Agreement. No unfavorable consequences or implications could or should be drawn from that omission, even because at the time the three-year period was still running with a remaining eighteen months or so to go. More pointedly, in support of their view that Clause 2.3 was not intended as an unconditional and enforceable obligation, Respondents sought to point out that it was not until the 9th November 2017 in a letter sent by their Greek counsel and only as a reaction to the Notice of Default and Notice of Enforcement Event moved by Respondents, that they formally requested Respondents to fulfill the EPC obligation. Claimants have rebutted by asserting that they actively requested fulfillment of the EPC Clause via communications with Roger Ye. Though this informal goading, in lieu of a formal intimation to perform may, on the face of it be difficult to reconcile with Claimants' stand that to them the value of the unsecured EPC obligation ran into tens of millions of Euro, no unfavorable legal consequences or implications could or should be drawn from that omission even had it been established. It is also not to be excluded that this approach may be attributed to cultural differences or strategic considerations and, in any event, this omission is no impediment to*

*claim subsequently, even in view of Clause 11.1 of the Share Sale and Purchase Agreement which provides as follows:*

"the failure of a Part to enforce or to exercise, at any time or for any period of time, any term of or any right arising under or pursuant to this Agreement does not constitute and shall not be construed as, a waiver of such term or right and shall in no affect that Party's right to enforce or exercise it later."

Context and position of clause 2.3

*143.     In conjunction with the consideration as to whether Clause 2.3 is a conditional or an unconditional obligation, the Tribunal has also considered the argument submitted by Claimants' that the EPC Clause was agreed as an integral and fundamental ingredient of the financial provisions of the Share Sale and Purchase Agreement (fn. 55 Para 35 of the Claimants' First Round Submissions) as further corroborated by the relevance of the* 'location' *of 2.3 within Clause 2 entitled* 'Consideration for Sale Shares'. *Claimants argue that the inclusion of the EPC obligation within the Consideration Clause is highly relevant. In this respect, Claimants submit that* "it cannot be emphasized enough that the Parties chose to include this provision within clause 2 of the SPA which is that part of the SPA that deals with the Consideration for the Sale Shares. There can be no doubt that clause 2.3 is a fundamental ingredient of the pricing mechanism within the SPA, so that the financial rationale of the SPA is completely wiped out without it." *(fn. 56 Para 11 of the Claimants' First Round Submissions)*

*Claimants have argued that the relevance of the context in which the clause was inserted is pointing, even in view of Article 1008 of the Civil Code which provides that* "all the clauses of a contract must be interpreted with reference to one another, giving to each clause the meaning resulting from the whole instrument."

*144.     Context is of course key in the interpretation of contractual clauses; indeed interpretation and construction always depend on context. Context however does not and should not be considered as synonymous to location. Where a clause is located in a contract may have a material significance to context, but on its own will not determine context or meaning. Article 1008 of the Civil Code is indeed relevant for a proper interpretation of the disputed Clause. However, the Tribunal finds that there is no compelling grounding for the Claimants' argument based simply on the inclusion of Clause 2.3 under the general heading* 'Consideration for Sale Shares'. *A reading of the entirety of Clause 2 of the Share Sale and Purchase Agreement and of the whole of the agreement, reveals no language to suggest or evidence, that part of the stipulated consideration is* a quid pro quo *for the EPC obligation.*

*Indeed, the Tribunal finds that the more compelling view is that it is Clause 2.1 that unequivocally determines the consideration for the shares. To the contrary of Claimants' argument, Clause 2.1 clearly states that the* "Parties agree that **the total consideration** payable by both Purchasers to the Vendors **for the purchase of the Sale Shares** *(emphasis added)* under this Agreement shall be an amount equivalent to seventy million, six hundred sixty thousand Euro (€70,660,000)." *From a reading of 2.1, it is clear that the consideration contemplated is for the* **"purchase of Sale Shares."** *Though Clause 2.3 may give rise to a number of interpretational issues, the same cannot be said for Clause 2.1 which is clear and unequivocal and leaves no room for interpretation.*

*145.    The express and exclusive nexus of the price to the Sale Shares in Clause 2.1, the absence of any apportionment of the consideration to or for the EPC obligation, the absence of a deferred payment obligation for partial settlement of price to coincide with the performance of the EPC obligation or milestones in respect thereof, or the absence of any form of security for the fulfillment of the EPC obligation are all considerations which militate against the interpretation that the seventy million, six hundred sixty thousand Euro (€70,660,000) includes a component as consideration for the EPC obligation.*

*146.    Neither does the text or location of the wording in Clause 2.3.1 necessarily bear out SPI's submissions (echoing Mr. Peng's words (fn. 57 Para 8 of Mr. Peng's First Affidavit) that without the EPC clause* "SPI could not and would never have signed the SPA"*, whether in the Consideration Clause or in Warranties Clause. The Vendors do acknowledge at Clause 4.3.1 that the Purchasers have entered into the Share Sale and Purchase Agreement in reliance upon the Warranties but Clause 2.3.1 or wording to that effect is not stipulated as one of the Warranties.*

The company announcement and its significance

SPI *have adduced evidence to the effect that their understanding was that they had secured a firm and binding EPC commitment. Reference is made in fact to Exhibit XDP17 attached to Mr Peng's affidavit in terms of which it is recorded that he stated* …. We will sign this Agreement with SinSin, a leading company in China to acquire their 26.57 MW PV projects base in Greece today or tomorrow. In the meantime, they will authorize 360MW PV Projects EPC Contracts During the next 3 years […] this is a big milestone that SPI achieved. […] In the meantime, build a strong relation with SinSin. It will get more support from Sinsin reosources in future SPI growth."

*Mr. Peng could very well have assumed that he had secured, for the SPI Group, a series of EPC contracts for PV Projects with an output of at least 360 MW. He could indeed have had several reasons for that communication and it is not the Tribunal's task to determine what those reasons could have been. For the purposes of the resolution of this dispute, what is critically relevant is not what Mr. Peng assumed and communicated internally a few days before the Share Sale and Purchase Agreement but what was agreed to in the Share Sale and Purchase Agreement itself.*

*147.    Claimants have also argued that the discussion and subsequent agreement to raise the 300MW commitment to 360MW is also indicative that the EPC Clause was binding. (fn. 58 Para of Claimants' First Round Submissions). In the Tribunal's view, the critical point under consideration is not whether the clause is binding or not but rather whether the obligation is conditional or unconditional, and in the case of a conditional obligation, whether the conditions were satisfied. It is conceded that there would have not been much sense to renegotiate the megawattage if the matter were entirely discretionary and the renegotiation is indicative that Claimants did not regard this as a discretionary matter. However, by attributing utility and/or value to a 360MW commitment rather than a 300MW commitment, one cannot reasonably infer an unconditional obligation. The added mega wattage is still consistent with the thesis in favour of a binding conditional (as against a non-binding or discretionary) commitment, in the sense that in the event of the verification of the conditions upon which the obligation was contingent, there would have been added benefit in an increased megawattage obligation.*

148.     *Both Claimants and Respondents have referred to the public announcement made by SPI on the OTCBB and its relevance for the purpose of interpreting the disputed clause. Respondents have argued that the language of the public announcement, particularly use of the word "may" is evidence of a 'discretion' and not an unconditional obligation. (fn. 59 Para 57 of the Respondents First Round Submissions) Claimants have on the other hand argued that the public announcement makes it "abundantly clear that the SinSin transaction was perceived to be the beginning of a strategic collaboration in which SPI would act as SinSin's dedicated EPC partner." (fn. 60 Para 53 of the Claimants' First Round Submissions)*

*In the Tribunal's opinion the Company Announcement cannot be a decisive factor in the determination of the mutual intent of the parties to the contract and in the interpretation of Clause 2.3. The Tribunal however does not consider it as evidence of a discretion, which should be differentiated from an unconditional obligation. A discretion imposes no obligation, whether conditional or unconditional. A conditional obligation, on the other hand, brings on a binding enforceable obligation, once the condition verifies itself. Neither does the public announcement attest to an intention to appoint SPI as SinSin's dedicated EPC partner. In the Tribunal's view, the announcement could not be couched in definitive unconditional wording, not because there was a discretion on SinSin's part whether to appoint SPI or their affiliated entities as EPC contractors but because the obligation was contingent upon the verification of a number of conditions. The divergent submissions on the interpretation of the Company Announcement have not been critical for the Tribunal's deliberations on the meaning of Clause 2.3, however, if at all, the announcement itself resonates the view that Clause 2.3 cannot be read as an unconditional obligation. To couch the announcement in unconditional terms would in fact have been a misrepresentation of Clause 2.3 and may have been tantamount to misleading the market.*

### 4.     OTHER RULES ON INTERPRETATION OF CONTRACTS

149.     *The Arbitral Tribunal finds that Clause 2.3 reads and was intended by the contracting parties as a conditional obligation. In its analysis, the Tribunal finds further comfort in other rules of interpretation which dispel any lingering doubts as to the alleged unconditionality of Clause 2.3 in favour of the obligee.*

*Section 1364 of the Civil Code, regulating sale, provides that* **"Any provisions of a contract of sale which are doubtful or ambiguous shall be interpreted against the seller or the buyer according to the rules of interpretation relating to contracts in general."** *The rules of interpretation relating to contracts in general do in fact contemplate an express provision to be applied for the resolution of doubts, if any.* (fn. 61 *Giovanni Bugeja vs Carmelo Pisani (Commercial Court, 14th November 1951)*

*Section 1009 of the Civil Code provides that* **"in case of doubt, the agreement shall be interpreted against the obligee and in favour of the obligor."** *Accordingly, not only do Claimants have a more arduous probative task as the onus of proof lies with them* (onus probandi incumbit ei qui dicit); *additionally, as an obligee, Article 1009 of the Civil Code tilts the balance of any possible doubtful interpretation against them. In the absence of a clear interpretation of the contract, any doubt or ambiguity as to whether Clause 2.3 imposes an unconditional obligation to appoint an EPC contractor would, on the basis of Section 1009, have to be resolved in favour of the Respondents as the obligors.*

5.      *THE ARGUMENT BASED ON ARTICLE 1004 OF THE CIVIL CODE*

*150.      Claimants have referred to Article 1004 of the Civil Code (fn. 62 Para 53 of the Claimants' First Round Submissions) in terms of which* "when a clause is susceptible of two meanings, it must be construed in the meaning in which it can have some effect rather than in that in which it can produce none." *In the view of the Tribunal, the reference to Article 1004 is, in this context, misplaced. An interpretation of Clause 2.3 as a conditional obligation is not an interpretation that would render clause 2.3 without effect, but one that would have effect only subject to the satisfaction of one or more conditions. Clearly one has to distinguish between an interpretation which does not produce an effect; and one where no effect is produced because the conditions did not verify themselves or remained unsatisfied. The non-fulfillment of the conditionalities with the consequence that the obligation did not have a resultant effect does not mean that the clause was interpreted in a manner which had no effect. In this sense therefore Article 1004 cannot be validly invoked to favour an unconditional undertaking in lieu of a conditional undertaking or to tip the balance from conditionality to unconditionality; that would be re-writing the contract and displacing the will of the parties as expressed in Clause 2.3.*

6.      *THE "CONTRA PROFERENTEM" RULE ARGUMENT*

*151.      The Tribunal has also considered the Claimants' arguments that, given the divergent interpretations of the parties, the benefit of doubt, rather than being accorded to the Respondents, should be accorded to the Claimants on the basis of the* "Contra Proferentem" *Rule. (fn. 63 Paragraphs 138-145 of the Claimants' Second Round Submissions) This argument is predicated on the assumption that the* Contra Proferentem *rule forms part of Maltese law* (fn. 64 *Para 138 of the Claimants Second Round Submissions) or that it exists as a* 'general rule of law' *independently of the context of applicable national law. (fn. 65 Para 143 of Claimants' Second Round Submissions) Claimants submit that the rule has been* "recognized by Maltese law and given practical application by the Maltese courts in the interpretation of contracts, particularly in the context of contracts of insurance."

*152.      The judgements cited by Claimants do invoke the* Contra Proferentem *rule but do not constitute authority to support the view that in the matter under consideration, Article 1009 is or can be thereby displaced and the doubt is to be resolved in favour of the Claimants, rather than the Respondents. The cited judgements refer to (i) contracts of insurance, (ii) in circumstances where the* "contract is drawn up and prepared exclusively by the insurer," *(fn. 66 GasanMamo Insurance Limited vs Alexander Jan Edward Van Reeven et (First Hall, Civil Court, 8th May 2017) (iii) and in any event, judicial decisions do not make law, though they do have interpretative value.*

*153.      Judgements of the Maltese Courts do not provide any judicial interpretative trend to suggest that the* Contra Proferentem *rule is one of general application. Neither can it be concluded that the restricted circumstances within which the* Contra Proferentem *rule has been limitedly invoked domestically are applicable in the matter under consideration. The* Contra Proferentem *rule has admittedly found its way into a number of systems of law, including those of a Roman and/or French tradition, the origins of which are also shared by Maltese Civil law. When adopted, the rule is ordinarily applied in the context of standard form or consumer contracts where there is disparity in the bargaining positions of*

contracting parties. There is no doubt that the Share Sale and Purchase Agreement is not a standard form or a consumer contract. There is evidence to the effect that the EPC Clause was requested by Claimants (fn. 67 Para 98 of Mr Ye's witness statement dated 18th February 2019) and not imposed by Respondents. Both parties had access to their respective legal counsel (fn. 68 Para 216 (c) of the Respondents' First Round Submissions and line 6 et seq of Page 131 of Mr. Peng's cross examination during the 29th November 2018 hearing) and there has been no suggestion that in the negotiations leading to the execution of the Share Sale and Purchase Agreement, there was a disproportionate imbalance in the bargaining powers of the contractual parties. Notwithstanding any financial disparity between the Claimants and Respondents, each of the contracting parties were free to make their own decisions as to whether to proceed to sign up to the Share Sale and Purchase Agreement.

154.    Accordingly, there is no statutory or judicial authority to support Claimants' view that, on the basis of the Contra Proferentem 'rule', any doubt in interpretation of Clause 2.3 is to be resolved in their favour. On the contrary, on the basis of an express statutory provision, the doubt is, in terms of Article 1009 of the Civil Code, to be resolved in favour of the obligor, that is, the Respondents.

7.    ALLEGED BREACH OF CLAUSE 14

155.    Claimants have argued (fn. 69 Para 141 of the Claimants' First Round Submissions) that Respondents have also breached clause 14 of the Share Sale and Purchase Agreement which provides that;

"Each Party shall co-operate with the others and execute and deliver to the others such other instruments and documents and take such other actions as may be reasonably requested from time to time in order to carry out, evidence and confirm their rights and the intended purpose of this Agreement."

156.    Clause 14 and clauses of similar wording are not uncommon and are often referred to as Further Assurance Clauses. A Further Assurance Clause is a boilerplate clause commonly used to require parties to act cooperatively to complete any actions, including the execution of instruments and documents and / or the taking of such action which may not have necessarily been anticipated or expressly contemplated at drafting stage or contract execution stage and which is reasonably requested to carry out the intent of the agreement or to implement its provisions. A Further Assurance Clause is however predicated on the existence of an underlying legal obligation or obligations. Accordingly, though broadly expressed, a Further Assurance Clause cannot be invoked to create or infer an independent legal obligation but is of relevance to the completion of an existing underlying obligation. In the absence of a finding that 2.3 stipulates an unconditional obligation to appoint Purchasers as the EPC contractor in connection with future projects, the Tribunal is not of the view that Clause 14 has been breached by Respondents.

8.    THE SUBSEQUENT DISPOSAL OF SHARES

157.    In the Statement of Claim, the alleged breach of Clause 2.3 is preceded by a reference to a "disregard for the long term strategic partnership envisaged between the parties" in view of the Respondents' disposal of more than 65% of their shares in SPI Energy

*Co within just a few months from the date of signature of the SPA, which disposal resulted in the realization* "of profit of almost US$30,000,000 in this short time."

*158.     The Tribunal has considered whether the disposal of shares is in breach of the Agreement and/or whether there was an enforceable obligation which bound Respondents to forge* "a long term strategic partnership" *with Claimants. The only reference to a* ''mutual desire for future co-operation" *is made within the context of Clause 2.3. Indeed it is expressed as a* 'desire', *which the Tribunal cannot quite consider as a contractual obligation and in any event that* 'desire' *cannot be considered outside of the ambit of Clause 2.3, the interpretation of which has been considered and determined above.*

*The Share Sale and Purchase Agreement expressly stipulates a lock-up period of three months. In the context of a specific term expressly set out in that agreement, the Tribunal can hardly not consider that the Respondents were entirely within their contractual rights to dispose of the shares or any part of them, upon expiry of the lock-up period. Accordingly, the Tribunal finds that the sale of shares in SPI Energy Co, following the expiry of the lock-up period, was not in breach of the Agreement. Neither can it be concluded that the Share Sale and Purchase Agreement, whether by reference to future co-operation in 2.3 or otherwise, constituted an enforceable obligation to forge a long term strategic partnership or mutual co-operation beyond the ambit of any enforceable obligations contracted in the Share Sale Purchase Agreement.*

### 9.     THE ISSUE OF BAD FAITH

*159.     Having concluded that on the basis of the rules of interpretation enunciated by the Maltese Civil Code, Respondents did not breach their obligations in terms of the Share Sale and Purchase Agreement, the Tribunal also considered the allegations of bad faith raised by the Claimants, as no contractual party should be allowed to take advantage of its own bad faith. Claimants alleged that Respondents acted in bad faith in the negotiations preceding the execution of the Share Sale and Purchase Agreement as well as in its implementation* (fn. 70 *Para 139 of Claimants' first Round Submissions* "SinSin acted in bad faith both during the course of the negotiations, by withholding from SPI the fact that they were internally treating the EPC clause as non-binding, and after the signature of the SPA, by ignoring completely and absolutely their obligations under the EPC Clause*) and that accordingly their* "manifest bad faith" ..... *preclude them (SinSin) from enforcing their rights under the same agreements (the SPA and the Supplementary Agreements). (fn. 71 Para 140 of the Claimants; First Round Submission).*

*160.     The burden of proof of bad faith clearly lies on whosoever alleges it. Once Claimants have alleged bad faith, the onus of proof within the degree required of law, lies on them. It must be stated at the outset that for any allegation of bad faith to be substantiated, there must be clear and convincing evidence to the degree required by law of dishonesty in one's conduct, falsity in one's behaviour, or, as has been alleged in the matter under consideration, of a deliberate refusal to perform a contractual duty or obligation. (fn. 72 In Borg vs Grech Appell Court of Appeal, 30th January 1869.* "Mala fides si deve desumere da circostanze ineluttabili ed affatto non equivoche")

161.    *The Claimants have argued that the late introduction of the EPC clause was nothing more than a "lure" or a "bait" or a "ruse". All three terms imply deception or trickery of sorts, in order to achieve a desired objective. The reference to "lure", "bait" or "ruse" recurs in a number of Witness Statements submitted in evidence by Claimants, (fn. 73 Mr. Xiaofeng Peng, Mr. Hoong Kheong Cheong, Mr. Mario Zen) though pointedly, in cross examination, Mr. Peng did not convince the Tribunal that he understood the term itself. (fn. 74 Line 25 et seq at Page 37 of Mr. Peng's cross-examination during the 29th November hearing) Even if one were to attribute Mr. Peng's unconvincing reply in cross-examination to linguistic difficulties, convincing evidence of deceptive behaviour or dishonest conduct of sorts is required in order to satisfy the probative burden required to sustain the claim of bad faith or to substantiate the allegation that the EPC clause was a "lure" a "bait" or a "ruse". For this purpose, the Tribunal has examined all of the evidence submitted by Claimants in respect of the negotiation, execution and implementation of the Share Sale and Purchase Agreement as well as the Supplementary Agreement.*

162.    *The Tribunal does not endorse the view propounded by Claimants (fn. 75 Para 56 of Claimants' First Round Submissions) that the so called EPC teasers, constitute evidence of* "bad faith" *and* "deceptive intent" *or that Documents YDJ-50 and YDJ-51 are tantamount to* "compelling evidence of this ruse" *(fn. 76 Para 91 of Claimants' First Round Submissions) or the* "greatest attestation of the bad faith perpetrated by SinSin" *(fn. 77 Para 94 of Claimants' First Round Submissions) Neither is the Tribunal satisfied that Claimants have proven that the Respondents intentionally withheld from Claimants the* "fact" *(disputed by Respondents) that they internally regarded the EPC clause as non-binding. (fn. 78 Para 139 of Claimants' First Round Submissions) Subjecting an obligation to a conditionality which subsequently does not verify itself need not necessarily infer or imply that* 'ab initio' *Respondents did not attribute binding effect to the EPC clause.*

*Claimants have invoked what, in their view, is subsequent contractual non-performance as evidence of pre-existing bad faith. (fn. 79 Para 136 of Claimants' First Round Submissions) Claimants have in fact submitted that* "It has been shown that SinSin and their affiliated entities never entered into the investments in PV plants after the signature of the SPA nor did they engage in the award of any EPC contracts whatsoever, whether to SPI or to anyone else. This evidences that SinSin never intended to comply with the provisions of the EPC Clause ......".

*In the view of the Tribunal, the statement* "This evidences that SinSin never intended to comply with the provisions of the EPC Clause ......" *is a* non sequitur *as subsequent non-performance does not suffice to prove pre-existing bad faith.*

163.    *In addition to alleging bad faith* in contrahendo, *Claimants have also alleged bad faith of the Respondents in performance. The Tribunal is of the view that non-performance of an established contractual obligation, as of itself, is not necessarily tantamount to or conclusive evidence of bad faith. Even if one were to set aside Respondents thesis (disputed by Claimants) that (i)* "the Sin Sin Funds and/or its affiliates have indeed invested in PV plants" *(fn. 80 Para 93 of Respondents' Second Round Submissions) and (ii) the Almaden Fund Project and Chiping City Project were offered to Claimants (fn. 81 Para 53 and 73 of Respondents' Second Round Submissions), in the absence of satisfactory evidence of behaviour which is dishonest, deceptive or intentionally incorrect, one cannot necessarily infer or imply bad faith merely on the basis of purported non-performance. The degree of*

*proof required for a claim of bad faith to be sustained in a court of law exceeds conjectures, argumentation or mere inferences from contractual non-performance. The observation is being made without prejudice to the Tribunals' finding that Claimants were not in fact in breach of contract.*

### *XV. CONCLUSIONS*

*164.     In conclusion, (i) the Tribunal finds that, on the basis of applicable law, including the application of Maltese law rules on interpretation, it cannot be concluded that Respondents are in breach of their contractual obligations in terms of the Share Sale and Purchase Agreement; (ii) the Tribunal does not find convincing evidence to the degree required by law to support Claimant's view that SinSin acted in bad faith either at negotiation stage, execution stage or contract implementation stage, whether in respect of the Share Sale and Purchase Agreement or the Supplementary Agreement".*

## The Appeal

6.     The appellants presented their appeal on the 12th November 2020, wherein they are requesting this Court to:

*"…if it pleases the Court to accept this appeal application and while cancelling, dismissing and revoking the arbitral award delivered on the 29th October 2020 in the acts of the Arbitration I.5532/2018 in the aforesaid names, it decides by refusing all of the pleas of the defendant companies as provided in their Statement of Defence whilst accepting all of the pleas of the appellant companies as provided in their Statement of Claim, namely:*

1) *To declare that the defendants breached their contractual obligations under the Share Sale & Purchase Agreement dated 6th September 2014;*
2) *To declare that the defendants are solely responsible for the consequential damages caused to the appellant companies;*
3) ~~*To liquidate the damages suffered by the appellant companies or send its decision to the Arbitral Tribunal so that it may liquidate the same damages on the basis of the prove and technical reports provided in this case;*~~
4) *To order the defendants to pay the liquidated damages to the appellant companies;*
5) *To order the defendants to pay the legal interests on the same amount of liquidated damages from the date of its sentence to the date of the effective payment; and*
6) *To order the defendants to pay all of the costs of the arbitration as liquidated in the arbitral award, including the costs of this present Appeal."*

## The Reply to the Appeal

7.     The defendants responded by means of a reply presented on the 1st December 2020, wherein they submitted that the appeal lodged by the appellants should be dismissed for reasons listed in the said reply, including those of a preliminary nature which are: (a) the law

does not accord any right of appeal from an international arbitration, unless the parties had reserved such a right of appeal in their arbitration agreement; (b) the parties, by means of clause 16.2 of the SPA, had excluded the right of appeal; (c) the appeal took place on the grounds of an appreciation of facts and not of law.

**Considerations of this Court**

8.      This Court is firstly going to consider the question of admissibility or otherwise of the present appeal, as raised in the preliminary submissions of the defendants, which, if found to be valid, shall invalidate the said appeal. The Court begins by considering that which was agreed between the parties[1], and here it makes reference to clause 16.2 of the Share Sale & Purchase Agreement which was brought in evidence by the appellants as Doc. NVF1.

9.      Primarily, it must be said that clause 16.1 requires that the agreement be regulated and interpreted according to Maltese law. The subsequent clause 16.2 binds the parties to present any dispute which may arise between them with respect to the same agreement to arbitration procedures here in Malta so that this be decided by means of three arbiters, and this same clause also provides how these arbiters are to be chosen.

10.     By means of the same clause 16.2, the parties agreed that *"[t]he award of the arbitrators shall be final and binding upon the Parties"*. From what this clause provides, it results that the right of appeal was expressly excluded from the parties in a manner which was clear and unequivocal, so much so that there is no doubt as to their intention. Therefore, the Court considers that it was the parties themselves who renounced to their right of appeal from any arbitral award which could be delivered by a Tribunal in the case where a dispute arose between them, and given that from the outset the appellants' attempt was certainly going to fail, one cannot understand how the appellants could consider that this Court had any power to hear and decide their appeal. It considers that according to Maltese law, the parties wished that the Court would regulate their agreement, and notably article 992 of the Civil Code provides that a contract has the strength of law between the parties and that the

---

[1] Here the Court is taking into consideration that the appellant company SPI Energy Co. Ltd is the successor of Solar Power Inc., which appeared on the Share Sale & Purchase Agreement.

parties themselves alone can revoke it. Therefore, as long as the agreement between the parties remains the same, this Court cannot accept an appeal before it from any party.

**The Court decides**

**For the above reasons, the Court declares the appeal to be null and void, and refrains from taking further cognisance of it.**

**The costs of the said arbitral award are to remain as decided by the Tribunal, while those of the present appeal are to be borne by the appellants.**

Read.

**Hon. Dr Lawrence Mintoff LL.D.**
**Judge**

**Rosemarie Calleja**
**Deputy Registrar**

Appell Inferjuri Numru: 79/2020 LM



MALTA

# QORTI TAL-APPELL
## (Sede Inferjuri)

## ONOR. IMĦALLEF
## LAWRENCE MINTOFF

Seduta tat-12 ta' Novembru, 2021

Appell Inferjuri Numru 79/2020 LM

**SPI China (HK) Limited u SPI Energy Co. Ltd**
*('l-appellanti')*

***vs.***

**SinSin Europe Solar Asset Limited Partnership u**
**SinSin Solar Capital Limited Partnership**
*('l-appellati')*

**Il-Qorti,**

**Preliminari**

1.      Dan huwa appell magħmul mis-soċjetajiet rikorrenti **SPI China (HK) Limited u SPI Energy Co. Ltd** [minn issa 'l quddiem 'l-appellanti'] minn lodo arbitrali mogħti fl-Arbitraġġ numru I.5320/2018 tad-29 ta' Ottubru, 2020, [minn issa 'l quddiem 'il-lodo arbitrali'], mit-Tribunal tal-Arbitraġġ [minn issa 'l

Qrati tal-Ġustizzja

Vera Kopja

Rose Marie Vella
Deputat Reġistratur

Appell Inferjuri Numru: 79/2020 LM

quddiem 'it-Tribunal'] fiċ-Ċentru Malti għall-Arbitraġġ [minn issa 'l quddiem 'iċ-Ċentru'], li permezz tiegħu ddeċieda t-talbiet tagħhom fil-konfront tas-soċjetajiet intimati **SinSin Europe Solar Asset Limited Partnership** u **SinSin Solar Capital Limited Partnership** [minn issa 'l quddiem 'l-appellati'] kif ġej:

*"The Arbitral Tribunal therefore FINDS and AWARDS, as follows*

*(i)      The relief and remedies sought by Claimants as requested in their Statement of Claim, that is:*

*A declaration that the Respondents are in breach of their contractual obligations under the Share Purchase Agreement;*

*A declaration that Respondents are jointly and severally liable for the damages caused thereby to the Claimants;*

*The liquidation/quantification of the damages suffered by the Claimants or any one of them;*

*A final award ordering Respondents, jointly and severally between them, to pay to the Claimants the amount/s of damages so liquidated/quantified by the Arbitral Tribunal within a time to be established by the Tribunal;*

*A final award ordering Respondents to pay interest at the highest rate allowed by Maltese law on the amount of damages established to be due to the Claimants accruing as from the date of the award until date of eventual payment; and*

*A final award ordering Respondents to pay the costs of the Arbitration proceedings, including arbitrator fees and fees due to counsel of Claimants in terms of applicable rule;*

*Are dismissed in their entirety.*

*(ii)     The relief and remedies sought by Respondents are being upheld as follows:*

*Claimant's case is being dismissed in its entirety.*

*Costs are being awarded as follows:*

*The Fees of the arbitral tribunal, as agreed between the parties of €240,000 (two hundred and forty thousand euro) are to be borne by the Claimants;*

*The Fees and expenses payable to the Malta Arbitration Centre are to be borne by the Claimants;*

*The costs and expenses for legal representation of Claimants are to be borne by them. The costs and expenses for legal representation incurred by the Respondents are recoverable from the Claimants up to the amount of €511,600 (five hundred and eleven thousand, six hundred euro), which amount is, in the circumstances, deemed by the Arbitral Tribunal to be a reasonable ceiling;*

*The travel and expenses of witnesses are to the borne by the Claimants, provided that the professional fees of Accuracy, incurred by the Respondents, are recoverable from the Claimants up to the amount of €100,000 (one hundred thousand euro), which, in the circumstances, is deemed by the Arbitral Tribunal to be a reasonable ceiling. For the purposes of the Costs order, the expenses of the expert witnesses Mr. Stelios Lumakis and Accuracy have been deemed by the Tribunal to be expenses incurred in the arbitral proceedings I 5320.*

*Each party is to bear its own travel expenses.*

*Fees and expenses for logistical and translation services are to be borne 50% (fifty per centum) by Claimants and 50% (fifty per centum) by Respondents."*

### Fatti

2.     Il-fatti tal-każ odjern fil-qosor huma dawn li ġejjin. Il-partijiet kienu ffirmaw bejniethom *Share Sale & Purchase Agreement* fis-6 ta' Settembru, 2014, fejn l-appellati kienu ftehmu li ser ibiegħu l-ishma tagħhom fis-soċjetà Sinsin Renewable Investment Limited (C 60350) lill-appellanti skont dawk il-pattijiet u l-kondizzjonijiet hemm miftehma, inkluż l-obbligu li kull vertenza li tinqala' bejniethom għandha tiġi deċiża permezz ta' proċeduri ta' arbitraġġ hawn Malta. Ġara li nqala' xi diżgwid bejn il-partijiet wara li l-appellati allegatament biegħu aktar minn 65% mill-ishma tagħhom fl-imsemmija kumpannija lil terzi u naqsu wkoll allegatament milli jinkarigaw lill-appellanti kif maħsub permezz tal-klawsola 2.3 tax-*Share Sale and Purchase Agreement.* Min-naħa tagħhom l-appellanti b'risposta għall-aġir tal-appellati, iddeċidew

unilateralment li ma jkomplux jagħmlu l-pagamenti għax-xiri tal-ishma skont kif miftehma fl-imsemmi kuntratt.

## Mertu

3. L-appellanti għalhekk intavolaw proċeduri ta' Arbitraġġ bil-preżentata ta' Avviż tal-Arbitraġġ fiċ-Ċentru fl-20 ta' Marzu, 2018, segwit permezz tat-Talba bil-Miktub fit-12 ta' April, 2018, fejn filwaqt li ddikjaraw li l-pretensjoni tagħhom kienet waħda ta' ħlas ta' danni riżultanti minn ksur min-naħa tal-appellati tal-obbligi kuntrattwali kif imfissra fix-*Share Sale and Purchase Agreement,* talbu s-segwenti mit-Tribunal:

- *A declaration that Respondents are in breach of their contractual obligations under the SPA;*
- *A declaration that Respondents are jointly and severally liable for the damages caused thereby to the Claimants;*
- *The liquidation/quantification of the damages suffered by the Claimants or any one of them;*
- *A final award ordering Respondents, jointly and severally between them, to pay to the Claimants the amount/s of damages so liquidated/quantified by the Arbitral Tribunal within a time to be established by the Tribunal;*
- *A final award ordering Respondents to pay interest at the highest rate allowed by Maltese law on the amount of damages established to be due to the Claimants accruing as from the date of the award until date of eventual payment; and*
- *A final award ordering Respondents to pay the costs of the Arbitration proceedings, including arbitrators' fees and fees due to counsel of Claimants in terms of applicable rules".*

4. L-appellati laqgħu permezz ta' tweġiba li huma ntavolaw fid-9 ta' Mejju, 2018, fejn iddikjaraw li huma bl-ebda mod ma kienu kissru dak li kien jipprovdi

Case 2:22-cv-01991-MCE-JDP   Document 1-5   Filed 11/03/22   Page 33 of 64

għalih ix-*Share Sale and Purchase Agreement* u għaldaqstant l-appellanti ma kienux intitolati għar-rimedji pretiżi.

## Il-Lodo Arbitrali

5. It-Tribunal wasal għal-lodo arbitrali wara li għamel is-segwenti konsiderazzjonijiet rilevanti għal dan l-appell:

### *"XIV DECISION ON THE MERITS OF THE CLAIM.*

#### *A. THE FACTUAL MATRIX*

*92. By way of backdrop, the Arbitral Tribunal will provide a brief account of the principal facts of the case and the chronology of the principal events. The account is not intended to be exhaustive. However, to the extent that the facts and/or events do have a material legal bearing on the claims made by either Party they will be discussed in the analysis of the legal considerations.*

*93. Claimant SPI Energy Co., Ltd. is a global provider of photovoltaic (PV) solutions which is listed on the Nasdaq Stock Market. SPI Energy Co., Ltd. is the successor of Solar Power Inc, a signatory to the Share Sale and Purchase Agreement, which is the subject of these arbitral proceedings, following a merger between the two companies at the end of 2015. Claimant SPI China (HK) Limited is a subsidiary of SPI Energy Co., Ltd.*

*94. Claimants are involved in the business of provision of photovoltaic solutions for business, including developing, owning and operating solar PV projects as well as provision of EPC contractor services to PV farm projects.*

*95. Respondents are investment vehicles co-owned by two Chinese State-owned companies namely Xingxing Cathay International Group Co. Ltd (formerly Xingxing Ductile Iron Pipes Co. Ltd) and China Railway Trust Co. Ltd.*

*96. The Respondents were the indirect owners of a number of photovoltaic farms ("PV Farms") in Greece having a total power output of 26.57 MW (the "Greek PV Farms"). The Greek PV Farms were held through a structure comprising Sinsin Renewable Investment Limited (C 60350) (as a holding company) and four fully*

*owned Greek subsidiaries named Astraios Energiaki A.E., Photovoltaic Parks Veroia I A.E., Orion Energiaki A.E. and Jasper PV Macedonia A.E.*

*97.        There are conflicting versions of the Parties and their principal witnesses (fn. 2 Mr Xiaofeng Peng for the Claimants and Mr Roger Deyun Ye (Roger Ye) for the Respondents.), as to the iter of the negotiations and as to who made the first suggestion relating to the possible sale of the Greek PV Farms to SPI, though there appears to be consensus that the matter was first discussed in early 2014. (fn. 3 Para. 49 of Roger Ye's Affidavit where he states "In early 2014, I mentioned to Mr. Peng the Greek PV farms as a possible investment opportunity [...]).The negotiations were led by Mr. Peng on behalf of SPI Group and on the other hand by Mr. Roger Ye and Zeng Yaogan on behalf of the SinSin Funds. See also Exhibit-HK2 annexed to Mr. Hoong Cheong's solemn affirmation dated 27 September 2018).*

*98.        The parties have expressed divergent views and there are conflicting versions as to the motivating reasons for the initial discussions and subsequent negotiations. Claimants argue that Mr. Ye was eager to dispose of the Greek PV Farms because the investment made by Respondents at his behest turned out to be a bad investment. Whilst Respondents concede that as a result of the 2014 reduction in feed-in tariff for PV plants in Greece, the profitability of the Greek PV farms was impacted negatively, they argue that they were not a* "toxic asset or one that needed to be sold off without delay" *and they continued to operate profitably. (fn. 4 Para 87 of the Respondents' First Round Submissions) On the other hand, Respondents argue that the SPI Group was interested in acquiring the Greek PV Farms because they operate in the PV Business and they also suggest that in view of a prospective listing on NASDAQ, they were interested to build a portfolio of assets, a suggestion which is refuted by Claimants.*

*99.        A first term sheet was signed at the end of July 2014 for a share price of €71,350,000 (seventy-one million, three hundred and fifty thousand euro). (fn. 5 Paragraph 63 of Mr Ye's witness statement dated 18 February 2019 and Exhibit-HK2 annexed to Mr. Hoong Kheong Cheong's solemn affirmation dated 27 September 2018). The first term sheet makes no reference to the EPC Clause. Mr. Peng failed to secure board approval for the transaction during a board meeting of the 25th July 2014 and was directed to obtain improved terms. A due diligence investigation of the Greek PV farms by the SPI Group followed. (fn. 6 Exhibit-HK2 annexed to Mr. Hoong Kheong Cheong's solemn affirmation dated 27 September 2018).*

Appell Inferjuri Numru: 79/2020 LM

*100.     The Parties also expressed divergent views as to the reason/s for the EPC stipulation and the time when the EPC stipulation was first discussed. The Claimants argue strongly that the EPC Clause was* "an integral and fundamental ingredient of the financial provision of the SPA" *given that the* "anticipated return on the deal was completely disproportionate without additional consideration." *(fn. 7 Para 35 of the Claimants' First Round Submissions) Mr. Peng testified that* "the only way therefore that the SPI Group could agree to enter into the transaction at the purchase price of €70.66 million was for it to obtain a side benefit (a quid pro quo) at least equal to the amount of the premium over true value". *(fn. 8 Affidavit by Mr Peng at page 3 para 7.)*

*101.     The Respondents, on the other hand, maintain inter alia, that the EPC Clause was only included in order to assist the SPI Group to deal with certain issues that may have been raised by its auditors. (fn. 9 Respondents' First Round Submissions at para 140) More particularly, it could be of value in the context of a goodwill impairment test that may have been conducted by the auditors, (fn. 10 Para 100 of Mr Ye's witness statement dated 18 February 2019, Para 56 of Mr Zeng's witness statement dated 18 February 2019 and Exhibit ZYG-9 annexed to the said statement) besides being of value to SPI as it sought to acquire more assets in its preparations to list on the NASDAQ.*

*102.     Claimants' justification for an added* "benefit" *is predicated on their view that the valuation of the four Greek SPV's was far less than the agreed purchase price of €70,660,000 (seventy million six hundred and sixty thousand euro). In support of their, view Claimants' submitted three expert reports drawn up Mr Stelios Loumakis which indicates, inter alia, that a fair valuation for the Greek Plants would have been in the region of €42,000,000 (forty two million euro). (fn. 11 Page 12 of the September Technical Analysis and Opinion for the selling price from SIN SIN to SPI of a portfolio of 8 PV plants with a total capacity of 26.4 MWp in Northern Greece at the end of 2014 which states in conclusion* "A reasonable price for the sale would be around 42 mls euros, offering both parties a Project IRR of 11%, that is satisfactory for Euro-Eurozone terms.......... The only reasonable reason we could find for SPI to sign such an extremely high buying price of 70.6 mls, is the compensatory benefit of undertaking as an EPC contractor to build the worldwide PV portfolio of SIN SIN amounting to 360 MWp."*) Respondents on their part, rebutted the valuation methodology and conclusions of expert reports submitted by Claimants' in their own 'ex parte' expert reports drawn up by Mr. Eduard Saura and Ms Laura Cozar dated 18ᵗʰ February 2019. (fn. 12 At page 62 of the Expert Report of Edward Saura & Laura Cozar of the 18th February 2019, they*

*concluded that the* "the conclusions of the Claimants' Expert Report are fundamentally flawed and do not assist in determining the value of the Greek PV Plants or the reasonableness of the Transaction."*)*

*103.     As to timing of the negotiation of the EPC stipulation, Mr. Peng testified that the matter was broached early in the negotiations. (fn. 13 Para 59 (d) of Mr. Peng's Second Affidavit.) Respondents, on the other hand, submitted that the matter was raised for the first time on the 2nd September 2014, that is a mere four days prior to the execution of the Share Purchase Agreement. (fn. 14 Para 98 of Mr. Ye's witness Statement dated the 18th February 2019 and Exhibit YDJ-50 annexed to the said statement.)*

*104.     Exhibit YDJ-50 includes an email sent by SPI's director of Mergers and Acquisitions, Mr Huiyuan Zha (known as Steve Zha), at 13.03hrs on the 2 September 2014 requesting insertion of the EPC clause. The email reads as follows:*

"In addition, we request SIN-SIN to promise that it will preferentially select SPI as its EPC partner in its future PV plant business. Also, it promises that among the PV plants invested by it or its affiliated companies within the next three years, project with a capacity of not less than 300MW shall be awarded to SPI and its affiliated companies for EPC works, while the price for the EPC contract works shall not be less than the then current market price and the terms of payment shall not be less than the market levels. The above clause shall be written into the purchase agreement or the relative supplementary agreement."

*105.     SinSin submitted in evidence (fn. 15 Exhibit ZYG 9) an email from Liu Yilong to Mr. Zhao dated 2ⁿᵈ September 2014 attesting their go ahead to the SPI request for the inclusion of an EPC Clause, which go ahead was couched with a request to* "pay attention not to add any term with other punishing obligations because of this term."

*106.     On the 27ᵗʰ August 2014, a first draft of the Sale and Share Purchase Agreement was forwarded to Mr. Peng who requested a number of amendments thereto. A Term sheet was issued on the 28ᵗʰ August 2014 indicating agreement on a total price of €70,660,000 (seventy million six hundred and sixty thousand euro). (fn. 16 Paragraph 68-72 of Mr Ye's witness statement dated 18 February 2019 and Exhibits YDJ-35 and YDJ-36 annexed to the said statement). The Investment Committee of SinSin Funds approved the transaction on the 29ᵗʰ August 2014. (fn. 17 Para 75 of Mr. Ye's witness statement dated 18th February 201) A Board Meeting was held on the 5ᵗʰ September 2014 wherein the* "Board approved the management (sic) to enter into the SPA with Sinsin" *(fn. 18 Exhibit-HK3 annexed*

to Mr. Hoong Kheong Cheong's solemn affirmation dated 27 September 2018) and the Share Sale and Purchase Agreement was signed by the Parties on the 6th September 2014.

107.    On the same day, that is, the 6th September 2014, as security for the fulfilment of SPI Group's obligations under the SPA, four Pledge of Shares Agreements were executed in terms of which the shares in the SPVs were pledged in favour of the SinSin Funds as follows:

(a)    Pledge of Shares Agreement between the Respondents, the Purchasers, Veltimo Limited Cyprus and Astraios Energy SA dated 6 September 2014;

(b)    Pledge of Shares Agreement between the Respondents, the Purchasers, SinSin Renewable and Jasper PvMakedonia SA dated 6 September 20l4;

(c)    Pledge of Shares Agreement between the Respondents, the Purchasers, Veltimo Limited Cyprus and Orion Energy SA dated 6 September 2014;

(d)    Pledge of Shares Agreement between the Respondents, the Purchasers, Photovoltaica Parka Veroia I Malta Limited and Photovoltaica Parka Veroia I SA dated 6 September 2014. (fn. 19 Vide Paragraphs 78 and 79 of Mr Ye's witness statement dated 18 February 2019 and also Paragraph 52 of Mr Zeng's witness statement dated 18 February 2019, together with Exhibits ZYG-6 and ZYG-7 annexed to the said witness statement)

108.    A public announcement was made by SPI on the OTCBB on the 9th September and 3 October 2014 notifying the market that SPI executed a share purchase agreement with SinSin, which included provisions "specifying that SinSin or its affiliates may appoint SPI and its subsidiaries to provide engineering, procurement and construction (EPC) services up to 360MW of additional solar PV projects that SinSin intends to invest in and/or develop over the next three years".

109.    The execution of the Share Sale and Purchase Agreement was ratified by the Board of Directors of XinXing Pipes at a board meeting duly held on the 10th September 2014. (fn. 20 Para 59 of Mr Zheng's witness statement dated 18 February 2019 and Exhibit ZYG-10 annexed to the said statement.)

110.    Claimants procured the transfer of 38,225,800 shares in SPI Energy Co. Ltd to the Respondents (the "SPI Shares"). The SPI Shares were trading at the price of US$0.717 each on NASDAQ and the number of shares transferred was calculated on this basis. (fn. 21 Claimants' Statement of Facts)

111.    Claimants made two cash payments, totaling EUR 7,066,000. (fn. 22 Ibid.)

*112.     In early November 2015, SPI Group requested an extension for the payment of the third and fourth instalments under the Share Sale and Purchase Agreement (each instalment mounting to €21,198,000) due respectively on the 30ᵗʰ November 2015 and the 20ᵗʰ June 2016. (fn. 23 Paragraph 153 of Mr Ye's witness statement dated 18 February 2019 and Paragraph 81 of Mr Zeng's witness statement dated 18 February 2019)*

*113.     There were protracted negotiations between the parties which culminated in the execution of the Supplementary Agreement and the Personal Guarantee Agreement on or around the 14ᵗʰ March 2016.*

*114.     Meanwhile SPI Energy Co Ltd transferred from OTCBB to NASDAQ and successfully listed its securities on NASDAQ on the 19ᵗʰ January 2016.*

*115.     On the 30ᵗʰ October 2017, SinSin Funds sent a Notice of Default and Notice of Enforcement to SPI, notifying them as a result of the failure to pay the Sale Amount, an Event of Default under the Pledge Agreements had occurred and SinSin Funds would execute the Pledge Agreements if such Event of Default was not cured. (fn. 24 Paragraph 153 of Mr Ye's witness statement dated 18 February 2019 and Paragraph 81 of Mr Zeng's witness statement dated 18 February 2019)*

*116.     On the 9th of November 2017, SPI replied with an Extrajudicial Response denying the claims made in SinSin Funds' Notices of Default and Notices of Enforcement Event. (fn. 25 Paragraph 153 of Mr Ye's witness statement dated 18 February 2019 and Paragraph 81 of Mr Zeng's witness statement dated 18 February 2019)*

*117.     SinSin Funds instituted Court proceedings in Greece, including on the 25ᵗʰ January 2018 proceedings for enforcement of the Share Pledge Agreements. Proceedings in Greece have been suspended until the conclusion of these Arbitral Proceedings.*

### B.     LEGAL CONSIDERATIONS

*118.     This process has been replete with conflicting versions on the motivating reasons leading to the negotiations between the parties, on the iter and timing of the negotiations, particularly on the reasons and timing of the EPC stipulation. As has been conceded by Claimants, some of those differences are* "arguably irrelevant." *In this respect, Claimants have submitted as follows (fn. 26 Para 40 of Claimants' SPI's First Round Submissions.)*

**"Indeed, the whole discussion relating to the origins of the EPC Clause is very arguably irrelevant, because whatever those origins, the fact remains that the**

Appell Inferjuri Numru: 79/2020 LM

clause was agreed and inserted into the SPA and must therefore be given its full legal effect."

*The logic of Claimants as to the* "irrelevance" *of the origins of the EPC clause is applicable to other considerations in respect of which there are conflicting versions. Besides the conflicting versions as to the* "origins" *of the EPC clause, the timing of the insertion of the EPC Clause, the omission of the EPC commitment in the Terms Sheet are all matters which are similarly* "arguably irrelevant", *given that the EPC clause did find its way in the final Share Sale and Purchase Agreement.*

*119.      The Tribunal is in agreement with Paragraphs 170 and 171 of Claimants' Second Round Submissions which sum up the principal legal issue at stake in a succinct and correct manner by stating as follows:*

"Such is the volume of evidence produced in these Cases (by the SinSin Funds in particular) and such is the ardently different interpretation of that evidence by the Parties, that it would not be difficult to get lost in the minute detail of that evidence and to miss the fundamental issue in dispute.

Aside from the distraction of the often-irrelevant facts and allegations underlying that evidence, the essence of the Cases lies in the question concerning the breach of a particular contractual provision within a share purchase agreement, that is clause 2.3 of the SPA – the EPC Clause."

*The Tribunal considers the interpretation, application and legal effect of Clause 2.3 of the Share Sale and Purchase Agreement as central to the resolution of this dispute. Part of the evidence describing pre-contract conduct has had more of a distractive effect rather than being of assistance for the Tribunal to determine the central issue in dispute. Pre-contractual conduct may at times not be entirely irrelevant for a resolution of a contractual matter, however in this case that consideration is limited by Clause 12.1 of the Share Sale and Purchase Agreement which provides that;*

"The Agreement (together with the Schedules) sets forth the entire agreement and understanding between the parties in respect of the matters set out herein and, accordingly, this Agreement supersedes and overrides any other agreement or understanding between the Parties in respect of the subject-matter hereof."

*In this award, the Tribunal shall first address the issues which it considers are the key legal aspects of this dispute and shall subsequently address each of the arguments proffered by the Claimants in support of their claim.*

### 1.    CLAUSE 2.3 OF THE SHARE SALE AND PURCHASE AGREEMENT

*120.    Claimants and Respondents have proffered diametrically opposed views in respect of the meaning and application of Clause 2.3 of the Share Sale and Purchase Agreement.*

#### Claimants Position

*121.    Claimants' position is to the effect that* "on a proper and legal interpretation of its terms and applying the rules of interpretation referred to above, the EPC Clause is not a conditional obligation, but it is an unconditional, complete and binding obligation ....." *(fn. 27 Para 113 of Claimants' First Round Submissions.)*

*122.    They maintain that the proper interpretation of the words* "subject to the conclusion of an hoc contract/s" *in the context of the entire EPC clause is* "merely a reference to the practical necessity to have an EPC contract between SPI and the relevant SinSin entity investing in the PV plant in question, because other than that, the EPC clause includes a complete, clear, categorical and unconditional undertaking that SinSin (or their affiliated entities) shall be investing in PV plants with a capacity of more than 360MW and 'shall' appoint SPI as the EPC contractor for those projects". *(fn. 28 Para 120 of Claimants' First Round Submissions.)*

*123.    Claimants submit that* "Indeed, the Parties included in the EPC Clause all the components of the EPC contracts that they could possibly agree at the time. The object of the contracts was agreed: EPC contracts for PV projects with an output of at least 360MW. The EPC contract parties were agreed: SinSin or their affiliates as principals and SPI as contractor. The contract period was agreed: three years from completion of the SPA. The price was agreed: no less than current market prices for comparable work. The terms of payment were also agreed: no less than current market terms for comparable work. There was nothing else that the Parties could have possibly added in the EPC Clause at the time. It was intended to be and is a complete agreement, and it comprehensively spells out everything that objectively could be spelt out at the time." *(fn. 29 Para 123 of the claimants' First Round Submissions.)*

*124.    Claimants maintain that the EPC clause is in fact a* 'financial' *provision. This, they maintain, is manifest also from the language chosen by the parties in the provision itself where it states that the agreement contained therein is made* "[...] pursuant to the conclusion of the transfer of shares contemplated herein, that is, as an integral part of the financial consideration for the shares. The term

Appell Inferjuri Numru: 79/2020 LM

"pursuant" denotes that the EPC commitment is in fact a consequence of the transfer of shares and a financial component of that transfer." *(fn. 30 Para 117 of the Claimants' First Round Submissions)*

*Respondents' position*

125.    *Respondents, on the other hand, have argued that* "even a literal reading of the clause still makes the interpretation given by SPI Group untenable and unsustainable". *(fn. 31 Para 254 of the Respondents' First Round Submissions) They submit that* "At the end of the first paragraph of the EPC Clause, there is a clear condition which states "subject to the conclusion of an ad hoc contract/s for the purpose and the below conditions." *(fn. 32 Para 255 of the Respondents' First Round Submissions) They maintain that* "SPI Group cannot separate the word 'shall' (as used in Clause 2.3.1) from its context. The limb of the EPC Clause in para 2.3.1 only comes into play if and only if ad hoc contracts are successfully concluded." They argue that "The Clause therefore can clearly never be interpreted as being unconditional and, thus as adding considerable monetary value in order to bridge the alleged gap between the purchase price for the shares in SinSin Renewable and their fair market value." *(fn. 33 Paras 254-258 of the Respondents' First Round Submissions)*

126.    *Clause 2.3 is, in Respondents' view, a* "a gesture of goodwill and acknowledges the parties' intention regarding future co-operation on solar power projects, a "best endeavours clause" *(fn. 34 Para 43 of the Respondents' Statement of Defence) that was intended to indicate that the SinSin Funds would favourably consider awarding EPC contracts to SPI in the future if (and only if) the Parties could conclude the relative EPC contracts. (fn. 35 Para 17 of the Respondents' First Round Submissions) Clause 2.3 is to SinSin* "a conditional promise of future collaboration," *(fn. 36 Para 53 of the Respondents' First Round Submissions) a clause which* "simply records (SinSin's) gesture of goodwill and acknowledges the Parties' intention regarding future co-operation on solar power projects". *(fn. 37 Para 43 of the Respondents' Statement of Defence)*

*There is, in SinSin's view* "a considerable difference between:

(a) a binding and conditional clause in terms of which the SinSin Funds would have been happy to give SPI Group EPC work in appropriate circumstances and under the appropriate terms and conditions and if and only if the relative EPC contract could have been concluded to the satisfaction of both Parties; and

**(b) an unconditional obligation to award EPC contracts that had a value that bridged the alleged "gap" between the fair market value of the shares in SinSin Renewable and the agreed purchase price."** *(fn. 38 Para 47 of the Respondents' First Round Submissions)*

*The Issue of bad faith*

*127. Claimants have also invoked bad faith on the part of Respondents, arguing that "* ....SinSins's failure to even invest in the PV plants referred to in clause 2.3 of the SPA (let alone to award EPC contracts for those plants to SPI) is in itself already a flagrant breach of the SPA because it manifests bad faith perpetrated by SinSin when agreeing the EPC Clause and the SPA and it is in direct breach of other provisions of the SPA itself." *(fn. 39 Para 109 of the Claimants First Round of Submissions) This submission is developed further by the Claimants in paragraphs 135 et seq of their submissions. Claimants argue that SinSin acted in bad faith both during negotiations prior to the SPA, by withholding from them the fact that they were internally treating the EPC clause as non-binding and also after completion of the contract, as a result of SinSins's failure to invest in PV plants and their failure to award any EPC contracts, whether to SPI or to anyone else.*

*128. The Respondents, on the other hand, refute any suggestion that their actions are tantamount to bad faith and counter argue that the suggestion that SinSin never entered into PV investments after the Share Sale and Purchase Agreement was concluded and that they did not award any EPC contracts is to say the least incorrect and misleading. Respondents submit that, as a matter of fact, they performed all of their obligations under the Share Purchase Agreement in good faith and in effect it is SPI and other group entities which acted in utmost bad faith by undertaking to make various payments but never honoured such obligations. SinSin further submit that Claimants went so far as to sign a Supplementary Agreement pursuant to which it confirmed its indebtedness to SinSin unconditionally but ultimately defaulted on its obligations. Claimants also emphasise the point that the first time that a reference to their interpretation of the EPC Clause and the purported obligations resulting therefrom was made was in October 2017, that is after the SinSin Funds had sought to enforce the pledges over the shares in the Greek SPVs.*

*2.* *MALTESE LAW ON INTERPRETATION OF CONTRACTS*

*129. In the Tribunal's view, the resolution of the dispute under consideration is ultimately a matter of contractual interpretation and proper application of Clause*

*2.3 of the Share Sale and Purchase Agreement, coupled with an ascertainment whether the allegation of bad faith propounded by the Claimants has been proven to the degree required by law. It is therefore in this context that the Tribunal will refer to the rules of interpretation of contracts under Maltese law.*

*130.    The fundamental principle regulating effects of contracts is that the will of the parties, as expressed in the contractual provisions, should prevail and should be observed,* Pacta sunt servanda. *This stems from the legal principle that* "Contracts legally entered into shall have the force of law for the contracting parties." *(fn. 40 Article 992 (1) of the Civil Code)*

*Accordingly, a court or arbitral tribunal should not disturb the balance that contracting parties would have, at times painstakingly, tried to achieve in their commercial negotiations, nor to substitute its discretion for the parties' will and should restrain itself from interfering in the parties' mutual agreement, unless the contract is vitiated at law or is otherwise unlawful, null or annullable.*

*The Maltese Courts have, on innumerable occasions, made reference to this fundamental principle of the law of contracts. The words of the Court of Appeal in Gloria wife of Jonathan Beacom et vs Architect and Civil Engineer Anthony Spiteri Staines, (fn. 41 Court of Appeal; 5th October 1998) sum up the matter succinctly as follows:*

**"The cardinal principle which regulates the institute of contracts remains at all times that the binding effect of a contract must be respected and that it is the will of the parties as expressed in the agreement which must be observed and fulfilled.** *Pacta sunt servanda.***"**

*In truth, both Claimants and Respondents have invoked the* "pacta sunt servanda" *principle, each to a different end. The diametrically opposed views of Claimants and Respondents arise from a differing interpretation of Clause 2.3 of the Share Sale and Purchase Agreement.*

*131.    It is therefore the adjudicators' task to ascertain the parties' will,* ***as expressed in the agreement*** *(words emboldened for emphasis only.) Trabucchi in his Institutes of Civil Law (fn. 42 Trabucchi Istituzioni di Diritto Civile, 22 Edizione, Cedam pg 681) underlines this succinctly;*

**Quando si dice che oggetto dell'interpretazione contrattuale è in sostanza una** *quaestio voluntatis***, bisogna intendere bene.** *Questio voluntatis* **non vuol dire ricerca di quella che può essere stata l'intenzione o lo scopo intimamente**

**perseguito dall'uno o dall'altro contraente. Ciò che si deve ricercare è il "voluto", cosí come tradotto nelle dichiarazioni negoziali."**

"When one states that the objective of contractual interpretation is in substance a matter of *quaestio voluntatis*, one should understand carefully. *Quaestio voluntatis* does not mean a research into the possible intention or the objective intimately sought by either one of the contractual parties. What should be ascertained is what was "willed" (by the parties) as translated in the contractual stipulations."

*132.      Equally important as the fundamental tenet of* "Pacta sunt servanda" *is the principle of good faith which is enunciated in Article 993 of the Civil Code which provides that* "Contracts must be carried out in good faith." *(fn. 43 Carmelo Mifsud vs Joseph Spiteri et (Civil Court, First Hall, Mr. Justice Wallace Gulia, 30th April 1987); Chris Cachia & Associates Limited vs Damian u Roseanne spouses Formosa (Civil Court First Hall, Mr. Justice Raymond Pace, 1st October 2002) The terminology echoes the principle enunciated in the Napoleonic Code (fn. 44 Marcade V. Spiegazione Teorico-Pratica del Codice Napoleone (Napoli 1875), Volume VI, Para 466) which is the principal source of the Maltese Civil Code. In Lawrence Fenech vs Simon Interiors Limited (fn. 45 First Hall, Civil Court Mr. Justice Raymond Pace, 27th June 2002), the Court observed that it is on the basis of (the principle of) good faith, that Articles 1002 et sequitur of Chapter 12 on the Interpretation of Contracts are draw up and particularly Article 1003, which provides that* "Where the literal meaning differs from the common intention of the parties as clearly evidenced by the whole of the agreement, preference shall be given to the intention of the parties.".

*133.      Good faith permeates contractual relations and is considered as a rule of conduct to be observed by contractual parties during negotiation, execution and performance of one's contractual obligations. (fn. 46 Francis Carbone vs Bart Attard, First Hall Civil Court Mr. Justice Philip Sciberras 3th June 2004) Mr. Justice Philip Sciberras summed up the matter as follows:*

**"Good faith does not have mere theoretical value. On the contrary, in an objective sense, it is understood as a rule of conduct of reasonableness and above all loyalty and correctness. In general terms it constitutes an ethical-juridical principle in the exercise of rights."** *(fn. 47 Carmelo Bonello et vs Concetta Farrugia, Mr. Justice Philip Siciberras, Appeal from the Rent Regulation Board)*

*As the Court of Appeal stated, an adjudicator should not allow a party to take advantage of* "mala fides" *as* "no business should be immune from the

fundamental principle of fraus ommia corrumpit." *(fn. 48 Anthony Xuereb vs Debono Developments Ltd (Court of Appeal, Inferior Jurisdiction 14th January 2015.)*

*134.    The parties have gone to great lengths to provide their respective interpretations to Clause 2.3. In support of their respective positions, the parties have adduced voluminous evidence in respect of pre and post contractual conduct and behavior, in an attempt to show the underlying intention and motive behind Clause 2.3. Not all of that evidence necessarily has weight in a determination of the proper meaning and application of the provisions of Clause 2.3.*

*The legislator has not left contractual interpretation up to an adjudicator's arbitrariness or subjectivity. The interpretation and construction of contracts is itself governed by rules and the Maltese Civil Code has provided a number of rules of interpretation in Articles 1002 to 1011. (fn. 49 L-Alfabett tal-Kodiċi Ċivili, Volume K, by Mr. Justice Philip Sciberras, pages 641 et seq, refers to a long list of judgements which have applied Articles 1002 et seq of the Civil Code regulating Interpretation of Contracts) It is these norms of interpretation which the Tribunal is bound to apply in its interpretation of the disputed clauses in the Share Sale and Purchase Agreement.*

*135. The starting point for an adjudicator is to attribute to the words of an agreement the meaning attached to them by usage at the time of the agreement with a view to an objective reading of the disputed clause. The words which the contracting parties use to articulate and express their intent are the prime keys available to an adjudicator to understand what the parties intended to achieve. If by giving to the words used their ordinary meaning, the contractual provision is clear, the contractual provision should be applied according to that meaning. It is therefore the words used in the context of the clause and the agreement as a whole that are the first principal determinants of the mutual intention of the contracting parties. The first rule of interpretation enunciated by the Civil Code (fn. 50 Article 1002 of the Civil Code) is in fact:*

"Where, by giving to the words of an agreement the meaning attached to them by usage at the time of the agreement, the terms of such agreement are clear, there shall be no room for interpretation."

*As has been repeatedly observed by the Court of Appeal,* "it is not the interpretation given by the parties to the agreement or the diverse meaning given by them to the agreement which matters but rather it is the objective reading by the judge who attributes to the words their ordinary meaning in the

context in which they were used by the contracting parties that matters." *(fn. 51 John Zammit et vs Michael Zammit Tabona proprio et nominee (Court of Appeal in its Superior Jurisdiction 28th February 1997); TGS Company Limited vs Polidano Brothers Limited (Court of Appeal, 18th July 2017))*

136.     Article 1003, which is the second rule of interpretation contemplated by the Civil Code does refer to the parties' intention by providing that:

"Where the literal meaning differs from the common intention of the parties as clearly evidenced by the whole of the agreement, preference shall be given to the intention of the parties".

*Article 1003 is not an open invitation to the Arbitral Tribunal to embark upon a search of the parties' intention in all circumstances. Neither does Article 1003 suggest that when, ex post, the parties disagree on the interpretation of their contractual stipulations, intention should prevail over the written agreement. The Maltese Courts have had occasion to point out that Article 1003 is applied in circumstances where it results in an unequivocal manner from a reading of the whole agreement that the words expressed in the written agreement do not reflect the intention of both contractual parties (and not merely the intention or view of one of the parties) as clearly evidenced by the whole of the agreement. In those circumstances, preference is given to the parties' common intention over the written word. (fn. 52 J. Bartolo et vs A. Petroni et noe (Court of Appeal, 7th October 1997). See also Vincent Aquilina vs Caterina Micallef (Court of Appeal 12th May 1997); Mary Lanfranco vs Salvatore Vella et (Court of Appeal, 6th October 2000); Avv. Leslie Grech noe vs Ivan Burridge pro et noe Court of Appeal, 14th January 2002). Indeed, reference to article 1003 should only be resorted to if by applying the rule in article 1002, the adjudicator cannot properly come to the conclusion that the language of the agreement is clear, and therefore needs to resort to further interpretative tools in order to determine the mutual will of the parties.*

3.     *APPLICATION OF THE RULES TO THE SHARE SALE AND PURCHASE AGREEMENT*

137.     *In the dispute under consideration, rather than a matter of disjoint between the parties' common intention and the words as expressed in Clause 2.3, the dispute revolves around a differing interpretation of the meaning and import of Clause 2.3.*

138.     *The disputed clause reads as follows. (Parts have been emboldened for emphasis only)*

> 2.3 The Parties hereby agree that pursuant to the conclusion of the transfer of shares contemplated herein and in recognition of their mutual desire for future co-operation, the Vendors, or any one of their respective affiliated entities as the case may be, undertake to appoint Purchaser Two as the EPC contractor in connection with future projects undertaken by them, or one of their respective affiliated entities as the case may be, **subject to the conclusion of an ad hoc contract/s for the purpose and the below conditions:**
>
> 2.3.1.        the Vendors hereby confirm that either one of them or one of their respective affiliated entitles, as the case may be, shall be investing in photovoltaic plants with a capacity of over 360M within three year from the Closing date and that the Vendors, or one of their respective affiliated entities as the case may be, shall appoint Purchasers as the EPC Contractor in connection with such project; and
>
> 2.3.2.        provided that the price of the EPC contract work and the relative terms of payment set by the Purchasers for the EPC work in question shall not be less than the then current market price/levels for comparable work.

*139.     Legal drafting is not a perfect science and it is the very imperfection of legal drafting that in most instances gives rise to disputes and the consequent need to interpret clauses in a contract. However imperfections in drafting are often the result of commercial negotiations with a view to achieve compromise and a balancing of interests. It is not the function of this Tribunal to upset that balance, if by attributing to the text and language used the common meaning attached to them by usage at the time of the agreement, it is satisfied that the mutual intent of the parties is clear.*

*The opening paragraph of clause 2.3 reads clearly enough; it is an undertaking by the Vendors or any one of their respective affiliated entities to appoint Purchaser Two as the EPC contractor in connection with future PV Investments, subject to the conclusion of an ad hoc contract. By attributing to the words used their ordinary meaning, one can only reasonably conclude that the undertaking to appoint Purchaser as an EPC contractor is a conditional undertaking; it is clearly stipulated as conditional upon the conclusion of a mutually agreed contract.*

*Nor is one able to argue convincingly that:*

*(i)       the Respondent, through that provision, effectively and unconditionally bound itself to grant "future" EPC contracts; rather, the Tribunal is of the view that the obligation to appoint "Purchaser Two" as an EPC Contractor is conditional on*

*(i) the Respondents actually making PV investments in the future; and (ii) the execution of an ad hoc contract for that purpose. To argue otherwise would be tantamount to ignoring the designation of Clauses 2.3.1 and 2.3.2 as "conditions";*

*(ii)     all of the principal terms of the ad hoc contract were agreed to, subject only to their crystallization in a written agreement. EPC contracts are complex agreements which include mutual rights and obligations which go far beyond what has been indicated in Clause 2.3. As to Claimants' submission that the Parties included in the EPC Clause all the components of the EPC contracts that they could possibly agree at the time, the fact that all the components of an EPC contract which could have been agreed at the time were expressly contemplated in Clause 2.3 does not, of itself, create a comprehensibly regulated obligation which is unconditional and specifically enforceable. The Tribunal cannot concur with this position. Indeed the Tribunal favours the view that in effect, the fundamental aspects of such an enforceable obligation such as (i) the specific contractual party, (ii) the precise object of the agreement, (iii) the price and (iv) the contract modalities are completely absent. Accordingly the Tribunal is of the view that it cannot be stated that Clause 2.3 of the Share Sale and Purchase Agreement contains all of the fundamental elements of an EPC contract, subject only to the formality of sign off.*

*140.     The* 'conclusion of an ad hoc contract' *is not the only conditionality contemplated by Clause 2.3, the opening paragraph of which suggests that there are an additional two* **"below conditions"**. *Faced with the clear designation of Clauses 2.3.1 and 2.3.2 as* "conditions", *the Tribunal is, on the basis of Article 1002 of the Civil Code, bound to interpret them as nothing more nor less than what the contracting parties themselves have called them –* **"conditions."** *There is no ambivalence, no ambiguity, in the designation of these clauses as conditions, and therefore the Tribunal cannot set aside the designation and construction of Clauses 2.3.1 and 2.3.2 as* "conditions" *and opt to accord preference to any purported* "intention" *that is not reflected in the* "literal" *meaning of the terms as expressed. Accordingly, the circumstances required for Article 1003 to trump Article 1002 are not evident.*

*Of the two* 'below conditions', *the first* 'condition' *is stipulated in terms of 2.3.1. The designation of 2.3.1 as a* **condition** *is not inconsequential from an interpretational point of view. Once 2.3.1 is stipulated as a condition, as the opening paragraph to 2.3 clearly spells out, then it would read as an undertaking by the Vendors that either one of them or one of their respective affiliated entitles, will appoint Purchaser Two as the EPC Contractor (subject to the conclusion of an*

*ad hoc contract) on condition that* "they shall be investing in a photovoltaic plants with a capacity of over 360M within three year from the Closing date." *The view propounded by Claimants (fn. 53 Para 124 of the Claimants' First Round Submissions) that the* "element of uncertainty is categorically and unequivocally excluded" *cannot be reconciled with the designation of 2.3.1 as one of the conditions to which the undertaking in terms of 2.3 is subject.*

*That being the case, then on the basis of Section 1058 (1) of the Civil Code, if the three year period lapses without Vendors, either one of them or their respective affiliated entities investing in a photovoltaic plants with a capacity of over 360M within three years from the Closing date, that condition would be deemed to have failed.*

*In terms of S.1058. (1)* "Where an obligation is contracted on condition that an event shall happen within an appointed time, such condition shall be deemed to have failed if the time expires without the event having happened."

*141.     The second 'condition' of Clause 2.3 stipulates that the price of the EPC contract work and the relative terms of payment set by the Purchasers for the EPC work in question shall not be less than the then current market price/levels for comparable work. The condition sets guidelines for price and terms of payment but cannot be construed as establishing the* "agreed price" *as suggested by Claimants. (fn. 54 Para 123 of Claimants' First Round Submissions) The price is as yet undetermined. Market conditions change over time and any intention to agree on price and terms of payment in line with market conditions at the time of a contract being executed, can only be construed as having established guidance for negotiations between the parties at a later stage; the parties could not envisage what those market conditions would be over the course of the three years contemplated in Clause 2.3 and therefore could never have had any actual price in mind. They left the matter open for further discussion and negotiation if the right circumstances presented themselves. The very words and context of Clause 2.3 clearly denote that it was clear or should have been clear to both parties that they would be required to enter into further negotiations with respect to the EPC contracts, in the event that Respondents made future PV investments.*

*In paragraph 116 of their Second Round Submissions SPI proffer the view that 2.3 is to be read in a manner that the obligation of the Vendors or their affiliated entities to appoint Purchaser Two as the EPC contractor is conditional upon the obligation of the Vendor itself to invest in in PV plants with a capacity of over 360MW within three years and to appoint SPI as EPC Contractor for those projects.*

Appell Inferjuri Numru: 79/2020 LM

*In this respect, Claimants state as follows:* "Indeed, if anything, it is the entry into
the specific EPC Contracts that is conditional upon the fulfilment by the SinSin
Funds of the direct, unconditional and unequivocal obligations set out in clause
2.3.1, that is, the obligations to (i) invest in PV plants with a capacity of over
360MW within three years; and (ii) appoint SPI as EPC Contractor for those
projects. The SinSin Funds' failure to invest in PV projects and to offer any EPC
contracts to SPI made the fulfilment of the condition they now seek to invoke
against SPI an impossibility."

*In this context, if condition 2.3.1 were to be severed in this manner from the rest
of the clause to be read, as suggested in para 116 of Claimants' Second Round
Submissions, in· such a manner so that the obligation of Vendor to appoint
Purchaser as EPC contractor is conditional upon the unconditional obligation of the
Vendor to (i) invest in PV plants with a capacity of over 360MW within three years;
and (ii) appoint SPI as EPC Contractor for those projects, the clause could fall foul
of Section 1056 of the Civil Code which provides as follows* "(1) Where an
obligation is contracted on a condition which makes the obligation depend solely
upon the will of the obligor, the obligation is null."

*142.    Respondents have pointed out that the EPC commitment was not raised
by Claimants during the negotiation of the Supplementary Agreement. No
unfavorable consequences or implications could or should be drawn from that
omission, even because at the time the three-year period was still running with a
remaining eighteen months or so to go. More pointedly, in support of their view
that Clause 2.3 was not intended as an unconditional and enforceable obligation,
Respondents sought to point out that it was not until the 9ᵗʰ November 2017 in a
letter sent by their Greek counsel and only as a reaction to the Notice of Default
and Notice of Enforcement Event moved by Respondents, that they formally
requested Respondents to fulfill the EPC obligation. Claimants have rebutted by
asserting that they actively requested fulfillment of the EPC Clause via
communications with Roger Ye. Though this informal goading, in lieu of a formal
intimation to perform may, on the face of it be difficult to reconcile with Claimants'
stand that to them the value of the unsecured EPC obligation ran into tens of
millions of Euro, no unfavorable legal consequences or implications could or should
be drawn from that omission even had it been established. It is also not to be
excluded that this approach may be attributed to cultural differences or strategic
considerations and, in any event, this omission is no impediment to claim
subsequently, even in view of Clause 11.1 of the Share Sale and Purchase
Agreement which provides as follows:*

"the failure of a Part to enforce or to exercise, at any time or for any period of time, any term of or any right arising under or pursuant to this Agreement does not constitute and shall not be construed as, a waiver of such term or right and shall in no affect that Party's right to enforce or exercise it later."

Context and position of clause 2.3

*143. In conjunction with the consideration as to whether Clause 2.3 is a conditional or an unconditional obligation, the Tribunal has also considered the argument submitted by Claimants' that the EPC Clause was agreed as an integral and fundamental ingredient of the financial provisions of the Share Sale and Purchase Agreement (fn. 55 Para 35 of the Claimants' First Round Submissions) as further corroborated by the relevance of the* 'location' *of 2.3 within Clause 2 entitled* 'Consideration for Sale Shares'. *Claimants argue that the inclusion of the EPC obligation within the Consideration Clause is highly relevant. In this respect, Claimants submit that* "it cannot be emphasized enough that the Parties chose to include this provision within clause 2 of the SPA which is that part of the SPA that deals with the Consideration for the Sale Shares. There can be no doubt that clause 2.3 is a fundamental ingredient of the pricing mechanism within the SPA, so that the financial rationale of the SPA is completely wiped out without it." *(fn. 56 Para 11 of the Claimants' First Round Submissions)*

*Claimants have argued that the relevance of the context in which the clause was inserted is pointing, even in view of Article 1008 of the Civil Code which provides that* "all the clauses of a contract must be interpreted with reference to one another, giving to each clause the meaning resulting from the whole instrument."

*144. Context is of course key in the interpretation of contractual clauses; indeed interpretation and construction always depend on context. Context however does not and should not be considered as synonymous to location. Where a clause is located in a contract may have a material significance to context, but on its own will not determine context or meaning. Article 1008 of the Civil Code is indeed relevant for a proper interpretation of the disputed Clause. However, the Tribunal finds that there is no compelling grounding for the Claimants' argument based simply on the inclusion of Clause 2.3 under the general heading* 'Consideration for Sale Shares'. *A reading of the entirety of Clause 2 of the Share Sale and Purchase Agreement and of the whole of the agreement, reveals no language to suggest or evidence, that part of the stipulated consideration is* a quid pro quo *for the EPC obligation.*

*Indeed, the Tribunal finds that the more compelling view is that it is Clause 2.1 that unequivocally determines the consideration for the shares. To the contrary of Claimants' argument, Clause 2.1 clearly states that the* "Parties agree that **the total consideration** payable by both Purchasers to the Vendors **for the purchase of the Sale Shares** *(emphasis added)* under this Agreement shall be an amount equivalent to seventy million, six hundred sixty thousand Euro (€70,660,000)." *From a reading of 2.1, it is clear that the consideration contemplated is for the "purchase of Sale Shares." Though Clause 2.3 may give rise to a number of interpretational issues, the same cannot be said for Clause 2.1 which is clear and unequivocal and leaves no room for interpretation.*

*145. The express and exclusive nexus of the price to the Sale Shares in Clause 2.1, the absence of any apportionment of the consideration to or for the EPC obligation, the absence of a deferred payment obligation for partial settlement of price to coincide with the performance of the EPC obligation or milestones in respect thereof, or the absence of any form of security for the fulfillment of the EPC obligation are all considerations which militate against the interpretation that the seventy million, six hundred sixty thousand Euro (€70,660,000) includes a component as consideration for the EPC obligation.*

*146. Neither does the text or location of the wording in Clause 2.3.1 necessarily bear out SPI's submissions (echoing Mr. Peng's words (fn. 57 Para 8 of Mr. Peng's First Affidavit) that without the EPC clause* "SPI could not and would never have signed the SPA", *whether in the Consideration Clause or in Warranties Clause. The Vendors do acknowledge at Clause 4.3.1 that the Purchasers have entered into the Share Sale and Purchase Agreement in reliance upon the Warranties but Clause 2.3.1 or wording to that effect is not stipulated as one of the Warranties.*

The company announcement and its significance

SPI *have adduced evidence to the effect that their understanding was that they had secured a firm and binding EPC commitment. Reference is made in fact to Exhibit XDP17 attached to Mr Peng's affidavit in terms of which it is recorded that he stated* …. We will sign this Agreement with SinSin, a leading company in China to acquire their 26.57 MW PV projects base in Greece today or tomorrow. In the meantime, they will authorize 360MW PV Projects EPC Contracts During the next 3 years [...] this is a big milestone that SPI achieved. [...] In the meantime, build a strong relation with SinSin. It will get more support from Sinsin reosources in future SPI growth."

*Mr. Peng could very well have assumed that he had secured, for the SPI Group, a series of EPC contracts for PV Projects with an output of at least 360 MW. He could indeed have had several reasons for that communication and it is not the Tribunal's task to determine what those reasons could have been.  For the purposes of the resolution of this dispute, what is critically relevant is not what Mr. Peng assumed and communicated internally a few days before the Share Sale and Purchase Agreement but what was agreed to in the Share Sale and Purchase Agreement itself.*

*147.     Claimants have also argued that the discussion and subsequent agreement to raise the 300MW commitment to 360MW is also indicative that the EPC Clause was binding. (fn. 58 Para of Claimants' First Round Submissions).  In the Tribunal's view, the critical point under consideration is not whether the clause is binding or not but rather whether the obligation is conditional or unconditional, and in the case of a conditional obligation, whether the conditions were satisfied. It is conceded that there would have not been much sense to renegotiate the megawattage if the matter were entirely discretionary and the renegotiation is indicative that Claimants did not regard this as a discretionary matter. However, by attributing utility and/or value to a 360MW commitment rather than a 300MW commitment, one cannot reasonably infer an unconditional obligation. The added mega wattage is still consistent with the thesis in favour of a binding conditional (as against a non-binding or discretionary) commitment, in the sense that in the event of the verification of the conditions upon which the obligation was contingent, there would have been added benefit in an increased megawattage obligation.*

*148.     Both Claimants and Respondents have referred to the public announcement made by SPI on the OTCBB and its relevance for the purpose of interpreting the disputed clause. Respondents have argued that the language of the public announcement, particularly use of the word "may" is evidence of a 'discretion' and not an unconditional obligation. (fn. 59 Para 57 of the Respondents First Round Submissions) Claimants have on the other hand argued that the public announcement makes it "abundantly clear that the SinSin transaction was perceived to be the beginning of a strategic collaboration in which SPI would act as SinSin's dedicated EPC partner." (fn. 60 Para 53 of the Claimants' First Round Submissions)*

*In the Tribunal's opinion the Company Announcement cannot be a decisive factor in the determination of the mutual intent of the parties to the contract and in the interpretation of Clause 2.3. The Tribunal however does not consider it as evidence*

*of a discretion, which should be differentiated from an unconditional obligation. A discretion imposes no obligation, whether conditional or unconditional. A conditional obligation, on the other hand, brings on a binding enforceable obligation, once the condition verifies itself. Neither does the public announcement attest to an intention to appoint SPI as SinSin's dedicated EPC partner. In the Tribunal's view, the announcement could not be couched in definitive unconditional wording, not because there was a discretion on SinSin's part whether to appoint SPI or their affiliated entities as EPC contractors but because the obligation was contingent upon the verification of a number of conditions. The divergent submissions on the interpretation of the Company Announcement have not been critical for the Tribunal's deliberations on the meaning of Clause 2.3, however, if at all, the announcement itself resonates the view that Clause 2.3 cannot be read as an unconditional obligation. To couch the announcement in unconditional terms would in fact have been a misrepresentation of Clause 2.3 and may have been tantamount to misleading the market.*

### 4.    OTHER RULES ON INTERPRETATION OF CONTRACTS

*149.    The Arbitral Tribunal finds that Clause 2.3 reads and was intended by the contracting parties as a conditional obligation. In its analysis, the Tribunal finds further comfort in other rules of interpretation which dispel any lingering doubts as to the alleged unconditionality of Clause 2.3 in favour of the obligee.*

*Section 1364 of the Civil Code, regulating sale, provides that* **"Any provisions of a contract of sale which are doubtful or ambiguous shall be interpreted against the seller or the buyer according to the rules of interpretation relating to contracts in general."** *The rules of interpretation relating to contracts in general do in fact contemplate an express provision to be applied for the resolution of doubts, if any. (fn. 61 Giovanni Bugeja vs Carmelo Pisani (Commercial Court, 14th November 1951)*

*Section 1009 of the Civil Code provides that* **"in case of doubt, the agreement shall be interpreted against the obligee and in favour of the obligor."** *Accordingly, not only do Claimants have a more arduous probative task as the onus of proof lies with them* (onus probandi incumbit ei qui dicit); *additionally, as an obligee, Article 1009 of the Civil Code tilts the balance of any possible doubtful interpretation against them. In the absence of a clear interpretation of the contract, any doubt or ambiguity as to whether Clause 2.3 imposes an unconditional obligation to appoint an EPC contractor would, on the basis of Section 1009, have to be resolved in favour of the Respondents as the obligors.*

## 5.    THE ARGUMENT BASED ON ARTICLE 1004 OF THE CIVIL CODE

*150.    Claimants have referred to Article 1004 of the Civil Code (fn. 62 Para 53 of the Claimants' First Round Submissions) in terms of which* "when a clause is susceptible of two meanings, it must be construed in the meaning in which it can have some effect rather than in that in which it can produce none." *In the view of the Tribunal, the reference to Article 1004 is, in this context, misplaced. An interpretation of Clause 2.3 as a conditional obligation is not an interpretation that would render clause 2.3 without effect, but one that would have effect only subject to the satisfaction of one or more conditions. Clearly one has to distinguish between an interpretation which does not produce an effect; and one where no effect is produced because the conditions did not verify themselves or remained unsatisfied. The non-fulfillment of the conditionalities with the consequence that the obligation did not have a resultant effect does not mean that the clause was interpreted in a manner which had no effect. In this sense therefore Article 1004 cannot be validly invoked to favour an unconditional undertaking in lieu of a conditional undertaking or to tip the balance from conditionality to unconditionality; that would be re-writing the contract and displacing the will of the parties as expressed in Clause 2.3.*

## 6.    THE "CONTRA PROFERENTEM" RULE ARGUMENT

*151.    The Tribunal has also considered the Claimants' arguments that, given the divergent interpretations of the parties, the benefit of doubt, rather than being accorded to the Respondents, should be accorded to the Claimants on the basis of the* "Contra Proferentem" *Rule. (fn. 63 Paragraphs 138-145 of the Claimants' Second Round Submissions) This argument is predicated on the assumption that the* Contra Proferentem *rule forms part of Maltese law (fn. 64 Para 138 of the Claimants Second Round Submissions) or that it exists as a* 'general rule of law' independently *of the context of applicable national law. (fn. 65 Para 143 of Claimants' Second Round Submissions) Claimants submit that the rule has been* "recognized by Maltese law and given practical application by the Maltese courts in the interpretation of contracts, particularly in the context of contracts of insurance."

*152.    The judgements cited by Claimants do invoke the* Contra Proferentem *rule but do not constitute authority to support the view that in the matter under consideration, Article 1009 is or can be thereby displaced and the doubt is to be resolved in favour of the Claimants, rather than the Respondents. The cited judgements refer to (i) contracts of insurance, (ii) in circumstances where the*

"contract is drawn up and prepared exclusively by the insurer," *(fn. 66 GasanMamo Insurance Limited vs Alexander Jan Edward Van Reeven et (First Hall, Civil Court, 8th May 2017) (iii) and in any event, judicial decisions do not make law, though they do have interpretative value.*

*153. Judgements of the Maltese Courts do not provide any judicial interpretative trend to suggest that the* Contra Proferentem *rule is one of general application. Neither can it be concluded that the restricted circumstances within which the* Contra Proferentem *rule has been limitedly invoked domestically are applicable in the matter under consideration. The* Contra Proferentem *rule has admittedly found its way into a number of systems of law, including those of a Roman and/or French tradition, the origins of which are also shared by Maltese Civil law. When adopted, the rule is ordinarily applied in the context of standard form or consumer contracts where there is disparity in the bargaining positions of contracting parties. There is no doubt that the Share Sale and Purchase Agreement is not a standard form or a consumer contract. There is evidence to the effect that the EPC Clause was requested by Claimants (fn. 67 Para 98 of Mr Ye's witness statement dated 18th February 2019) and not imposed by Respondents. Both parties had access to their respective legal counsel (fn. 68 Para 216 (c) of the Respondents' First Round Submissions and line 6 et seq of Page 131 of Mr. Peng's cross examination during the 29th November 2018 hearing) and there has been no suggestion that in the negotiations leading to the execution of the Share Sale and Purchase Agreement, there was a disproportionate imbalance in the bargaining powers of the contractual parties. Notwithstanding any financial disparity between the Claimants and Respondents, each of the contracting parties were free to make their own decisions as to whether to proceed to sign up to the Share Sale and Purchase Agreement.*

*154. Accordingly, there is no statutory or judicial authority to support Claimants' view that, on the basis of the* Contra Proferentem *'rule', any doubt in interpretation of Clause 2.3 is to be resolved in their favour. On the contrary, on the basis of an express statutory provision, the doubt is, in terms of Article 1009 of the Civil Code, to be resolved in favour of the obligor, that is, the Respondents.*

7.    *ALLEGED BREACH OF CLAUSE 14*

*155. Claimants have argued (fn. 69 Para 141 of the Claimants' First Round Submissions) that Respondents have also breached clause 14 of the Share Sale and Purchase Agreement which provides that;*

"Each Party shall co-operate with the others and execute and deliver to the others such other instruments and documents and take such other actions as may be reasonably requested from time to time in order to carry out, evidence and confirm their rights and the intended purpose of this Agreement."

*156.     Clause 14 and clauses of similar wording are not uncommon and are often referred to as Further Assurance Clauses. A Further Assurance Clause is a boilerplate clause commonly used to require parties to act cooperatively to complete any actions, including the execution of instruments and documents and / or the taking of such action which may not have necessarily been anticipated or expressly contemplated at drafting stage or contract execution stage and which is reasonably requested to carry out the intent of the agreement or to implement its provisions. A Further Assurance Clause is however predicated on the existence of an underlying legal obligation or obligations. Accordingly, though broadly expressed, a Further Assurance Clause cannot be invoked to create or infer an independent legal obligation but is of relevance to the completion of an existing underlying obligation. In the absence of a finding that 2.3 stipulates an unconditional obligation to appoint Purchasers as the EPC contractor in connection with future projects, the Tribunal is not of the view that Clause 14 has been breached by Respondents.*

### 8.     THE SUBSEQUENT DISPOSAL OF SHARES

*157.     In the Statement of Claim, the alleged breach of Clause 2.3 is preceded by a reference to a* "disregard for the long term strategic partnership envisaged between the parties" *in view of the Respondents' disposal of more than 65% of their shares in SPI Energy Co within just a few months from the date of signature of the SPA, which disposal resulted in the realization* "of profit of almost US\$30,000,000 in this short time."

*158.     The Tribunal has considered whether the disposal of shares is in breach of the Agreement and/or whether there was an enforceable obligation which bound Respondents to forge* "a long term strategic partnership" *with Claimants. The only reference to a* ''mutual desire for future co-operation" *is made within the context of Clause 2.3. Indeed it is expressed as a* 'desire', *which the Tribunal cannot quite consider as a contractual obligation and in any event that* 'desire' *cannot be considered outside of the ambit of Clause 2.3, the interpretation of which has been considered and determined above.*

*The Share Sale and Purchase Agreement expressly stipulates a lock-up period of three months. In the context of a specific term expressly set out in that agreement,*

*the Tribunal can hardly not consider that the Respondents were entirely within their contractual rights to dispose of the shares or any part of them, upon expiry of the lock-up period. Accordingly, the Tribunal finds that the sale of shares in SPI Energy Co, following the expiry of the lock-up period, was not in breach of the Agreement. Neither can it be concluded that the Share Sale and Purchase Agreement, whether by reference to future co-operation in 2.3 or otherwise, constituted an enforceable obligation to forge a long term strategic partnership or mutual co-operation beyond the ambit of any enforceable obligations contracted in the Share Sale Purchase Agreement.*

*9.     THE ISSUE OF BAD FAITH*

*159.     Having concluded that on the basis of the rules of interpretation enunciated by the Maltese Civil Code, Respondents did not breach their obligations in terms of the Share Sale and Purchase Agreement, the Tribunal also considered the allegations of bad faith raised by the Claimants, as no contractual party should be allowed to take advantage of its own bad faith. Claimants alleged that Respondents acted in bad faith in the negotiations preceding the execution of the Share Sale and Purchase Agreement as well as in its implementation (fn. 70 Para 139 of Claimants' first Round Submissions "SinSin acted in bad faith both during the course of the negotiations, by withholding from SPI the fact that they were internally treating the EPC clause as non-binding, and after the signature of the SPA, by ignoring completely and absolutely their obligations under the EPC Clause) and that accordingly their "manifest bad faith" ..... preclude them (SinSin) from enforcing their rights under the same agreements (the SPA and the Supplementary Agreements). (fn. 71 Para 140 of the Claimants; First Round Submission).*

*160.     The burden of proof of bad faith clearly lies on whosoever alleges it. Once Claimants have alleged bad faith, the onus of proof within the degree required of law, lies on them. It must be stated at the outset that for any allegation of bad faith to be substantiated, there must be clear and convincing evidence to the degree required by law of dishonesty in one's conduct, falsity in one's behaviour, or, as has been alleged in the matter under consideration, of a deliberate refusal to perform a contractual duty or obligation. (fn. 72 In Borg vs Grech Appell Court of Appeal, 30th January 1869.* "Mala fides si deve desumere da circostanze ineluttabili ed affatto non equivoche")

*161.     The Claimants have argued that the late introduction of the EPC clause was nothing more than a* "lure" *or a* "bait" *or a* "ruse". *All three terms imply deception or trickery of sorts, in order to achieve a desired objective. The reference to* "lure", "bait" *or* "ruse" *recurs in a number of Witness Statements submitted in*

*evidence by Claimants, (fn. 73 Mr. Xiaofeng Peng, Mr. Hoong Kheong Cheong, Mr. Mario Zen) though pointedly, in cross examination, Mr. Peng did not convince the Tribunal that he understood the term itself. (fn. 74 Line 25 et seq at Page 37 of Mr. Peng's cross-examination during the 29th November hearing) Even if one were to attribute Mr. Peng's unconvincing reply in cross-examination to linguistic difficulties, convincing evidence of deceptive behaviour or dishonest conduct of sorts is required in order to satisfy the probative burden required to sustain the claim of bad faith or to substantiate the allegation that the EPC clause was a* "lure" *a* "bait" *or a* "ruse". *For this purpose, the Tribunal has examined all of the evidence submitted by Claimants in respect of the negotiation, execution and implementation of the Share Sale and Purchase Agreement as well as the Supplementary Agreement.*

*162.     The Tribunal does not endorse the view propounded by Claimants (fn. 75 Para 56 of Claimants' First Round Submissions) that the so called EPC teasers, constitute evidence of* "bad faith" *and* "deceptive intent" *or that Documents YDJ-50 and YDJ-51 are tantamount to* "compelling evidence of this ruse" *(fn. 76 Para 91 of Claimants' First Round Submissions) or the* "greatest attestation of the bad faith perpetrated by SinSin" *(fn. 77 Para 94 of Claimants' First Round Submissions) Neither is the Tribunal satisfied that Claimants have proven that the Respondents intentionally withheld from Claimants the* "fact" *(disputed by Respondents) that they internally regarded the EPC clause as non-binding. (fn. 78 Para 139 of Claimants' First Round Submissions)  Subjecting an obligation to a conditionality which subsequently does not verify itself need not necessarily infer or imply that* 'ab initio' *Respondents did not attribute binding effect to the EPC clause.*

*Claimants have invoked what, in their view, is subsequent contractual non-performance as evidence of pre-existing bad faith. (fn. 79 Para 136 of Claimants' First Round Submissions) Claimants have in fact submitted that* "It has been shown that SinSin and their affiliated entities never entered into the investments in PV plants after the signature of the SPA nor did they engage in the award of any EPC contracts whatsoever, whether to SPI or to anyone else. This evidences that SinSin never intended to comply with the provisions of the EPC Clause ......".

*In the view of the Tribunal, the statement* "This evidences that SinSin never intended to comply with the provisions of the EPC Clause ......" *is a* non sequitur *as subsequent non-performance does not suffice to prove pre-existing bad faith.*

*163.     In addition to alleging bad faith* in contrahendo, *Claimants have also alleged bad faith of the Respondents in performance. The Tribunal is of the view*

*that non-performance of an established contractual obligation, as of itself, is not necessarily tantamount to or conclusive evidence of bad faith. Even if one were to set aside Respondents thesis (disputed by Claimants) that (i)* "the Sin Sin Funds and/or its affiliates have indeed invested in PV plants" *(fn. 80 Para 93 of Respondents' Second Round Submissions) and (ii) the Almaden Fund Project and Chiping City Project were offered to Claimants (fn. 81 Para 53 and 73 of Respondents' Second Round Submissions), in the absence of satisfactory evidence of behaviour which is dishonest, deceptive or intentionally incorrect, one cannot necessarily infer or imply bad faith merely on the basis of purported non-performance. The degree of proof required for a claim of bad faith to be sustained in a court of law exceeds conjectures, argumentation or mere inferences from contractual non-performance. The observation is being made without prejudice to the Tribunals' finding that Claimants were not in fact in breach of contract.*

### XV.    CONCLUSIONS

*164.    In conclusion, (i) the Tribunal finds that, on the basis of applicable law, including the application of Maltese law rules on interpretation, it cannot be concluded that Respondents are in breach of their contractual obligations in terms of the Share Sale and Purchase Agreement; (ii) the Tribunal does not find convincing evidence to the degree required by law to support Claimant's view that SinSin acted in bad faith either at negotiation stage, execution stage or contract implementation stage, whether in respect of the Share Sale and Purchase Agreement or the Supplementary Agreement".*

## L-Appell

6.    L-appellanti ntavolaw l-appell tagħhom fit-12 ta' Novembru, 2020 fejn qegħdin jitolbu lil din il-Qorti sabiex:

*"...jogħġobha tilqa' dan ir-rikors tal-appell u filwaqt li tħassar, twarrab u tirrevoka l-lodo arbitrali mogħti fid-29 ta' Ottubru 2020 fl-atti tal-Arbitragg l.5320/2018 fl-ismijiet premessi, taqta' u tiddeciedi billi tiċħad l-eċċezzjonijiet kollha tas-soċjetajiet intimati appellati kif dedotti fl-*Istatement of Defence *tagħhom filwaqt illi tilqa' t-talbiet kollha tas-soċjetajiet esponenti appellanti hekk kif dedotti fl-*Istatement of Claim *tagħhom u ċioe:*

Appell Inferjuri Numru: 79/2020 LM

> 1) *Tiddikjara illi l-intimati kissru l-obbligi kuntrattwali tagħhom taħt il-*Share
>    Sale & Purchase Agreement *datat 6 ta' Settembru 2014;*
>
> 2) *Tiddikjara illi l-intimati huma solidament responsabbli għad-danni
>    konsegwenzjali kawżati lis-soċjetajiet esponenti;*
>
> 3) *Tillikwida d-danni hekk sofferti mis-soċjetajiet esponenti jew tibgħat id-
>    deċiżjoni tagħha lit-Tribunal Arbitrali* de quo *a tenur tal-artikolu 71(2)(ċ) tal-
>    Att dwar l-Arbitraġġ sabiex jillikwida hu l-istess danni abbażi tal-provi u
>    rapporti tekniċi kollha prodotti fil-kawża;*
>
> 4) *Tordna lill-intimati jħallsu lis-soċjetajiet esponenti id-danni hekk likwidati;*
>
> 5) *Tordna lill-intimati sabiex iħallsu imgħaxijiet legali fuq l-istess ammont ta'
>    danni hekk likwidat mid-data tas-sentenza tagħha sad-data tal-pagament
>    effettiv; u*
>
> 6) *Tordna lill-intimati iħallsu l-ispejjeż kollha tal-arbitraġġ hekk kif likwidati fil-
>    lodo arbitrali appellat inkluż l-ispejjez tal-Appell odjern."*

## Ir-Risposta tal-Appell

7.    L-appellati wieġbu permezz ta' risposta ippreżentata fl-1 ta' Diċembru,
2020, fejn issottomettew li għandu jiġi miċħud l-appell interpost mill-appellanti,
u dan għar-raġunijiet li huma jfissru fl-imsemmija risposta fosthom dawk ta'
natura preliminari, u li huma: (a) il-liġi ma kienet takkorda l-ebda dritt t'appell
minn arbitraġġ internazzjonali sakemm il-partijiet ma jkunux irriżervaw dak id-
dritt ta' appell fil-klawsola kompromissorja ta' bejniethom; (b) il-partijiet
permezz tal-klawsola 16.2 tal-SPA kienu eskludew id-dritt t'appell; (ċ) l-appell
sar fuq apprezzament ta' fatti u mhux ta' liġi.

## Konsiderazzjonijiet ta' din il-Qorti

8.    Din il-Qorti ser tgħaddi qabel xejn sabiex tikkonsidra l-kwistjoni tal-
ammissibilità o meno tal-appell odjern, sollevata fis-sottomissjonijiet

preliminari tal-appellati, illi jekk jinstabu li huma validi għandhom iġibu fix-xejn l-imsemmi appell. Il-Qorti tibda billi tikkonsidra dak li ġie patwit bejn il-partijiet[1], u hawn tagħmel riferiment għall-klawsola 16.2 tax-*Share Sale & Purchase Agreement* li ġie esebit mill-appellanti bħala Dok. NVF1.

9.      Għandu jingħad qabel xejn li l-klawsola 16.1 titlob li l-ftehim għandu jiġi regolat u nterpretat skont il-liġi Maltija. Il-klawsola sussegwenti 16.2 torbot lill-partijiet sabiex jippreżentaw kull vertenza li tista' tinqala' bejniethom fir-rigward tal-istess ftehim għall-proċeduri ta' arbitraġġ hawn Malta sabiex din tiġi deċiża permezz ta' tliet arbitri, u dan filwaqt li l-istess klawsola tipprovdi wkoll kif għandhom jiġu magħżula l-imsemmija arbitri.

10.     Permezz tal-istess klawsola 16.2, il-partijiet ftehmu li *"[t]he award of the arbitrators shall be final and binding upon the Parties"*. Jirriżulta minn dak li tipprovdi għalih din il-klawsola, li d-dritt tal-appell ġie espressament eskluż mill-partijiet b'mod ċar u inekwivoku, tant u hekk li m'hemm l-ebda dubju dwar dik li kienet l-intenzjoni tagħhom. Għalhekk il-Qorti tikkunsidra li kienu l-partijiet stess li rrinunzjaw għad-dritt tagħhom ta' appell minn kull lodo arbitrali li seta' jingħata mit-Tribunal f'każ fejn jinqala' xi diżgwid bejniethom, u għalhekk it-tentattiv tal-appellanti mill-ewwel kien ser ifalli biċ-ċert, tant li ma tista' bl-ebda mod tifhem kif l-appellanti setgħu jikkonsidraw li din il-Qorti kellha xi setgħa li tisma' u tiddeċiedi l-appell tagħhom. Tqis li skont il-liġi Maltija, li l-partijiet xtaqu li għandha tirregola l-ftehim ta' bejniethom, u senjatament l-artikolu 992 tal-Kodiċi Ċivili, tipprovdi li kuntratt għandu s-saħħa ta' liġi bejn il-partijiet u li huma

---

[1] Hawn il-Qorti qegħda tieħu in konsiderazzjoni li s-soċjetà appellanta SPI Energy Co. Ltd hija s-suċċessur ta' Solar Power Inc., li dehret fuq ix-*Share Sale & Purchase Agreement.*

biss l-istess partijiet li jistgħu iħassruh. Għaldaqstant sakemm il-ftehim ta' bejn il-partijiet huwa dak li hu, din il-Qorti ma tistax tilqa' quddiemha appell minn xi parti.

## Decide

Għar-raġunijiet premessi l-Qorti tiddikjara l-appell bħala irritu u null u tastjeni milli tieħu konjizzjoni ulterjuri tiegħu.

L-ispejjeż ta' l-imsemmi lodo arbitrali jibqgħu kif deċiżi mit-Tribunal, filwaqt li dawk tal-appell odjern għandhom jitħallsu mill-appellanti.

Moqrija.

Onor. Dr Lawrence Mintoff LL.D.
Imħallef

Rosemarie Calleja
Deputat Reġistratur

Vera Kopja

Rose Marie Vella
Deputat Reġistratur